# EXHIBIT A

**VIRGINIA:**

## IN THE CIRCUIT COURT OF LOUDOUN COUNTY

EPICERIE CIGAR RETAIL SHOP LLC.    :

    Plaintiff,    :

    v.    :    Case No.: CL26-2555

**CASCADES STATION LLC**    :
Serve:  Registered Agent    :
    C T Corporation System    :
    4701 Cox Rd. Suite 285.    :
    Glen Allen, VA 23060    :
        :
**BEMOBILE, INC.**    :
Serve:  Registered Agent    :
    C T Corporation System    :
    4701 Cox Rd. Suite 285.    :
    Glen Allen, VA 23060    :
        :
    Defendants.    :

## COMPLAINT

**COMES NOW**, Plaintiff, Epicerie Cigar Retail Shop, LLC ("Plaintiff" or "Epiceri"or "Tenant"), by counsel, and brings this Complaint against Defendants Cascades Station LLC., ("Cascades" or "Landlord") and BeMobile, Inc., ("Bemobile" or "Verizon"), for breach of contract, conversion, statutory business conspiracy, tortious interference with business expectancy, common-law civil conspiracy, and detinue, arising from events pertaining to the unjust termination of Plaintiff's commercial business lease located at 21399 Epicerie Plaza, Sterling VA 20164 #B135 (the "Property" or "Unit") and reletting to BeMobile, Inc.. This complaint states as follows:

## PARTIES

1. Plaintiff Epicerie Cigar Retail Shop, LLC is a Virginia limited liability company with its principal place of business at 430 Conner Grant Rd, New Bern, NC, 28562.

2. Defendant Cascades Station LLC is a Delaware limited liability company authorized to conduct business in Virginia, with its principal place of business at 11501 Northlake Dr, Cincinnati, OH, 45249 and with a registered office at 4701 Cox Rd Ste 285, Glen Allen, VA, 23060.

3. Defendant BeMobile, Inc., is a North Dakota corporation authorized to do business in Virginia, with its principal place of business at 2100 S Columbia RD Ste 214, Grand Forks, ND, 58201 with a registered office at 4701 Cox Rd Ste 285, Glen Allen, VA, 23060.

## JURISDICTION AND VENUE

4. Jurisdiction is proper under Va. Code § 17.1-513 as the amount in controversy exceeds $4,500.

5. Venue is proper under Va. Code § 8.01-262 because the property subject to the lease and the events giving rise to this claim occurred in Loudoun County, Virginia.

## FACTS

6. On October 25, 2022, Plaintiff and Cascades entered into a written ten-year commercial lease (the "Lease") for Unit B135 at the Cascades Overlook shopping center, approximately 1,680 square feet, located at 21399 Epicerie Plaza, Sterling, Virginia 20164 (the "Property"). A true and accurate copy of the Lease is attached hereto as **Exhibit A.**

7. The Lease set out a fixed minimum rent schedule (monthly installments escalating from $6,300 to $8,219.40 over the 120-month term) and initial estimated monthly CAM/taxes/insurance charges.

8.      Plaintiff paid a $7,616.00 security deposit and first month's rent upon execution of the Lease.

9.      The Lease granted two five-year renewal options, subject to conditions, evidencing Plaintiff's long-term leasehold and business expectancy at the Property.

10.      The permitted use is "the operation of a high-end retail cigar shop selling cigars and tobacco, and related cigar and tobacco accessories" (a term the Lease does not define). The clause expressly permits "ancillary and incidental" related products, including nicotine vapor accessories and CBD products derived only from hemp in compliance with law; it also lists categories of prohibited products and "head shop" items.

11.      Section 25 of the Lease (Default and Remedies) provides the Plaintiff with a 10-day cure period after notice written notice of default.

12.      Plaintiff took possession of the property and invested significant sums to design and build a high-end cigar shop.

13.      Plaintiff installed marble floors, ceilings, custom walls, electrical systems, cashier counter, displays and showcases, point of sale system, security cameras, ADT security system, TV displays, and 20 feet by 20 feet climate-controlled cigar room by expending $90,000.00.

14.      The Landlord and its management inspected the Unit and approved for the Unit for opening.

15.      Plaintiff opened for business and continuously operated under the tradename "Smoky Shop & More."

16.      Plaintiff stocked its cigar shop with luxury and major cigar brands, displaying the cigars from floor to ceiling stacked on 24 shelves 8 feet high in its cigar room. Plaintiff sold luxury cigars ranging from $100-$200 a cigar.

17. Plaintiff stocked, displayed, and sold hundreds of vape and tobacco products monthly on a revolving inventory.

18. Plaintiff's business started to grow day-by-day, and the Landlord's management regularly visited, greeted, looked around the Unit, and complimented the Plaintiff on its cigar shop.

19. The growth of Plaintiff's business attracted some bad actors, and the Unit experienced five attempted break-ins, where the thieves attempted to smash through the Unit's front facing glass.

20. Plaintiff installed an automated, remote-controlled steel security gate at a cost of approximately $23,000 to protect its inventory, staff, and customers. This investment was made in good faith to safeguard the business and preserve the leased premises.

21. Plaintiff's sales and revenue doubled year-by-year, and Plaintiff made all its rent payments to Cascades on time without any problems or complaints from Cascades.

22. Plaintiff's customers consistently complimented the luxury displays, quality of selection and left 5-star reviews for the cigar shop.

23. The Landlord continued to regularly stop by, chit chatted, looked around the Unit, and complimented the Plaintiff on its cigar shop.

24. In or about Summer of 2024, over a few different occasions, individuals wearing Verizon shirts visited the store and browsed around without buying anything and asked the Plaintiff's staff peculiar questions such how much revenue the business was generating, how long the cigar shop had been there, whether the Plaintiff was experiencing any financial difficulties and had any plans to relocate or shut its business down.

25.    The visits from Verizon wearing shirt individuals continued for some time until October 2024. In one visit the individual stated that they were scouting for a location in the plaza for a new Verizon store.

26.    On October 11, 2024 at about 10:00AM, the Landlord contacted Plaintiff's manager Karima Elouahidy by phone and demanded that certain products (kratom and glass pipes) on display be removed from business, and in the same phone call the Landlord stated that if the business was struggling, the Landlord "had someone who would by the business."

27.    The Plaintiff rejected the Landlord's suggestion to sell the business and by 10:44AM removed the kratom and glass pipes and sent the Landlord a text message with pictures of the display evidencing the removal of the products that Landlord had objections with. A true and accurate copy of the text message with pictures is attached hereto as **Exhibit B**. The Landlord replied confirming that the text message was related to the Epicerie store.

28.    Shockingly, on October 21, 2024, Defendant's management agent (Phillips Edison & Company) issued a written Notice of Tenant Default, asserting that "Tenant shall not:… sell any products classified as kratom, kava,…" and that Plaintiff's "present use" violated the Permitted Use clause and stating "pursuant to Section 25, Tenant shall cure such defaults within ten (10) days after receipt of this Notice. Failure to cure… will result in termination."

29.    Plaintiff was confused as the Plaintiff had promptly removed the products in question on October 11, 2024 by 10:44AM, whereas the written notice was dated 10 days after the fact on October 21, 2024.

30.    Plaintiff had promptly removed products identified by management and uploaded texted photographs on October 11, 2024 to document compliance. Plaintiff attempted to contact the Landlord without success. Plaintiff messaged management using the DashComm tenant

portal and re-uploaded the October 11, 2024 10:44AM photos to the portal and inquired, "Why are we still in violation? We took everything from the shelves... I uploaded the proof (pictures taken on October 11, 2024)." After the message, the "Compliance" tab status change to "Pending." A true and accurate copy of the DashComm tenant portal is attached hereto as **Exhibit D.**

31.    Notwithstanding Plaintiff's cure, 44 minutes after receiving a phone call from the Landlord on October 11, 2024 related to the removal of the products, on November 11, 2024, the Tenant received an email on November 11, 2024 at around 10:59 AM stating:

"My name is Amanda Riggs. I am in the legal department at Phillips Edison, the Landlord of Cascades Station in Sterling, VA.

On October 21, 2024, Tenant was delivered a Notice of Default for violating Tenant's Permitted Use provision. Pursuant to the Lease, Tenant's Permitted Use of the Premises is strictly limited to, "the operation of a high-end retail cigar shop selling cigars and tobacco, and related cigar and tobacco accessories, all in compliance with Governing Law, and for no other use."

Despite being notified of such default, Tenant's present use of the Premises continues to be in violation of the Permitted Use provision of the Lease. Tenant was to cure said default within 10-day of receipt.

Under such continued default, Landlord is hereby exercising its right to terminate the Lease. As part of such termination, Tenant will pay to Landlord a termination fee of $39,000.00. This $39,000.00 represents 6 months of base rent ($39,128.60) rounded down to an even dollar amount.

Tenant has 14-days to sign the Lease Termination Agreement and remit payment and vacate the Premises accordingly. Otherwise, Landlord is prepared to purse legal action."

A true and accurate copy of the Termination Email is attached hereto as **Exhibit E.**

32.    The Plaintiff continued to plead and reason with the Landlord as to what additional objections or specific items or appearance the Landlord had issues with and the Landlord's representative respond with vague assertion that the Plaintiff was not operating a "high-end retail cigar shop[.]" that "the space does not give off the appearance of a high-end retail cigar shop." A true and accurate copy of this email communication is attached hereto as **Exhibit F.**

33.    On December 3, 2024, the Landlord deducted Plaintiff's rent payment for December 2024.

34.    On December 5, 2024, when the Plaintiff arrived to open its cigar shop, the Plaintiff discovered a handwritten taped note on the outer glass door stating:

"12/5/2024

Your locks have been changed.

For further information:

Contact: Amand Riggs 513-338-2763

or

Cheri Bloss 807-252-1786

--Property Management—"

A true and accurate copy of December 5, 2024 handwritten taped notice is attached hereto as **Exhibit G.**

35.    The Landlord unable to get through steel security gate behind the glass door told the Plaintiff that everything is fine and that the Landlord needs to conduct some "maintenance,"

that will take a few hours and whether the Plaintiff can let the Landlord into the Unit and the Plaintiff complied and observed the Unit via the security cameras.

36.     Shockingly, the Plaintiff observed unknow large men ransacking and confiscating all the property and inventory at the Unit including cash, papers, invoices, receipts, vendor bills, financial records, point of sale system, TVs cigars, vapes, and tobacco products.

37.     The Plaintiff promptly called police and arrived at the store and spoke with the police. The Police stated that the individuals were clearing the Unit because they had a lease with the Landlord for the unit and that the Plaintiff cannot enter or take anything from the Unit.

38.     The last thing observed by the Plaintiff was that the individuals disconnected one camera after another, eventually the security feed went blank.

39.     Within weeks of the lockout, a Verizon store began operating in the Unit.

40.     It was later discovered that the store was a Verizon retail store operated by BeMobile Inc.

41.     Upon information and belief, Cascades and BeMobile coordinated and conspired together to unjustly terminate and remove the Plaintiff so BeMobile could take over the place and operate a Verizon retail store.

42.     As a result of Defendants' conduct, Plaintiff suffered severe economic harm in the form of cash, cigars, hookahs, e-liquids, cigarettes, papers, glass piers, cleaners, posters, point of sale system, vape and tobacco products valued at $393,000.00.

43.     As a result of Defendants' conduct, Plaintiff suffered severe economic harm in the form of loss of showcases, displays, cigar room, marble floors, wall displays, special lighting and steel security gate value at $111,000.000.

44. As a result of Defendants' conduct, Plaintiff suffered severe economic harm in the form of loss of receipts, invoices, financial records, daily business sales and profits of approximately $2,500.00 for an aggregate of $912,500.00.

45. As a result of Defendants' conduct, Plaintiff suffered severe economic harm in the form of loss of rent December 2024 in the amount of $7,616.00 and security deposit in the amount of $7,616.00 for an aggregate amount of $15,352.00.

46. As a result of Defendants' conduct, Plaintiff suffered severe economic harm in the form of loss of leasehold interest (with over eight years remaining), and harm to goodwill.

47. As a result of Defendants' conduct, Plaintiff suffered severe economic harm in the form of loss complete and total destruction of Plaintiff's business at the Unit.

## COUNT I: BREACH OF LEASE AGREEMENT
### (Against Cascades Station LLC.)

48. All previous paragraphs are incorporated herein.

49. Plaintiff and Defendant entered into a valid and enforceable lease agreement on October 25, 2022, allowing for the operation of Plaintiff's cigar shop at Cascades Overlook (Exhibit 1).

50. Section 25 of the Lease requires Defendant to provide Plaintiff written notice for any alleged lease violations and to grant Plaintiff a 10-day period to cure.

51. Pursuant to Section 25 of the Lease, Defendant had a duty to not terminate the lease without first providing notice for any alleged lease violation and allowing Plaintiff an opportunity to cure such violation.

52. Defendant wrongfully terminated the Lease without providing the required notice and opportunity to cure.

53.    Defendant's termination and lockout breached the Lease by failing to credit Plaintiff's cure, by weaponizing an undefined "high-end" requirement, and by acting arbitrarily to re-tenant the space.

54.    As a result of Defendant's breach, Plaintiff has suffered damages including loss of business, leasehold rights, and consequential lost profits totaling $2,000,000.00.

## COUNT II: CONVERSION
### (Against All Defendants)

55.    All previous paragraphs are incorporated herein.

56.    At all times relevant, Plaintiff owned and had the right to immediate possession of its specific personal property located at the leased Premises, including but not limited to: (i) cigar and tobacco inventory (ii) furniture, fixtures, and equipment; (iii) exterior and interior signage and (iv) cash on hand and merchant processing receipts. The property was of substantial monetary value, totaling at least $504,000.00, and was readily identifiable by invoices, photographs, and inventory records that were all confiscated by the Defendants in concert.

57.    On December 5, 2024, without Plaintiff's consent and without lawful justification, Defendants and its agents took possession of that property.

58.    Defendants' acts were willful, wanton, and malicious, reflecting a conscious disregard for Plaintiff's property rights. Defendants knew that Plaintiff owned the seized property and had not abandoned it, yet intentionally appropriated the property to its own use and for the benefit of BeMobile or other third parties.

59.    As a direct and proximate result of Defendant's willful and malicious conversion, Plaintiff has suffered damages including but not limited to the fair market value of the property wrongfully taken, loss of business continuity and goodwill, and consequential damages in the amount of $504,000.00.

## COUNT III: STATUTORY BUSINESS CONSPIRACY (Va. Code §§ 18.2-499, -500)
### (Against All Defendants)

60.    All previous paragraphs are incorporated herein.

61.    Defendants, acting in concert, combined, associated, agreed, mutually undertook, or otherwise conspired to willfully and maliciously injure Plaintiff in its trade, business, and profession by: (i) unlawfully terminating the Lease without the contractually required cure period; (ii) locking Plaintiff out of the premises and seizing its inventory and cash; and (iii) replacing Plaintiff with a Verizon retail store for BeMobile Inc.

62.    The actions of Defendants were not mere parallel conduct, but involved concerted, coordinated, and premeditated steps to pressure Plaintiff to vacate, followed by eviction under false pretenses, all with the intent to cause harm to Plaintiff's business.

63.    Defendant's conduct was intentional, without lawful justification, and undertaken for the purpose of removing Plaintiff from the premises and transferring the leasehold to BeMobile Inc., a Verizon retail store.

64.    As a direct and proximate result of Defendants' unlawful and malicious conspiracy, Plaintiff suffered significant business injuries, including lost profits, loss of leasehold interest, and inventory damages totaling approximately $2,504,000.00.

65.    Overt acts include Defendant Cascades' acceptance of Plaintiff's December 2024 rent on December 3, 2024, followed by the December 5 lockout, and both Defendants' prior statements as to the financial condition of the business, whether the Plaintiff was struggling and wanted to move out or shutdown and statement that the Landlord "had someone who would buy the business."

66.     Plaintiff is entitled to recover treble damages and reasonable attorney's fees under Va. Code § 18.2-500.

## COUNT IV: TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (Against All Defendants)

67.     All previous paragraphs are incorporated herein.

68.     At all relevant times, Plaintiff had valid business expectancies including: (i) continued operation for the remainder of its 10-year term with two five-year options; and (ii) potential assignment/sublease opportunities (subject to Lease consent procedures), about which unsolicited inquirers were made by Defendant Cascades and Defendant BeMobile.

69.     Defendants knew of these expectancies and intentionally interfered by wrongfully terminating the Lease without contractual notice or cure, changing the locks, seizing Plaintiff's property, and transferring the space to BeMobile to operate a Verizon retail store, thereby preventing Plaintiff from continuing operations or negotiating an assignment or sublease.

70.     In performing such unlawful conspiracy, Defendant performed the aforesaid acts willfully, intentionally, purposefully, and without justification against Plaintiff, using criminal and/or unlawful means.

71.     Defendant's interference was without lawful justification and directly caused Plaintiff to lose the benefit of its business expectancies and suffer substantial damages including lost profits, lost goodwill, and loss of its leasehold interest damages totaling approximately $2,504,000.00.

## COUNT V: COMMON-LAW CIVIL CONSPIRACY
### (Against All Defendants)

72.     All previous paragraphs are incorporated herein.

73.     Defendants and one or more third parties, including Verizon and/or its agents, entered into an agreement or mutual understanding to use wrongful means to oust Plaintiff from its leased premises and appropriate Plaintiff's leasehold and business assets for the benefit of Verizon.

74.     This agreement is evidenced by: (i) repeated unsolicited inquiries by persons connected to Verizon (BeMobile Inc.) about Plaintiff's willingness to vacate or transfer its lease; (ii) Defendant's abrupt and pretextual termination of the Lease on November 11, 2024 despite Plaintiff's documented cure efforts; and (iii) the immediate re-tenanting of the premises by BeMobile as a Verizon retail store.

75.     The combination was for the unlawful purpose of (i) unlawfully terminating Plaintiff's Lease and (ii) evicting Plaintiff by self-help lockout, or for the lawful purpose of re-tenanting the space but by unlawful means (breach of lease, wrongful lockout, and conversion of Plaintiff's inventory, furniture, and cash).

76.     In furtherance of this common scheme, Defendants and its co-conspirator(s) committed overt acts including, but not limited to: (i) serving a premature and invalid Termination Notice; (ii) directing Plaintiff's representatives to leave under the pretense of maintenance and then changing the locks; (iii) damaging and converting Plaintiff's inventory, furniture, signage, and cash; and (iv) transferring possession of the unit to BeMobile as a Verizon retail store.

77.     These overt acts constitute breach of lease, conversion, tortious interference with business expectancy, and wrongful self-help eviction. Virginia law requires such a predicate unlawful act to support a common-law civil conspiracy.

78.     As a direct and proximate result of the common-law civil conspiracy, Plaintiff has sustained business-related injuries recognized under Virginia law, including loss of its leasehold

estate (with more than eight years remaining), loss of substantial inventory and business assets, lost profits from the retail cigar business, and loss of goodwill with suppliers and customers. These damages are directly tied to Plaintiff's trade and business and therefore fall squarely within the type of business injury protected by Virginia conspiracy law.

## COUNT VI: DETINUE
### (Against All Defendants)

79.    All previous paragraphs are incorporated herein.

80.    Plaintiff is and was at all relevant times the owner of or lawfully entitled to immediate possession of specific personal property located at the leased premises, including but not limited to: (i) cigar and tobacco inventory]; (ii) furniture, fixtures, and equipment [; (iii) exterior and interior signage]; and (iv) cash on hand and merchant processing receipts. Each category of property was readily identifiable (by invoices, purchase records, and inventory valuation) and of substantial monetary value all of which the Defendants confiscated.

81.    Defendants, without lawful process and through the actions of its agents, entered and took control of the premises on or about November 2024, changed the locks, and took possession of Plaintiff's aforesaid property. Defendants have retained possession and/or disposed of it despite Plaintiff's demand for return, thereby unlawfully detaining property belonging to Plaintiff.

82.    At the time of Defendants lockout, Plaintiff had an immediate right to possess the above-described property because it owned the inventory outright and remained current under its merchant accounts.

**WHEREFORE**, Plaintiff prays and respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against Defendant Cascades Station LLC., for Breach of Lease Agreement (Count I);

B. Enter judgment in favor of Plaintiff and against Defendants Cascades Station LLC and BeMobile Inc., for Conversion (Count II);

C. Enter judgment in favor of Plaintiff and against Defendants Cascades Station LLC and BeMobile Inc., for Statutory Business Conspiracy under Virginia Code §§ 18.2-499 and 18.2-500 (Count III);

D. Enter judgment in favor of Plaintiff and against Defendants Cascades Station LLC and BeMobile Inc., for Tortious Interference with Business Expectancy (Count IV);

E. Enter judgment in favor of Plaintiff and against Defendants Cascades Station LLC and BeMobile Inc., for Common-Law Civil Conspiracy (Count V);

F. Enter judgment in favor of Plaintiff and against Defendants Cascades Station LLC and BeMobile Inc., for Detinue (Count VI), ordering the immediate return of Plaintiff's specific personal property as described herein or, if return is not possible, judgment for its fair-market value at the time of the December 5, 2024 taking, plus damages for its wrongful detention;

G. Award Plaintiff compensatory damages of not less than $2,504,000.00 on Counts I–VI combined, including but not limited to inventory losses, lost leasehold interest, lost profits, and injury to goodwill;

H. Award Plaintiff treble damages and reasonable attorney's fees pursuant to Virginia Code § 18.2-500 for Count III (Statutory Business Conspiracy);

I. Award Plaintiff punitive damages in the amount of $350,000 for Conversion, Common-Law Conspiracy, and Tortious Interference;

J. Award Plaintiff pre-judgment and post-judgment interest and the costs of this action; and

K. Grant such other and further relief, at law or in equity, as the Court deems just and

proper.

Respectfully Submitted
Epicerie Cigar Retail Shop, LLC
By Counsel

MAHDAVI, BACON, HALFHILL, & YOUNG, PLLC

By:_____

Faisal Shawn Mughal (VSB# 84251)
11350 Random Hills Rd., Ste 700
Fairfax, VA 22030
T: 703-352-1300
F: 703-352-1301
E: fsm a mbhylaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

On this 10TH day April, 2026, I, Faisal Shawn Mughal, served a copy of this Complaint and exhibits by U.S. First Class Mail to:

**CASCADES STATION LLC**
R/A: C T Corporation System
4701 Cox Rd. Suite 285,
Glen Allen, VA 23060

**BEMOBILE, INC.**
R/A: C T Corporation System
4701 Cox Rd. Suite 285,
Glen Allen, VA 23060

Faisal Shawn Mughal, Esq.

# EXHIBIT A

## LEASE

THIS LEASE ("Lease") is made by and between Landlord and Tenant (as each is hereafter defined) The following terms shall be defined as provided below:

**PARTIES:**

**Landlord:** Cascades Station LLC
a Delaware limited liability company

**Tenant:** Epicerie Cigar Retail Shop LLC,
a Virginia limited liability company

**d/b/a:** Epicerie Cigar Retail Shop

**PREMISES:**

**Shopping Center:** Cascades Overlook

**Shopping Center Address:** 21399 Epicerie Plaza, Sterling VA 20164

**Unit Number:** B135 **Square Feet:** approximately 1,680

**Effective Date:** shall mean the date this Lease is fully executed by both Tenant and Landlord

**Commencement Date:** shall mean the date on which possession of the Premises is delivered by Landlord to Tenant

**Fixed Minimum Rent Commencement Date:** shall mean 180 days after the Commencement Date

**Additional Rent Commencement Date:** shall mean the Fixed Minimum Rent Commencement Date

**Expiration Date:** shall mean the last day of the 120th full calendar month after the Fixed Minimum Rent Commencement Date, unless sooner terminated, or extended, as provided for in this Lease

**FIXED MINIMUM RENT:**

| MONTH(S) | ANNUAL | MONTHLY INSTALLMENT |
|---|---|---|
| 1 - 12 | $75,600.00 | $6,300.00 |
| 13 - 24 | $77,868.00 | $6,489.00 |
| 25 - 36 | $80,203.20 | $6,683.60 |
| 37 - 48 | $82,605.60 | $6,883.80 |
| 49 - 60 | $85,092.00 | $7,091.00 |
| 61 - 72 | $87,645.60 | $7,303.80 |
| 73 - 84 | $90,266.40 | $7,522.20 |
| 85 - 96 | $92,971.20 | $7,747.60 |
| 97 - 108 | $95,760.00 | $7,980.00 |
| 109 - 120 | $98,632.80 | $8,219.40 |

**INITIAL ESTIMATED PAYMENTS OF ADDITIONAL RENT:**

| | | |
|---|---|---|
| CAM. | $747.60 | Per Month |
| Real Estate Taxes | $310.80 | Per Month |
| Insurance: | $127.40 | Per Month |

**Renewal Option:** 2 options to renew this Lease for an additional term of 5 years each ("Renewal Term"). A Renewal Term shall commence upon the first day after the last day of the then-existing term of this Lease so long as the following conditions have been satisfied: (1) Landlord shall have received written notice of Tenant's election to exercise the applicable Renewal Option at least 180 days prior to the expiration of the then-existing Term of this Lease; (2) no event of default by Tenant shall exist at the time of commencement of any Renewal Term beyond the applicable cure period; and (3) all terms, covenants, and conditions of this Lease as set forth for the Initial Term of this Lease shall apply in the applicable Renewal Term except that (i) the Term of this Lease shall be extended for the applicable Renewal Term and (ii) Fixed Minimum Rent during the applicable Renewal Term shall be as set forth herein. The foregoing option(s) are personal to Tenant and are not exercisable by or transferable to an assignee, subtenant or successor of Tenant.

**FIRST RENEWAL TERM FIXED MINIMUM RENT:**

| MONTH(S) | ANNUAL | MONTHLY INSTALLMENT |
|---|---|---|
| 1 – 12 | $101,589.60 | $8,465.80 |
| 13 – 24 | $104,630.40 | $8,719.20 |
| 25 – 36 | $107,772.00 | $8,981.00 |
| 37 – 48 | $111,014.40 | $9,251.20 |
| 49 – 60 | $114,340.80 | $9,528.40 |

**SECOND RENEWAL TERM FIXED MINIMUM RENT:**

| MONTH(S) | ANNUAL | MONTHLY INSTALLMENT |
|---|---|---|
| 1 – 12 | $117,768.00 | $9,814.00 |
| 13 – 24 | $121,296.00 | $10,108.00 |
| 25 - 36 | $124,941.60 | $10,411.80 |
| 37 – 48 | $128,688.00 | $10,724.00 |
| 49 – 60 | $132,552.00 | $11,046.00 |

**Security Deposit:** $7,485.50 to be paid upon execution of this Lease by Tenant to payee Cascades Station LLC

**First Month's Rent Amount:** $7,485 80 to be paid upon execution of this Lease by Tenant to payee Cascades Station LLC

165106.4

Permitted Use: shall mean for the operation of a high-end retail cigar shop selling cigars and tobacco, and related cigar and tobacco accessories, all in compliance with Governing Law and for no other use. On an ancillary and incidental basis only, Tenant shall be permitted to sell nicotine vapor products, related nicotine vapor accessories, and cannabidiol (CBD) products derived only from hemp and in compliance with Governing Law. Notwithstanding anything in this Lease to the contrary, Tenant shall not: (i) operate as a business or facility used in growing, delivery, transferring, supplying, dispensing, distributing or selling marijuana or hemp, whether by prescription, medical recommendation, or otherwise, (ii) sell any products classified as kratom, kava, or Delta-8 or any products in any way derived from or containing marijuana; (iii) sell any illegal or illicit drugs or drug paraphernalia; (iv) sell any glassware, such as but not limited to, bongs, bowls, pipes, or any other glassware that may be used in the consumption of marijuana, hemp or tobacco, (v) operate as a headshop, (vi) grow, process, or manufacture hemp or marijuana, (vii) sell any marijuana or marijuana-related products and paraphernalia, whether or not such products are deemed legal and/or approved by the FDA or DEA; (vii) operate for any unlawful purpose or in any way which would constitute a nuisance to tenants or occupants of the Shopping Center. No smoking or vaping is permitted within the Premises or other areas of the Shopping Center, including product testing and/or sampling. If Landlord receives any complaints from other tenants in the Shopping Center because of odors or fumes emanating from the Premises, then Tenant shall take whatever measure necessary, at Tenant's sole cost and expense, to prevent the emanation of such odor or fumes, including but not limited to, installing a commercial air purifier or filter in the Premises Notwithstanding anything herein to the contrary. Tenant shall not violate the Shopping Center's private covenants and restrictions set forth in Exhibit D. The interpretation of the Permitted Use shall be narrowly and strictly construed

Rent Payment Address: Cascades Station LLC, NW 601202 P O. Box 1450 Minneapolis, MN 55485-1202

Notice Address:

FOR LANDLORD:
Cascades Station LLC
Robert F Myers, COO
11501 Northlake Drive
Cincinnati, Ohio 45249

WITH A COPY TO:
Legal Services
Phillips Edison & Company
11501 Northlake Drive
Cincinnati, Ohio 45249

FOR TENANT:
Epicerie Cigar Retail Shop LLC
430 Conner Grant Rd
New Bern, NC 28560
Attn: Hafdaila Alahdal
E-mail address. khilmited_service@outlook.com
Phone 247-608-2241
*(cannot be a P O Box or the Shopping Center address)*

The following are incorporated as part of this Lease as if fully set forth herein

A.  General Lease Terms
B.  Exhibit A - Site Plan
C.  Exhibit B - Tenant Improvement Allowance (TIA Request Form, Unconditional Final Waiver of Liens, and Estoppel)
D.  Exhibit C - Sign Criteria
E.  Exhibit D - Shopping Center Private Covenants and Restrictions
F.  Guaranty

## GENERAL LEASE TERMS

1   LEASE OF PREMISES. In consideration of Rent to be paid by Tenant and of the covenants and agreements herein contained, and other good and valuable consideration, Tenant does hereby lease from Landlord the Premises. "Initial Term" shall mean the time period from the date on which possession of the Premises is delivered by Landlord to Tenant through the Expiration Date "Term" shall mean the Initial Term plus any renewal or extension thereof. The approximate location of the Premises is shown on the site plan attached to this Lease as Exhibit A.

2   LANDLORD TERMINATION RIGHT. Notwithstanding anything herein or in this Lease to the contrary, in the event that Landlord or a potential buyer of the Shopping Center is unable to: (i) obtain financing for the Shopping Center at market interest rates or on market loan or offering terms (market interest rates, market loan, or offering terms shall be determined based on the market at the time Landlord applies for such financing or offering) and such inability to obtain financing at market interest rates and on market loan terms is related to Tenant's tenancy and operation in the Premises; (ii) Landlord or any buyer or transferee is unable to obtain title insurance satisfactory to Landlord or any buyer or transferee; or (iii) any existing Landlord lender deems such Tenant use and operation as a violation of the loan covenants, then Landlord shall have the right to terminate this Lease at any time upon 30 days' prior written notice to Tenant

3   LEASE CONTINGENCY - APPROVALS. This Lease shall be contingent upon Landlord obtaining all approvals required by Landlord's existing covenants and obligations with respect to the Shopping Center. In the event that Landlord is unable to obtain any such approvals, Landlord shall have the right to terminate this Lease immediately upon written notice to Tenant and this Lease shall be null and void without any further liability to either party

4   RENT PAYABLE. Throughout the Term of this Lease, Tenant agrees to pay the following (collectively referred to as "Rent") (a) Fixed Minimum Rent and (b) all additional sums, charges, or amounts of whatever nature ("Additional Rent") to be paid by Tenant to Landlord in accordance with Governing Law, court order or this Lease and all shall be deemed as rents from real property. Commencing on the dates set forth in this Lease, Tenant shall pay Rent, payable on or before the first day of each month in advance, via Electronic Funds Transfer (EFT) through www.dashcomm.com, or provided Landlord provides notice to Tenant, via such other payment method and/or at such other location as may be acceptable to Landlord in its sole discretion, without deduction or set-off. Landlord and Tenant agree that Fixed Minimum Rent, Percentage Rent, Additional Rent, and all other charges paid to Landlord under this Lease shall qualify as "rents from real property" as defined in Section 856(d) of the Internal Revenue code of 1986, as amended from time to time (the "Code") and as further defined in Treasury Regulation ("Regulation") Section 1.856-4. Should the requirements of the Code and/or Regulation be amended so that any amount payable to Landlord under this Lease no longer qualifies as "rents from real property" for the purposes of the Code and associated Regulations such amount payable to Landlord under this Lease shall, at Landlord's option, be adjusted so that it will qualify as "rents from real property" for the purposes of the

165106.4



Code and Regulation, as amended; provided, however, that any adjustments required pursuant to this provision shall be made so as to produce the equivalent (in economic terms) consideration as was payable prior to such adjustment. Tenant and Landlord shall enter into such amendment or amendments as may be necessary to effect the foregoing and negotiate in good faith with respect thereto. Except for casualty or condemnation, if Tenant is paying any form of Rent abatement, or is entitled to pay a future Rent abatement, and Tenant extends the Term of this Lease via the exercise of an option, renewal, holdover, or otherwise, then upon the commencement of such extended Term, Tenant shall resume the full payment of Rent as provided under this Lease. For purposes of clarity, Tenant shall have no right to revive the direct cause of such Rent abatement during the remaining Term of this Lease. All payments received by Landlord under the terms of this Lease shall be applied by Landlord to Tenant's account in Landlord's sole discretion. Notwithstanding anything in this Lease to the contrary, Tenant's obligation to pay Rent, including any holdover premium, shall under no circumstances be subject to force majeure.

5.    REPORTING GROSS SALES  Tenant shall report its gross sales to Landlord for each calendar month, on a quarterly basis, electronically via Landlord's website at www.dashcomm.com or in such other form as shall be acceptable to Landlord in its sole discretion, certifying that the information is complete and correct. If any report of gross sales is not received by Landlord within 30 days following the applicable reporting period set forth above, then Tenant shall be subject to a late fee of $100.00 and an additional $100.00 for each month the report of gross sales is not yet received.

6.    ADDITIONAL RENT. Commencing upon the Additional Rent Commencement Date, Tenant shall pay, as Additional Rent Tenant's Proportionate Share of the Shopping Center's (i) common area maintenance charges ("CAM") (which charges include but are not limited to all of the following: all utility charges, utility management services, painting, repaving, resurfacing, re-striping, landscaping, traffic control, repairs and improvements, lighting, internet, holiday decorations, sanitary and drainage control, public address system, online services, cleaning, removal of snow, trash, and rubbish; management fees; operation of and maintenance of any sign(s); personnel to direct parking and to provide security for the common areas and facilities, management and supervision, personal property taxes, supplies, licenses, impact and permit fees, equipment used for such maintenance; all Landlord costs and expenses related to reducing and/or managing the Shopping Center's carbon footprint, environmental impact, and/or greenhouse gas emissions, including, but not limited to, implementing and maintaining any: energy efficiency, environmental management plan(s); sustainability; alternative/renewable energy system(s) including, without limitation, solar, wind, or other technology; LED lighting, recycling program(s); water management system(s); and related actions and/or improvements and the technological evolutions thereof; capital improvements made to the Shopping Center (provided that with respect to capital improvements Tenant shall pay, annually, its Proportionate Share of the approximate average amount of 15% of the total cost of all capital improvements made to the Shopping Center), (ii) real estate taxes for the Shopping Center (including assessments, ad valorem taxes, water and sewer rents, public utilities, excises, levies, business license or permit fees, gross receipts taxes, rent taxes, parcel tax, margin tax, franchise tax, net worth tax, and other governmental charges related to the Shopping Center or any part thereof, including the buildings and improvements, or on the sidewalks or streets in front of the same and costs and expenses incurred in contesting or negotiating an adjustment thereof) and (iii) insurance carried by the Landlord for the Shopping Center, plus an administrative fee not to exceed 15% of such CAM, real estate taxes and insurance for each full or partial calendar year during the Term of this Lease. Tenant's Proportionate Share is the square footage of the Premises divided by the total square footage of the leasable floor area within the Shopping Center, not including those tenants designated from time to time by Landlord. Following the end of each calendar year, Landlord shall send Tenant a reconciliation statement showing actual expenses for the prior calendar year. In the event of a deficit, Tenant shall pay the difference upon demand, in the event of an overage, Landlord shall credit same toward Tenant's account.

7.    PAYMENT OF RENT AND CHARGES  All Rent to be paid by Tenant shall be paid as provided in this Lease. If Tenant shall fail to pay any Rent on or before the fifth (5th) day after the due date, then Tenant shall be assessed a late fee of 5% of the amount due each month until paid in full. Any unpaid amounts shall also bear interest in the amount of 1½% per month, or the maximum allowed by Governing Law, whichever is less. Tenant shall also pay to Landlord all expenses incurred in the collection of any such past due amounts. Should any governmental authority acting under any Governing Law, ordinance, or regulation, levy, assess, or impose a sales tax, excise and/or assessment upon or against this Lease, the execution hereof and/or the payment of rent including without limitation, any sales and use taxes or surtax, tax on business activity, product use or consumption, whether by way of substitution for or in addition to any existing tax or otherwise, and whether evidenced by documentary stamps or the like, Tenant shall be responsible for and shall pay such tax excise and/or assessment, or shall reimburse Landlord for Landlord's payment thereof as Rent.

8.    SECURITY DEPOSIT. Tenant acknowledges and agrees that the Security Deposit shall at all times during the Term of this Lease remain on deposit with Landlord as security for the payment of Rent and the performance by Tenant of the terms of this Lease. Tenant shall pay and deliver the Security Deposit as required under this Lease. In the event of any default or damage to the Premises, the Security Deposit shall be retained by Landlord and may be applied toward damages arising from such default and/or damage and shall not be construed as liquidated damages. The cost of any repairs to the Premises will be estimated and will also include administrative costs incurred by Landlord in repairing such damage. If applied toward damages, Tenant shall replenish the Security Deposit upon request by Landlord. Upon yielding the Premises to Landlord at the expiration of this Lease in the condition required under this Lease, and provided no default has occurred, the remaining balance of the Security Deposit shall be returned to Tenant in accordance with Governing Law

9.    TENANT WORK. In the event Tenant desires to perform any construction, improvements, or Permanent Improvements (as hereafter defined) in the Premises ("Tenant Work"), Tenant shall prior to starting construction, submit to Landlord for Landlord's approval all plans, drawings, and or specifications required to be submitted to any city, county, zoning or other governmental authority in order to obtain the required permits for the Tenant Work ("Tenant's Plans"). Any Tenant Work shall be performed and completed by licensed contractors in a first-class manner and in compliance with all applicable Governing Law. "Permanent Improvements" shall mean physical improvements, additions and modifications to the Premises that (i) will become a permanent part of the Premises or are permanently affixed to the Premises such that removal may be likely to cause damage to the Premises, and (ii) increase the value, utility or appearance of the Premises, and (iii) are not specific to Tenant's trade use of the Premises. Tenant shall open for business to the public and be fully stocked, staffed, and operational within the entire Premises no later than 180 days after the Commencement Date and thereafter shall continuously and actively so operate for a minimum of 40 hours each week throughout the Term. In the event Tenant's business hours exceed the standard operating hours for the Shopping Center, Tenant shall be responsible for all costs associated with such excess hours (including but not limited to common area lighting, electricity, and

165106.4



security) If permits are required by Governing Law for Tenant to complete the Tenant Work, then within 30 days following the Effective Date. Tenant shall first submit Tenant's Plans to Landlord for Landlord's review and approval Landlord shall then have 7 days following receipt of Tenant's Plans to review and approve or comment. If Landlord does not timely approve Tenant's Plans in any instance, then Tenant's Plans shall be deemed not approved and Tenant shall re-submit to Landlord If Landlord approves Tenant's Plans, then Tenant shall have 7 days following Landlord's approval to submit Tenant's Plans to the applicable governmental authority to diligently pursue and obtain Tenant's permits If Landlord comments on Tenant's Plans, then Tenant shall revise Tenant's Plans accordingly and re-submit to Landlord, and the review approval, and submission time frames set forth within this Section shall again apply Tenant's failure to comply with these terms and conditions shall constitute a default under this Lease.

10. ABANDONMENT OF FF&E Subject to the priority lien of Tenant's lender Tenant grants to Landlord a lien and continuing security interest for all Rent and other obligations of Tenant under this Lease upon all abandoned goods, wares, equipment, fixtures, furniture, inventory, and other personal property of Tenant that remains in the Premises following the expiration of the 30th day after the expiration or earlier termination of this Lease, or other repossession of the Premises by Landlord, and such property shall not be removed from the Premises without the consent of Landlord, except in the ordinary course of business.

11. SIGNS. Tenant shall place no signs, advertisements, lettering, curtains, shades, exterior lighting or similar items, on the glass, windows or doors, nor shall Tenant paint or affix anything to the exterior of the Premises except the façade signage. Further, Tenant shall not be permitted to display any neon signage, or any other signage with marijuana or hemp leaves, or any signage bearing drug paraphernalia images or symbols. Tenant shall be specifically prohibited from placing any signage in the Common Areas, including but not limited to, sandwich boards, banners or flags. Any façade signage must directly correspond to the Premises and such signage shall not encroach upon any other tenant's façade Notwithstanding anything to the contrary in the preceding sentence Tenant shall be permitted to place professionally made signage on the interior of the storefront window surface of the Premises, provided such signage is professionally made and it does not cover more than 25% of the storefront window surface. Subject to applicable sign regulations of any governmental authority, Tenant shall obtain all required sign permits and install, no later than the date upon which Tenant opens for business in the Premises, façade signage in accordance with Landlord's sign criteria. Tenant shall be responsible for repairing any damage to the building attributable to the installation, maintenance, and/or removal of signs. Signs which remain in place on the Premises 10 days after the end of the Term or after Tenant abandons the Premises shall automatically become the property of Landlord and may be removed by Landlord at Tenant's expense (including the cost of repairs to the interior and exterior of the Premises). Landlord shall have no obligation to deliver the Premises to Tenant unless and until Tenant provides Landlord with its façade sign drawing.

12. TENANT'S USE. The Premises shall be used by Tenant solely for the Permitted Use Tenant agrees that it will not suffer or permit the Premises to be used for (i) any unlawful or immoral purpose, (ii) any purpose prohibited by Governing Law or covenants, conditions, or restrictions of record, or in violation of other leases at the Shopping Center Tenant shall completely comply with all Governing Law and all governmental authorities having jurisdiction of the Shopping Center or the Premises (including, without limitation, cleanliness, health, safety occupational, and use laws and regulations) now existing or hereafter adopted Tenant shall not interrupt, hinder or disrupt the use or enjoyment of any owner, occupant, tenant, customer, contractor, or Landlord in the Shopping Center or adjoining property Tenant shall not use any portion of the Premises for the operation of an ATM Tenant shall not disturb or penetrate the floor slab within the Premises without first obtaining Landlord's written consent. Tenant shall not solicit Shopping Center invitees in the common areas of the Shopping Center

Pursuant to Governing Law, as may be amended or replaced from time to time, the Landlord's interest as herein described shall not be subject to liens for improvements made by Tenant or any subtenant, and upon request of Landlord, Tenant shall join in a notice of non-responsibility attesting to such fact.

13. UTILITIES & WASTE MANAGEMENT Tenant agrees to pay for all electric gas, sewer, heat, water, and other utilities and taxes or charges on such utility services which are used in or attributable to the Premises, including but not limited to all meter connection charges and impact fees. Notwithstanding anything in this Lease to the contrary, the rights granted to Tenant under this Lease expressly exclude any right to use the air space outside the Premises (including the right to operate any aerial vehicle or drone), or the façade or other common areas of the Shopping Center for any virtual or augmented reality or similar technology; it being acknowledged that all such rights belong exclusively to Landlord In the event that Tenant's Permitted Use or operations requires any modification(s) to the Shopping Center common areas as a result of Governing Law or governmental approval, then any costs related to such modification(s) shall be the sole responsibility of Tenant, regardless as to the party that performs the work, and the performance of such modification shall be determined by Landlord in its sole discretion

Landlord reserves the right to (i) designate from time to time a garbage and/or recycling service to be utilized by Tenant, or (ii) provide and sell water, sewer, and electricity to Tenant at rates competitive to the rates charged by governmental authorities having jurisdiction, if any. Tenant will not permit or suffer any actual or threatened lien or other encumbrance, to attach to the Premises, any buildings, improvements, or any part of or interest in the Shopping Center, or the interest of Landlord, and nothing contained herein shall be deemed to imply any agreement of Landlord to subject Landlord's interest or estate to any lien or any encumbrance, and hereby appoints Landlord as attorney-in-fact to resolve any lien or encumbrance, and to the fullest extent permitted by Governing Law. Tenant shall indemnify and hold Landlord harmless for all costs and expenses, including attorney fees, related thereto. Tenant shall not cause any noise, vibration, odor, or other nuisance to emanate outside of the Premises. In addition to Landlord's rights and remedies under this Lease, Landlord shall also have the right to require Tenant to promptly install any necessary mitigation materials within the Premises at Tenant's sole cost and expense, in the event Tenant violates such emanation prohibition. Upon request from Landlord, Tenant shall report all of its energy and utility consumption to Landlord

14. RADIUS CLAUSE. During the Term of this Lease, Tenant shall not directly or indirectly operate, manage, or have any interest in any similar or competing business within a radius of 5 miles from the exterior boundary of the Shopping Center.

15. ACCEPTANCE OF PREMISES Even though Landlord may have notified Tenant that possession of the Premises is available for Tenant's occupancy and the Commencement Date has occurred pursuant to the terms of this Lease, Tenant agrees and acknowledges that Landlord, in its sole discretion, may elect to prohibit Tenant and its agents, employees and contractors from accessing the Premises unless and until Landlord

165106 4



has received: (i) copies of Tenant's certificates of insurance and endorsements required herein; and (ii) written evidence that all individually metered public utilities servicing the Premises are in Tenant's name. Tenant acknowledges and agrees that (a) Landlord is delivering the Premises and its systems in its "AS-IS", "WHERE-IS" condition WITH ALL FAULTS, (b) Tenant has examined the Premises prior to its execution of this Lease and is accepting the Premises (and taking possession thereof) in its "AS-IS", "WHERE-IS" condition WITH ALL FAULTS, (c) Landlord (including any party on behalf of Landlord) makes no warranty or representation whatsoever whether written or oral, express or implied, as to the condition or repair of the Premises, including, without limitation, any representations or warranties relating to the condition of the subsurface of the Premises and systems its habitability, merchantability, or fitness for a particular purpose compliance with Governing Law or the presence of Hazardous Materials (as defined below) at, under from, to, or in the vicinity of the Premises, and (d) Landlord makes no warranty or representation as to whether or not the Shopping Center or the Premises complies with ADA or any similar legislation. In the event that Tenant's use of the Premises requires modifications or additions to the Premises or Shopping Center in order to be in compliance with Governing Law, Tenant agrees to make any such necessary modifications and/or additions at Tenant's sole cost and expense. Tenant acknowledges that Landlord does not own or claim any ownership interest in any equipment, personal property or other related items left in the Premises by the previous tenant. Tenant acknowledges that any such equipment, personal property and other related items are owned only by the previous tenant, and neither Tenant nor Landlord has any ownership interest in such previously stated items. All damage done to any such aforementioned property shall be repaired at Tenant's sole cost and expense. Tenant acknowledges that if the previous tenant, lien holders or creditors of the previous tenant, or any other party which may hold a secured or unsecured interest in such equipment, personal property and other related items, reclaim(s) such property, Tenant is still bound by all terms and conditions of this Lease. Except as specifically provided in this Lease, Tenant hereby releases and fully discharges Landlord and each of Landlord's affiliates, members, employees, agents, attorneys, successors and assigns from any and all claims, demands, causes of action (or settlement thereof), losses, damages, liabilities, fines, penalties, costs and expenses (including attorney's fees and expenses), whether asserted or unasserted, known or unknown, liquidated or contingent, or in existence or arising hereafter, and whether based on negligence, intentional acts, statutes, or any other theory arising from or relating to the Premises, including, without limitation, (i) any conditions, including environmental and other physical conditions, affecting the Premises whether the same are a result of negligence or otherwise, or (ii) the past, present, future, actual or threatened presence or release of any Hazardous Materials at, under, from, to, or in the vicinity of the Premises.

16  LANDLORD'S MAINTENANCE. At all times, Landlord shall have full control over all exterior portions of the Premises and common areas of the Shopping Center. Landlord will keep the roof and the exterior walls of the Premises (excluding the store front, interior nonstructural portions of the exterior walls, and any plate glass, windows window frames, doors, and door frames) in proper repair, provided that in each case Tenant shall have given Landlord prior written notice of the necessity of such repair. Notwithstanding any other provision of this Lease, In no event shall Landlord be responsible for repairing, maintaining, or replacing the Premises or any part of the Premises or its systems when any such damage and/or maintenance is caused or necessitated by (1) any act or omission of Tenant or any of Tenant's employees, agents, customers, invitees, or licensees; (2) any fixtures, equipment, or other items installed in or placed in the Premises by Tenant; or (3) any use of the Premises not permitted under the terms of this Lease. Landlord shall not be charged with default in the performance of any of its obligations hereunder unless Landlord fails to perform such obligations within 30 days (or within such additional time as is reasonably required to correct any such default) after written notice to Landlord. Tenant shall have an affirmative duty to notify Landlord of needed maintenance or repairs to the Shopping Center or the common area.

17  TENANT'S MAINTENANCE. Except for the repairs Landlord is obligated to make pursuant to this Lease, Tenant shall, at its own cost and expense, make all necessary repairs, replacement, improvements, and decorations and perform all maintenance on, in, and to the Premises that are necessary or appropriate to keep the Premises including the doors and windows, clean, orderly and in good condition and repair, and in a safe and tenantable condition. Any work performed by or on behalf of Tenant shall be performed by a licensed contractor in the applicable field. Said obligation shall include, but is not limited to, the maintenance repair and replacement of the store front including but not limited to all glass, doors and windows. Tenant's signs, all mechanical, plumbing, electrical, and heating, ventilation and air-conditioning ("HVAC") systems. All such repairs and maintenance shall be accomplished in a good and workmanlike manner using new quality materials, and shall be in compliance with all Governing Law. Tenant is responsible for installation of any grease trap required by code and shall clean and maintain any grease trap servicing the Premises. Tenant shall not permit the accumulation of garbage, trash or other waste in or around the Premises or dumpster, nor the excessive usage of such. As part of Tenant's maintenance, repair, and replacement obligations, Tenant shall, at its sole cost and expense, enter into and maintain a contract with a certified third party HVAC service contractor, providing for the periodic (at least quarterly) service, maintenance and repair of the HVAC system serving the Premises, which shall provide for a scope of work and periodic services at a minimum, in accordance with manufacturer's specifications Upon request by Landlord, Tenant shall furnish Landlord with a copy of the current service contract, which contract shall be in form and substance reasonably satisfactory to Landlord and a current certificate of insurance of the Tenant's service contractor naming Landlord as an additional insured and such certificate shall be in form and substance and contain such coverages satisfactory to Landlord. In the event Landlord obtains an assignable warranty for any HVAC system servicing the Premises to the extent assignable, Landlord shall assign to Tenant any such assignable warranty on parts and labor for the HVAC system Tenant shall keep the Premises free of mold and mildew, and any conditions that could reasonably be expected to give rise to mold and mildew within the Premises If Tenant fails to perform any obligation and such failure continues for 15 days after written notice from Landlord (except in the case of an emergency when no prior notice shall be necessary), Landlord may, but shall not be obligated to, perform such obligation and Tenant shall pay to Landlord, upon demand, as Additional Rent, the cost of such performance plus 15% of such cost for supervision and overhead

18  CONDITION OF PREMISES AT TERMINATION OR EXPIRATION. At the expiration or earlier termination of this Lease, Tenant will quit and surrender the Premises in good condition and repair, reasonable wear and tear thereof excepted. All electric, plumbing and HVAC systems and equipment ("Systems") shall be surrendered to Landlord in good working order, with written documentation of services performed thereon and the dates performed. Tenant shall deliver all keys and security codes for the Premises to Landlord. Any furniture or trade fixtures left in the Premises after the Term, shall be deemed abandoned and become the property of Landlord or Landlord may have them disposed of and removed. Any work undertaken by Landlord that is associated with Tenant's failure to return the Premises to Landlord as required under this Lease, including, but not limited to repair and/or replacement of such damage, receipt of Tenant deliverables as required under this Lease. The costs of such removal of Tenant's personal property, and/or cleaning, will be billed back to Tenant at Tenant's sole cost and expense. The costs of such repairs, including administrative costs incurred by Landlord in the pursuit and performance such work, will be in Landlord's discretion. Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease

165106.4



19. HAZARDOUS MATERIALS. (a) Tenant shall not use, generate, manufacture, produce, store, treat, dispose, or permit the escape on, under, about, or from the Premises, or any part thereof, any flammable, explosive, radioactive, hazardous, toxic, contaminating, or polluting matter, waste, oil or substance, or related injurious materials or waste, or any petroleum or petroleum-derived products, emerging contaminants including but not limited to per and polyfluoroalkyl substances, asbestos in any form, urea formaldehyde foam insulation and polychlorinated biphenyls (collectively "Hazardous Materials"). Tenant shall not install or operate any underground storage tanks on the Premises. (b) To the fullest extent permitted by Governing Law Tenant shall defend, indemnify, protect, and hold Landlord and each of Landlord's members, employees, agents, attorneys, successors, and assigns, free and harmless from and against any and all claims, liabilities, penalties, forfeitures, losses, or expenses (including reasonable attorney fees) for death of or injury to any person or damage to any property whatsoever, alleged or claimed to be arising from or caused in whole or in part, directly or indirectly, by: (1) the presence in, on, under, or about the Premises, or discharge in or from the Premises, of any Hazardous Materials; or (2) Tenant's failure to comply with any federal, state, county, municipal, local, or other law (including common law), rule, ordinance, code, regulation, directive, order, permit, license, or authorization now or hereafter in effect relating to the industrial hygiene, worker health and safety, environmental protection, use, analysis, generation, manufacture, purchase, transportation, storage, removal, or disposal of Hazardous Materials (collectively, "Environmental Laws"). (c) Tenant shall provide immediate notice to Landlord of any violations of Environmental Laws, releases of Hazardous Materials, or upon receipt of any notices of violation, claims, suits, notices of liability, or oral or written investigations, inspections, requests for information, or meetings, or other inquiries from any governmental authorities and shall provide copies of any documents from or correspondence with any governmental authorities. (d) If asbestos or asbestos-containing material is damaged or disturbed by actions of Tenant or its agents, employees, or contractors, Tenant shall, at its sole cost, take all actions necessary to remove all such asbestos or asbestos-containing materials, or repair or encapsulate all such asbestos or asbestos-containing materials in full compliance with Environmental Laws. (e) Tenant shall promptly commence and diligently pursue to completion any investigation, corrective action or remediation (collectively, "Corrective Action") of any kind or nature that is necessary under any applicable Environmental Law or this Lease because of, or in connection with, Tenant's violation of any Environmental Law or the release of Hazardous Materials by Tenant. All Corrective Actions shall be performed by one or more contractors approved in advance in writing by Landlord and shall be completed in compliance with all applicable Environmental Laws. All costs and expenses related to such Corrective Actions shall be paid by Tenant, including, without limitation, reasonable costs and expenses incurred by Landlord in connection with monitoring or review of such Corrective Actions. In the event that Tenant shall fail to promptly commence or fail to diligently pursue to completion all such Corrective Actions, Landlord may, but shall not be required to, cause such Corrective Actions to be performed and all costs and expenses so incurred shall become immediately due and payable from Tenant to Landlord together with interest from the date of advancement until paid by Tenant. (f) Upon termination of this Lease or upon Tenant's abandonment of the Premises, Tenant shall, at its sole expense, remove all Hazardous Materials from the Premises, and shall clean up any contamination that occurred during the Term to the satisfaction of Landlord in its sole discretion and in compliance with all Environmental Laws and this Lease. (g) Tenant's duty to defend shall arise when Tenant receives notice of any death of or injury to any person or damage to any property that may trigger Tenant's duty to indemnify, protect, and hold Landlord and each of Landlord's members, employees, agents, attorneys, successors, and assigns, free and harmless, under this section. (h) Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease. The duty to defend shall continue until a court of competent jurisdiction determines that there is no possibility that Tenant's duty to indemnify, protect, and hold Landlord and each of Landlord's members, employees, agents, attorneys, successors, and assigns, free and harmless, under this section. Tenant's duty to defend shall extend to include any and all claims where Landlord's or third-party negligence is alleged. It is the intent of the parties that Tenant shall defend Landlord from the outset of any claims that Tenant could be found liable. Tenant agrees to defend such claims through counsel selected by Landlord. Any acts or omissions by employees, agents, assignees, contractors, or subcontractors of Tenant or others acting for or on behalf of Tenant (whether or not they are negligent, intentional, willful, or unlawful), will be strictly attributable to Tenant.

20. TENANT'S INSURANCE. At all times during the Term, Tenant shall keep in force at its own expense, with insurance carrier(s) having an A.M. Best rating or its equivalent of A-VIII or better, the following:

- Special Form Cause of Loss Policy insuring an amount equal to at least the 100% full replacement cost of Tenant's betterments, improvements, fixtures, furniture, inventory, equipment (including HVAC systems servicing the Premises) and all other items of personal property of Tenant whether or not located on or within the Premises. The deductible shall not exceed $1,000.00.

- Commercial general liability insurance form insuring the Premises, and any other portions of the Shopping Center used by Tenant, with limits no less than $1,000,000.00 per occurrence and $2,000,000.00 general aggregate with respect to bodily injury and property damage, including contractual liability, and $200,000.00 with respect to damage to property (fire legal liability). If Tenant sells alcoholic beverages for on-premises consumption, Tenant must have no less than $1,000,000.00 of liquor liability insurance. The aggregate limit may be satisfied through a combination of primary and umbrella/excess liability insurance. If Tenant has multiple locations, such insurance shall also provide that the general aggregate limits apply separately to each insured location. Tenant will name Landlord as "Additional Insured" and include (a) an endorsement to the effect that the insurer agrees to notify Landlord not less than thirty (30) days in advance of any modification or cancellation thereof; (b) an endorsement providing that such insurance affords Landlord primary insurance coverage and that any other insurance maintained by Landlord is excess and noncontributory with the insurance required herein; and (c) a waiver of subrogation endorsement. Claims-made coverage and insurance policies containing self-insured retention(s) are NOT ACCEPTABLE. Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by the standard form of property insurance. Tenant agrees to pay, on ten (10) days written demand, and as Additional Rent, any increase in Landlord's premiums for property and liability insurance, boiler and loss of rents that may be charged during the term of this Lease as a result of such actions.

- Tenant shall require any contractor performing work on the Premises to carry and maintain, at no expense to the Landlord comprehensive general liability insurance, including contractor's liability coverage, contractual liability coverage, broad form property damage endorsement and contractor's protective liability coverage, providing protection with limits not less than $2,000,000.00 per occurrence; and workers compensation or similar insurance in amounts required by Governing Law. Tenant shall provide evidence of contractor's coverage prior to any Tenant Work being performed in the Premises to alaswell@phillipsedison.com

165106.4



- Tenant will furnish to Landlord copies of evidence of property coverage (Acord 28) and Certificate of Liability Insurance (Acord 25) evidencing coverages required by this Lease, and evidence of payment of the premiums therefore    as Landlord may request. Evidence of coverage must be sent to: pecocerts@phillipsedison.com or to: Phillips Edison Risk Management, 11501 Northlake Drive, Cincinnati, OH 45249. Landlord shall have no obligation to deliver the Premises to Tenant until it has received evidence of the coverage required herein.

- Tenant shall at all times during the Term carry business interruption insurance, that also covers loss events due to communicable and infectious diseases, in an amount equal to all Rent payable under this Lease for a period of 12 months, and naming Landlord as a loss payee

- In the event Tenant fails to obtain, and provide the certificate(s) of insurance as required in this Lease, on or before the Commencement Date, or if Tenant fails to maintain such insurance at any time during the Term, Landlord shall have the right, without notice to Tenant to take such action as Landlord deems necessary to protect its interest in the Premises, including, without limitation, the obtaining of such insurance coverage required in this Lease, and all expenses incurred by Landlord in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Tenant to Landlord upon demand as Additional Rent, plus a 15% administrative fee.

- If Tenant uses any Hazardous Materials as part of its Permitted Use or operations, including, but not limited to a dry cleaner, vehicle service station, fuel pad, car wash, laundromat, or the like, Tenant shall obtain an environmental insurance policy with limits no less than $1,000,000.00 per occurrence and deliver proof of such policy to Landlord as required under this Lease.

- Tenant shall provide proof of such required insurance annually to Landlord and/or within 10 days following Landlord's request

21. INDEMNIFICATION. To the fullest extent permitted by Governing Law, Tenant covenants and agrees that it will defend, indemnify, protect and save and keep Landlord forever harmless against and from (i) any penalty or damage or charges imposed for any violation of Governing Law, whether occasioned by Tenant or those holding under Tenant; (ii) against and from all claims, loss, cost, damage or expense arising out of or from any act, omission or negligence of Tenant, or Tenant's contractors, licensees, agents, servants, invitees, concessionaires or employees, or arising from any accident or other occurrence on or about the Premises, or any sidewalk or common area used by Tenant, causing injury to any person or property; (iii) against and from any and all claims, loss, cost, damage or expense arising out of any failure of Tenant in any respect to comply with and perform all the requirements and provisions of this Lease. Tenant's duty to defend shall arise when Tenant receives notice of any claims, loss, cost, damage or expense that may trigger Tenant's duty to indemnify, protect, and hold Landlord free and harmless, under this section. The duty to defend shall continue until a court of competent jurisdiction determines that there is no possibility that Tenant's duty to indemnify, protect, and hold Landlord free and harmless, under this section. Tenant's duty to defend shall extend to include any and all claims where Landlord's or third-party negligence is alleged. It is the intent of the parties that Tenant shall defend Landlord from the outset of any claims that Tenant could be found liable. Tenant agrees to defend such claims through counsel selected by Landlord. Tenant hereby waives any and every claim for recovery from Landlord and its successors and assigns for any and all loss of or damage to the Shopping Center or Premises or to the contents thereof, which loss or damage is covered by valid and collectible physical damage or general liability insurance policies, it being understood and agreed that the foregoing waiver shall also apply to the deductible under any such policy. Tenant waives any and every claim against Landlord for any and all loss of or damage to the Shopping Center or the Premises or the content thereof, and any general liability, which would have been covered had the insurance policies required to be maintained by Tenant by this Lease been in force, to the extent that such loss, damage, or liability would have been recoverable under such insurance policies. In that this Tenant waiver will preclude the assignment of any such claim by subrogation (or otherwise) to an insurance company (or any other person), Tenant agrees to give to its insurance company which has issued, or in the future may issue, to it policies of physical damage insurance, written notice of the terms of this Tenant waiver, and to have said insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverage by reason of said Tenant waiver. Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease.

22. LANDLORD'S LIABILITY. Landlord shall not be liable for any damage to the Premises or its contents, regardless of the cause of such damage, for any acts or omissions of other tenants of the Shopping Center, nor for any condition of the Premises whatsoever unless Landlord is responsible for the repair thereof, pursuant to the terms of this Lease, and has failed to make such repair after written notice from Tenant of the need therefor, and expiration of a reasonable time for the making of such repair. Further Landlord shall not be liable for any damage, loss or cause of action, wherein the cause of such loss is attributable to the maintenance of Landlord, where Tenant knew or should have known of the need for such maintenance and failed to notify Landlord thereof. All personal property, fixtures, goods, wares, and merchandise in or about the Premises or the Shopping Center shall be and remain at Tenant's sole risk. Tenant shall timely pay all taxes directly or indirectly assessed on any furniture, fixtures and equipment existing in the Premises or otherwise owned by Tenant, whether such taxes are assessed against Tenant, Landlord, or the Shopping Center. Landlord shall have the right to sell or transfer the Shopping Center in its discretion, and in the event of any sale or transfer of Landlord's interest in the Premises, Landlord is hereby completely released and forever discharged from and of all covenants, obligations, and liabilities hereunder  Tenant acknowledges and agrees that Landlord's liability under this Lease shall be limited to Landlord's interest in the Shopping Center, and any judgements rendered against Landlord shall be satisfied solely out of the proceeds of sale of Landlord's interest in the Shopping Center.

23. DAMAGE TO REAL PROPERTY. Landlord will maintain fire and extended coverage insurance on the Shopping Center  If the Shopping Center building housing the Premises shall be damaged by fire or other casualty of the kind insured against in standard policies of fire insurance with extended coverage, or in the event that any portion of the Premises shall be physically taken or condemned for public use, or transferred in lieu of such physical taking or condemnation, Landlord shall, using reasonable discretion, either repair or restore the damage or terminate this Lease if: (a) the cost of repair or restoration exceeds the amount of insurance proceeds received by Landlord and available for the repair and restoration of the Premises or if Landlord's mortgagee or the applicable governmental authorities refuse to give their approval and consent to the repair and restoration; or (b) this Lease is in the last 12 months of the Term; or (c) any tenant leasing greater than 5,000 square feet of space in the Shopping Center terminates its lease as a result of damage (regardless of whether such damage affects the Premises); or (d) more than 25% of the Shopping Center is damaged (regardless of whether such damage affects the Premises). Any such termination shall not affect any

165106.4



rights accrued to Landlord because of prior defaults by Tenant. Tenant shall have no right or claim to the proceeds of any transfer in lieu of such physical taking or condemnation or for any portion of Landlord's condemnation award, and shall have no right or claim based on the condemnation of the Premises or the improvements thereto or of Tenant's leasehold interest therein. Tenant, upon the request of any Landlord, shall execute, within 5 days after such request, any and all instruments required in order to effectuate any such condemnation or sale in lieu of condemnation, in the form requested by Landlord or such public authority. In all instances of restoration, Landlord shall only be required to restore the building which houses the Premises and common areas adjoining the Premises, and that portion of the Premises which Landlord is required to maintain pursuant to this Lease, to the condition they were in prior to the damage. Landlord shall have no responsibility to repair or restore any portion of the Premises required to be insured by Tenant under this Lease and Tenant shall have 30 days after delivery of access to Tenant by Landlord to complete its rebuilding or repairing in accordance with plans to be approved by Landlord before the commencement of construction. In the event any portion of the Premises is not usable by Tenant due to such damage, Fixed Minimum Rent shall abate proportionate to the unusable square footage until re-delivered by Landlord.

24. TENANT ASSIGNMENT. Tenant shall not assign, transfer encumber, or sublease this Lease without the prior written consent of Landlord which may be granted or withheld in Landlord's sole discretion. Any request for Landlord's consent to any proposed assignment or sublease shall be accompanied by an administrative fee in the amount of greater of (i) $5,000.00, or (ii) 5% of the final purchase price for the sale of Tenant's business to its transferee. Notwithstanding anything in this Lease to the contrary, if Tenant proposes to transfer this Lease, Landlord may, at its option, upon written notice to Tenant delivered within 60 days after its receipt of Tenant's notice of proposed transfer, elect to terminate this Lease upon 30 days written notice. Upon any such termination, Landlord and Tenant shall have no further obligations or liabilities to each other under this Lease, except with respect to obligations or liabilities which accrue or have accrued prior to the date of such termination.

25. DEFAULT AND REMEDIES. The following shall be an event of default by Tenant: (a) failure to perform or observe any terms, conditions and/or obligations of this Lease, which failure is not cured within 10 days after notice of such default; (b) failure to pay Rent or any sum of money hereunder when due (including any past due Rent, or other sum of money owed to Landlord, whether or not pursuant to a separate written agreement); (c) the bankruptcy or insolvency of Tenant or the filing by or against Tenant of a petition in bankruptcy or for reorganization or arrangement or for the appointment of a receiver or trustee of all or a portion of Tenant's property, or Tenant's assignment for the benefit of creditors and/or (d) if Tenant, or its employees, contractors, agents, business invitees, assignees, sublessees, licensees, concessionaires, shareholders, members, owners, affiliates, and/or any other permitted occupants of the Premises (collectively, "Tenant Parties" and individually a "Tenant Party") shall conduct, or permit any activity in violation of Governing Law at the Premises and/or the Shopping Center that may result in Tenant or such Tenant Party being charged for a criminal or civil offense. Upon the occurrence of a Tenant default, Landlord without notice to Tenant in any instance (Tenant hereby expressly waiving any notices or demand required by Governing Law), may do any one or more of the following: (i) perform, on behalf of and at the expense of Tenant, any terms, conditions, and/or obligations under this Lease which Tenant has failed to perform; (ii) declare the entire amount of the Rent which would become due and payable during the remainder of the Term of this Lease to be due and payable immediately, including any past due Rent, or other sum of money owed to Landlord, whether or not pursuant to a separate written agreement; (iii) re-enter the Premises, terminate Tenant's and/or any Tenant Party's right to possession of the Premises and/or remove Tenant, any Tenant Party and all other persons and property from the Premises, without terminating this Lease; (iv) relet said Premises or any part thereof upon any such terms and conditions as Landlord in its sole discretion may deem advisable, (v) terminate this Lease; (vi) remove Tenant's property from the Premises and store the same at Tenant's expense, or dispose of Tenant's property, without Landlord being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby; (vii) sell Tenant's property located within the Premises at a public or private sale, with the proceeds being applied to the costs of sale and storage, Landlord's reasonable attorney fees, amounts owed to Landlord under this Lease, and with any surplus paid to Tenant, in that order; (viii) change the locks of the Premises and lock Tenant out of the Premises; (ix) charge Tenant an administrative fee of 10% per month for all monetary amounts owed by Tenant to Landlord (including any expenditures by Landlord in performing Tenant's obligations under this Lease), until such amounts have been paid in full, and/or (x) exercise any legal or equitable rights and/or remedies available to Landlord pursuant to Governing Law. All of Landlord's rights and remedies set forth within this Lease shall be cumulative. Tenant waives any rights to re-enter the Premises and any rights of redemption; exercise any other legal or equitable right or remedy it may have, which shall specifically include but not be limited to Landlord's exercise without court proceeding of a lien on any of Tenant's property in the Premises until cure of all events of default. No re-entry or commencement of any action for re-entry by Landlord shall be construed as an election to terminate this Lease, nor to release Tenant from its obligations hereunder. Tenant hereby waives all rights to request a jury trial in any action, proceeding, or counterclaim arising out of this Lease. Tenant further waives any right to interpose any non-compulsory counterclaim, or to seek damages, other than injunctive relief, in relation to the reasonableness of Landlord's discretion. In no event may Tenant recover any special, consequential, indirect or punitive damages against or from Landlord herein, including, without limitation, any damages for or relating to any lost profit or business income. If this Lease is terminated by Landlord after default by Tenant, Tenant nevertheless shall remain liable for all Rent which may be due or damages which may be sustained prior to such termination, and all reasonable costs, fees, and expenses, including attorney fees, incurred by Landlord in pursuit of its remedies hereunder, and/or in connection with any bankruptcy proceedings of Tenant or Tenant's guarantor (if applicable), and/or in connection with renting the Premises to others from time to time, plus additional damages which shall be an amount equal to the present value of Rent, discounted at a rate of 8%, which would have become due during the remainder of the Term. Notwithstanding anything in this Lease or other document(s) to the contrary, upon the occurrence of any Tenant default, or upon the effective date of any assignment or other transfer of this Lease by Tenant to any third party, the following provisions contained within this Lease, if any, shall be automatically, immediately, and permanently removed and deemed null and void: (a) any exclusive use right granted to Tenant, (b) any use restrictions and/or prohibitions granted to Tenant; (c) any building, improvement, development, or kiosk restrictions (either permanent or temporary); and (d) any co-tenancy and pylon/monument provisions granted to Tenant. In addition to any other rights and remedies available to Landlord under this Lease and/or at law and/or in equity. Tenant shall reimburse Landlord upon demand the unamortized portion of: (i) any allowance for Tenant improvements; (ii) brokerage fees paid by Landlord in connection with this Lease; (iii) costs expended by Landlord in connection with any tenant improvements made by Landlord; and (iv) all other costs, expenses and other sums incurred by Landlord in connection with preparing and/or improving the Premises for Tenant's occupancy under this Lease. In addition to all other rights and remedies, if Tenant shall be in default hereunder, Landlord shall, to the extent permitted by law, have a right of distress for rent and a lien on all of Tenant's fixtures, merchandise, and equipment in the Premises, as security for rent and all other charges payable hereunder. No delay or omission of Landlord to exercise any right or remedy shall be construed as a waiver of any such right or remedy or of any default by Tenant hereunder. The acceptance by Landlord of any Rent hereunder shall not be a waiver of any breach or default by Tenant, other than the failure of Tenant to pay the particular Rent accepted, regardless of Landlord's knowledge of such breach or at the time of

165106 4



acceptance of such Rent, or a waiver of Landlord's right to exercise any remedy available to Landlord by virtue of such breach or default. Acceptance of a partial payment of any amount of Rent owed shall not be a waiver of Landlord's right to recover the remaining amounts of Rent still owing.

26. LANDLORD'S INSPECTION RIGHTS Landlord shall have the right at all reasonable times to enter upon the Premises to: (i) inspect and; make repairs, additions, or improvements, comply on behalf of Tenant with Governing Law if Tenant fails to do so, at no cost to Landlord and in Landlord's sole discretion; examine the Premises to verify Tenant's compliance with its obligations under this Lease, install, maintain and repair pipes or other utility lines to provide service to or for other premises located in the Shopping Center, or otherwise perform any work or satisfy any other Landlord obligation or right as set forth within this Lease, (ii) to bring potential purchasers tenants, or mortgagees into the Premises and/or to (iii) market the space, including installing temporary signage

27. SUBORDINATION/ ESTOPPEL The rights of Tenant under this Lease shall be subordinate to the lien and terms and conditions of the instrument or the lien resulting from any other method of financing or refinancing now or hereafter in force against the real estate and/or buildings of which the Premises are a part or against any buildings hereafter placed upon the real estate of which the Premises are a part. In addition, if the interest of Landlord in the Premises shall be transferred to and owned by the holder of any deed of trust or mortgage ("Lender") by reason of foreclosure or any other manner, Tenant shall be bound to Lender under all of the terms of this Lease, with the same force and effect as if the Lender were the original Landlord under this Lease. Tenant does hereby attorn to (a) the Lender as its Landlord when the Lender is in possession of the Premises, (b) a receiver appointed in any action or proceeding to foreclose the deed of trust or mortgage, (c) any party acquiring title to the Premises, and (d) any successor to Landlord, said attornment to be effective and self-operative, without the execution of any further instruments on the part of any of the parties hereto, immediately upon such successor succeeding to the interest of Landlord in the Premises. The provisions of this section shall be self-operative Tenant, however, upon the request of any Lender or Landlord shall execute within 5 days after such request, instruments in confirmation of the foregoing provisions in the form requested by any such Lender or Landlord Additionally Tenant agrees within 5 days after written request, to execute, and deliver to Landlord and/or Landlord's designee an estoppel certificate in such form and substance as reasonably requested by Landlord, Landlord's designee and/or lender, with customary provisions Should Tenant fail to return the estoppel certificate then Tenant hereby appoints Landlord as attorney-in-fact to execute an estoppel certificate on Tenant's behalf and to the fullest extent permitted by Governing Law, Tenant shall indemnify and hold Landlord harmless for all costs and expenses, including attorney fees, related thereto.

28. RULES AND REGULATIONS. Tenant agrees to comply with and observe the rules and regulations of the Shopping Center Tenant's failure to keep and observe said rules and regulations shall constitute a breach of the terms of this Lease in the same manner as if such rules and regulations were contained herein as covenants

29. HOLDING OVER. In the event that Tenant shall hold over after the expiration of this Lease for any reason, the monthly Fixed Minimum Rent shall be 2 times the monthly average Fixed Minimum Rent that was payable during the last full 12 month period of this Lease, and thereafter. In all cases, 30 days' written notice shall be required to terminate such tenancy In the event Tenant fails to timely vacate the Premises following such 30-day period, then Tenant shall be deemed immediately and automatically in default of this Lease

30. RELOCATION OF PREMISES Landlord may, upon 60 days prior written notice to Tenant relocate Tenant to another existing location within the Shopping Center, in Landlord's sole discretion, and constructed at Landlord's expense. If in Landlord's sole discretion (I) no existing suitable space is available, (ii) Governing Law hinders such relocation, or (iii) Tenant has less than 12 months' lease term remaining. Landlord may terminate this Lease upon 30 day's written notice to Tenant in Landlord's sole discretion In the event of such relocation, all references in this Lease to the "Premises" shall thereafter refer to the space to which Tenant is relocated Tenant's Proportionate Share shall be adjusted based on the change in the square footage of the Premises

31. REDEVELOPMENT OF SHOPPING CENTER. In the event of any expansion, renovation, redevelopment or remerchandising of the Shopping Center, Landlord may require Tenant to surrender possession of all or a portion of the Premises for such period of time as required for such purposes, including for the remainder of the Term Landlord shall provide Tenant with 60 days' prior written notice of such surrender During such period of surrender Fixed Minimum Rent shall proportionally abate. If the expansion, renovation redevelopment, or remerchandising of the Shopping Center requires Tenant to surrender the Premises for the remainder of the Term as determined by Landlord in its sole discretion, then this Lease shall terminate upon 30 day's written notice by Landlord to Tenant Tenant's Proportionate Share shall be adjusted to reflect any changes in the total square footage of the Shopping Center Notwithstanding anything in this Lease to the contrary, if any grocery anchor expresses an intent to expand its premises into an area that encompasses any portion of the Premises then Landlord may terminate this Lease by delivering 90 days' written notice to Tenant and this Lease shall terminate without any liability to any party

32. NOTICE. All notices given or required to be given by Tenant must be delivered by a nationally-recognized overnight courier service or by registered or certified mail - return receipt requested postage prepaid (or equivalent), to the Notice Address Such address may be changed from time to time by written notice.

33. BROKERS. Each of the parties represents and warrants that it has engaged no broker and that no claims for brokerage commissions or finder's fees will arise in connection with the execution of this Lease To the fullest extent permitted by Governing Law, each of the parties agrees to indemnify the other against and hold it harmless from all liabilities arising from any such claim arising on account of its acts or omissions (including, without limitation the cost of attorney fees in connection therewith).

34. FORCE MAJEURE. In the event that Landlord shall be delayed or hindered in or prevented from doing or performing any act required in this Lease by reason of strikes, lock-outs, casualties, acts of God, labor troubles, inability to procure materials, failure of power, Governing Law. any order or recommendation of any governmental authority, state or federal emergency declarations, communicable and infectious diseases, riots, insurrection, war, delays attributable to Tenant, delays attributable to utility provider(s), or other causes beyond the reasonable control of Landlord, then Landlord shall not be liable or responsible for any such delays, and the doing or performing of such act shall be excused for the

165106.4

period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. Monetary obligations under this Lease shall not be subject to force majeure.

35. MISCELLANEOUS PROVISIONS: This Lease shall be effective as of the earlier of (i) the date executed by both Landlord and Tenant or (ii) the date on which possession of the Premises is delivered by Landlord to Tenant, and all terms and conditions shall be applicable even though the Term of this Lease has not yet commenced and shall be governed and construed under the applicable governmental laws, codes, rules, authorities, approvals, orders, reviews, regulations, court orders, including, but not limited to, local zoning and building codes of the state in which the Shopping Center is located, and Environmental Laws (as defined above), as may be amended from time to time ("Governing Law"). If Tenant is not an individual, Tenant represents and warrants that throughout the Term of this Lease, Tenant is and shall be a valid legal entity, duly licensed to do business in the state in which the Shopping Center is located, and in the event Tenant is not an individual, and should Tenant fail to maintain its status as a valid legal entity or license to do business within the Shopping Center state, then the individual members, partners, or shareholders of Tenant shall be liable for all the terms and conditions set forth in this Lease. Landlord shall have the right to audit Tenant's gross sales in the event any other tenant or occupant of the Shopping Center alleges that Tenant has violated such tenant's or occupant's use restriction(s). If this Lease is signed by more than one individual as "Tenant", the liability of all signatories shall be joint and several. Tenant agrees to hold this Lease as confidential and Tenant shall not, without Landlord's prior written consent, disclose the contents of this Lease or any information related to this Lease including but not limited to CAM-related information, to any third party. In the event Tenant violates this confidentiality clause, Tenant shall be obligated to promptly pay Landlord $10,000.00 as liquidated damages; the actual damages which would be suffered by Landlord in such event being impossible to ascertain as of the date hereof, but the agreed upon amount being a reasonable estimate thereof. Each provision of this Lease shall be construed in a manner as to give it the fullest legal force and effect possible. To the extent any provision is held to be unenforceable or invalid, the unenforceability or invalidity of such provision shall not affect the enforceability or validity of the remaining provisions of this Lease. No waiver of any provision of this Lease shall be deemed or shall constitute a waiver of any other provision hereof or shall constitute a continuing waiver unless expressly provided in writing by the Landlord. In the event of any breach of this Lease, and/or any litigation between Landlord and Tenant arising out of this Lease, the non-prevailing party shall pay to the prevailing party all reasonable costs and expenses, including but not limited to attorney fees, paralegal fees, filing fees and court costs, incurred by the prevailing party in connection with the litigation, which shall be payable on demand, and, if payable to Landlord, as Additional Rent, subject to all of Landlord's rights and remedies provided herein. This Lease may not be amended, modified, or varied except in a writing signed by both Landlord and Tenant. Landlord shall have the right, but not the obligation, at any time during the Term, to renovate the existing Shopping Center by performing any work that Landlord deems necessary, in its sole discretion, to modify and/or improve all or any of the following storefronts, façades, canopies, lighting systems, Shopping Center identification signs, tenant identification signs, parking, roof, common areas and other similar items, including, but not limited, lease, sell, grant, or license space to occupants in the common areas. Notwithstanding anything in this Lease to the contrary, Landlord shall have the right, but is under no obligation, to install solar system(s), submeter(s), battery(ies), alternative energy sources, electrical vehicle charging station(s), and/or technological evolutions thereof in the Shopping Center. Under no circumstances shall Tenant have the right to act as Landlord's attorney-in-fact or use power of attorney to settle, litigate, or resolve any claims that could negatively impact Landlord unless agreed to in writing by both Tenant and Landlord. Tenant acknowledges and agrees that, at any time, Landlord is authorized to make all inquiries deemed necessary to verify the accuracy of Tenant's and/or guarantor(s)' financial status and to determine the credit worthiness of Tenant and/or any guarantor(s). Notwithstanding anything in this Lease to the contrary, the terms and provisions of Tenant's personal financial statement that was submitted by Tenant to Landlord shall remain as part of this Lease. Tenant authorizes Landlord to make inquiries to outside parties about Tenant's and/or guarantor(s') credit experience. Tenant represents and warrants to Landlord that the individual(s) signing this Lease, or the individual(s) signing on behalf of the Tenant entity to this Lease, as applicable, has/have full authority to execute this Lease and bind Tenant. Tenant shall cooperate with Landlord as necessary for Landlord to comply with Governing Law.

36. PREPARATION. THIS IS A LEGAL DOCUMENT AND HAS BEEN PREPARED BY LANDLORD BUT HAS BEEN REVIEWED AND APPROVED BY TENANT. TENANT HAS HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL PRIOR TO EXECUTION, AND THUS THIS AGREEMENT SHALL NOT BE INTERPRETED IN FAVOR OF EITHER LANDLORD OR TENANT OR AGAINST EITHER LANDLORD OR TENANT MERELY BASED UPON THEIR EFFORTS IN PREPARING SUCH

37. COUNTERPARTS & DIGITAL EXECUTION. This Lease may be executed in counterparts (each of which shall be deemed an original but all of which together shall constitute one and the same Lease) and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party. In the event that any signature is delivered by: (i) by electronic signature pursuant to Electronic Signatures In Global and National Commerce Act ("E-SIGN") or The Uniform Electronic Transactions Act ("UETA"), or similar laws, regulations, or orders of such signature (including, without limitation, through software programs such as DocuSign); (ii) by e-mail delivery of a " pdf" format data file, "JPEG" file, or similar imaging format; or (iii) through any other electronic transmission, then, in each case, each party acknowledges and agrees that such electronic signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such were an original thereof. Landlord, Tenant, and any other signatory party to this Lease waives any right to claim that such respective electronic signature does not create a valid and binding contract memorializing the parties' intents through such Lease's terms and conditions. The delivery of an executed copy hereof by Tenant shall be deemed an offer only, open for acceptance by Landlord solely upon execution and delivery of this Lease by Landlord and an agreement binding on Landlord shall not be deemed formed until such execution and delivery not withstanding any reliance by Tenant on any oral or written or other statements from Landlord or any of its agents delivered via e-mail or otherwise. Tenant hereby acknowledges that it disclaims any such reliance.

38. OFAC. Tenant represents and warrants to Landlord that (i) neither Tenant, nor any person or entity that owns an equity interest in Tenant, nor any of Tenant's officers, directors or managing members is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under Executive Order 13224 ("Executive Order") signed on September 24, 2001, and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism," or other governmental action, (ii) Tenant's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) Tenant is currently in compliance and, throughout the Term of this Lease, Tenant shall comply with the Executive Order and with the Money Laundering Act and any other governmental requirement relating thereto. To the fullest extent permitted by Governing Law, Tenant shall defend, indemnify, and hold

165106.4



harmless Landlord from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorneys' fees and related costs) incurred by Landlord arising from or related to any breach by Tenant of the foregoing representations in this Section; and the foregoing indemnity obligations shall survive the expiration or earlier termination of this Lease

------- END OF GENERAL LEASE TERMS --–--
(SIGNATURE PAGES TO FOLLOW)

165106.4

LANDLORD:
Cascades Station LLC,
 a Delaware limited liability company

BY: Phillips Edison Grocery Center Operating Partnership I, L.P., a Delaware limited partnership, its manager

BY: Phillips Edison Grocery Center OP GP I LLC, a Delaware limited liability company, its general partner

By:

Name: Robert F. Myers

Its: Executive Vice President

Date: 10/25/2022

165106.4

DocuSign Envelope ID: 93012FF0-F3C5-45D2-9FD4    40EB0983DD

TENANT:
Epicerie Cigar Retail Shop LLC,
a Virginia limited liability company

By: _Hafdalla Alahdal_

Name: Hafdalla Alahdal

Its (Title): Owner

Date: 10/18/2022

Tenant D/B/A: Epicerie Cigar Retail Shop

165106.4



## EXHIBIT A – SITE PLAN



DISCLAIMER - This Site Plan is for general information purposes only and is not intended to constitute representations and warranties by Landlord as to the ownership of the real property depicted herein or the identity or nature of any occupants thereof, excluding the areas specifically identified in the legend of this Site Plan and except as otherwise expressly provided for in body of this Lease to the contrary.

165106.4



## EXHIBIT B - TENANT IMPROVEMENT ALLOWANCE

Landlord shall pay to Tenant a cash allowance ("Tenant Improvement Allowance") not to exceed $25,200.00 as Landlord's contribution toward the commercially reasonable cost of Permanent Improvements (as such term is defined in this Lease) to the Premises, which have been completed in a first class manner and in compliance with all applicable codes by licensed contractors. Notwithstanding anything in this Lease to the contrary, Landlord may, in Landlord's sole discretion, apply any or all of the Tenant Improvement Allowance towards any amounts owed by Tenant to Landlord under the Lease, and the Tenant Improvement Allowance shall be reduced, on a proportionate dollar for dollar basis, by any Tenant Improvement Allowance amount that Landlord applies to Tenant's arrears. The Tenant Improvement Allowance shall be issued after the fulfillment of each of the following requirements ("Requirements").

1      Tenant opens for business in the Premises, and has paid a full month's Rent after opening for business; and

2      Landlord receives Tenant's invoice (sample Request Form attached) which must include: Shopping Center name, Tenant name, contact information, and address (no P.O. Box) for mailing of payment, for payment of the Tenant Improvement Allowance with all of the following attached thereto:

      i.   copies of receipts/invoices showing the work or materials purchased or other evidence of the cost of reimbursable Permanent Improvements, the aggregate sum of which is at least the amount of the Tenant Improvement Allowance being requested by Tenant; and

      ii.  a list of all contractors, subcontractors and material suppliers (collectively "Contractors"), which must contain all of the following information for each Contractor: (a) Business Name (b) business address (c) business phone number (d) contact name (e) proof of contractor's license (f) dollar amount for services rendered at the Premises; and

      iii.  notarized unconditional final lien waivers and/or notarized unconditional final lien releases (sample attached hereto) from all Contractors in excess of $2,500.00; and

      iv.  copy of building permits for Tenant Work, if required to perform Tenant Work, and

      v.   a copy of the final Certificate of Occupancy for the Premises; and

      vi.  drawings: an electronic copy (AutoCAD format) of all applicable drawings and specifications including but not limited to architectural, mechanical, electrical, plumbing, civil and shop drawings, to the extent and if required for Tenant Work and/or permitting; and

      vii.  HVAC information: A list detailing the model numbers, serial numbers, and tonnage for each installed HVAC unit as well as the balance report and all warranty information related thereto, if HVAC systems were installed, or repaired as part of Tenant Work; and

      viii.  warranties: one (1) year workmanship warranty from all Contractors performing any Tenant Work over $2,500.00, and all warranties for any equipment installed as part of Tenant Work; and

      ix.  an estoppel certificate certifying that this Lease is in full force and effect; and

      x.   Tenant's W-9; and

      xi.  Tenant's e-mail address and ACH bank account information

3.     Tenant's request (sample Request Form attached), along with all of the foregoing documentation is received by Landlord no later than sixty (60) days after the date Tenant opens for business in the Premises, at the following address

        Vice President of Construction
        ATTN: TIA PAYMENT REQUESTS
        Phillips Edison & Company
        11501 Northlake Drive
        Cincinnati, OH 45249

4.     Landlord, at Landlord's option, has conducted a lien search on the Premises which has revealed no liens filed in relationship to the work performed by or on behalf of Tenant; and

5      Tenant is in compliance with all obligations under this Lease

Landlord may, at Landlord's option, retain a portion of the Tenant Improvement Allowance as Landlord deems necessary to insure Landlord against any liability for mechanics' or materialmen's liens and to ensure completion of the Permanent Improvements, each being held by Landlord

165106.4



until such time has passed under Governing Law that a mechanics' or materialmen's lien can no longer be filed against the Shopping Center. In the event: (i) Landlord has not received and approved copies of Tenant's contractor's insurance pursuant to the terms of this Lease prior to start of Tenant Work, and/or (ii) Landlord has not received and approved copies of Tenant's Plans, if applicable, prior to the start of Tenant Work, Landlord shall reduce the Tenant Improvement Allowance by 2.5% in each event, for a total potential reduction in Tenant Improvement Allowance by 5%. In the event Tenant fails to request any portion of the Tenant Improvement Allowance within the aforementioned timeframe, or fails to satisfy the Requirements, any obligation of Landlord to pay the Tenant Improvement Allowance shall be deemed null and void. Landlord will issue payment of Tenant Improvement Allowance within 60 days of receipt of all of the Requirements for such request. If either party terminates this Lease for any reason prior to the expiration of the Initial Term or any renewal thereof, Tenant shall reimburse Landlord for the unamortized portion of the Tenant Improvement Allowance within 15 days of the termination of this Lease. Further, in addition to any remedies available to Landlord under this Lease, in the event Tenant commits an event of default, regardless of whether this Lease is terminated, Tenant shall reimburse Landlord for the unamortized portion of the cost of the Tenant Improvement Allowance within 15 days of such notice. For purposes of this Section, the Tenant Improvement Allowance shall be amortized on a straight-line basis over the life of this Lease, including any renewal terms. Landlord and Tenant agree that the monies to be paid by Landlord to Tenant pursuant to this Section are being paid to Tenant for the purpose of Tenant's constructing or improving qualified long-term real property as defined in Section 110(c)(1) of the Internal Revenue Code of 1986, as amended, for use in such Tenant's trade or business at the Premises, which Premises Landlord and Tenant acknowledge constitutes retail space. It is the intent of Landlord and Tenant that Landlord and Tenant shall consider any such payment as made in accordance with Section 110 of the Internal Revenue Code of 1986, as amended, and Landlord and Tenant shall provide the Internal Revenue Service any and all information concerning such payments as may be required by the Internal Revenue Service.

165106.4



## SAMPLE TIA REQUEST FORM

Date: _____, 20___

Shopping Center Name: _____
Tenant Name: _____
TIA Amount requested: $_____
Tenant contact name: _____
Tenant contact phone number: ___ (___) _____ _____

Tenant ACH Information:
- Name on Account: _____
- Type of Account: _____
- Routing Number: _____
- Account Number: _____

Dear Landlord:

Please consider this Tenant's request for reimbursement of the commercially reasonable cost of Permanent Improvements to the space (Tenant Improvement Allowance) up to the limits defined in my Lease. By making such request, Tenant certifies that the Permanent Improvements for which reimbursement is sought have been completed in the Premises, according to Governing Law (as such term is defined in the Lease), in a good and workmanlike manner, and that all Contractors have been paid in full for such work.
Tenant has enclosed the following (check if enclosed):

copies of receipts/invoices showing the work or materials purchased or other evidence of the cost of reimbursable Permanent Improvements, the aggregate sum of which is at least the amount of the Tenant Improvement Allowance being requested by Tenant;

a list of all contractors, subcontractors and material suppliers (collectively "Contractors"), which must contain all of the following information for each Contractor: (a) Business Name, (b) business address, (c) business phone number, (d) contact name, (e) proof of contractor's license, and (f) dollar amount for services rendered at the Premises;

notarized unconditional final lien waivers and notarized unconditional final lien releases (sample attached hereto) from all Contractors in excess of $2,500.00;

copy of building permits for Tenant Work, if required to perform Tenant Work;

a copy of the final Certificate of Occupancy for the Premises;

drawings: an electronic copy (AutoCAD format) of all applicable drawings and specifications including but not limited to architectural, mechanical, electrical, plumbing, civil and shop drawings, to the extent and if required for Tenant Work and/or permitting;

HVAC information: A list detailing the model numbers and tonnage for each installed HVAC unit as well as the balance report and all warranty information related thereto, if HVAC systems were installed, or repaired as part of Tenant Work;

warranties: one (1) year workmanship warranty from all Contractors performing any Tenant Work over $2,500.00, and all warranties for any equipment installed as part of Tenant Work;

an estoppel certificate certifying that the Lease is in full force and effect,

Tenant's W-9

Tenant requests that the payment be mailed to the following address (cannot be a P.O Box):

_____
_____
_____

Signed: _____          Date: _____

Printed name: _____

165106.4



## FINAL WAIVER OF LIENS

The undersigned, being a party in connection with the construction, repair, renovation and/or demolition of the improvements being made upon real estate owned by _____, located in _____ City, State of _____, and generally described as _____ Shopping Center,

Acknowledges that payment in the amount of $_____ has been paid in full by _____ for the work completed and materials supplied to the above-described property. Contractor does hereby waive, release and quit claim all right to a lien upon the land and improvements above described, as a result of work done and/or materials furnished by the undersigned, any employees, materialmen and sub-contractors through the Pay Application date for which this payment was made.

Undersigned warrants that upon completion of any work or delivery of any materials, all laborers and sub-contractors employed in the performance of the work and all material men who have furnished materials and services will have been fully paid, that no laborers, sub-contractors or materialmen will assert a claim against or a lien upon the premises hereinabove described, that no claim has been assigned or will be assigned for payment or right to perfect a lien against said land and improvements, and that the undersigned is fully authorized and empowered to execute this waiver of lien.

Undersigned understands and agrees that the Owner, any lender and the title insurance company are entitled to rely upon this waiver.

WITNESS:                                    CONTRACTOR:

_____          _____

                                           Printed Name: _____

                                           Title: _____

COUNTY OF _____  )
                              )SS:
STATE OF _____  )

BE IT REMEMBERED that on this _____ day of _____, 20___, before me, a Notary Public in and for the said county and state, personally appeared _____, who acknowledged that he/she did sign the foregoing instrument and that the same is his/her free and voluntary act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my notarial seal on the date and year above-mentioned

                                           _____
                                           NOTARY PUBLIC

165106.4

## ESTOPPEL

_____, 20___

Cascades Station LLC
11501 Northlake Drive
Cincinnati, Ohio 45249
Attention: Construction

Re:      Lease dated _____, 20___ ("Lease"), between Cascades Station LLC ("Landlord") and Epicerie Cigar Retail Shop LLC, a Virginia limited liability company ("Tenant").

Ladies and Gentlemen:

The undersigned, as Tenant, warrants and represents to Landlord as follows:

1.   Landlord is not in default under the terms and/or conditions of the Lease;

2   Landlord has satisfied its responsibilities in accordance with Landlord Work as set forth in the Lease;

3   The Lease is in full force and effect and has not been modified, altered, or amended;

4   The person signing this letter on behalf of Tenant, as applicable, is a duly authorized agent of the Tenant, as applicable.

TENANT:

By: _____

Printed Name: _____

Title: _____

165106.4



## EXHIBIT C – SIGN CRITERIA

**SECTION I.**
The content of all signs shall be limited to letters designating the Tenant name and/or type of store or business only (any such designation of the store type shall be by general descriptive terms and shall not include any specifications of the merchandise offered for sale therein or the services rendered therein) and shall contain no advertising devices, slogans, symbols or marks (other than the store name and/or type of store). Crests and corporate shield designs are not permitted

**SECTION II.**
Landlord will provide an area on the building façade of appropriate size and location to Tenant's storefront. After having first obtained Landlord's written approval of Tenant's sign design (which submission shall include letter style and size) prepared in accordance with these criteria, Tenant will properly install a sign on the façade.

**SECTION III.**
The character, design, color, location and layout of all signs shall be subject to Landlord's prior approval. Requests for sign approval must be submitted to Landlord for approval prior to fabrication and shall include two (2) sets drawings each showing the following: (i) the storefront drawing with signage drawn to scale, (ii) section of sign indicating sign construction and means of attachment to storefront and shall indicate sign depth dimension and lease line plane; (iii) specific colors and materials to be used. Landlord will require fifteen (15) business days to review Tenant requests for sign approval. No deviation from the approved drawings will be permitted without resubmission for Landlord's approval. All signage submissions shall be sent to:

Phillips Edison & Company
11501 Northlake Drive
Cincinnati, Ohio 45249
Attn: Director of Property Management
(513) 554-1110
(513) 554-1009 (Fax)

**SECTION IV.**
Excepting the signs specified in Section VI of this Exhibit, no occupant shall install more than one (1) sign.

**SECTION V.**
All signs shall be in accordance with the following requirements

(a)  The sign lettering or any part thereof shall be located within the physical limits of the storefront of the Premises and must remain at least eighteen (18") inches away from the lease lines, and shall not exceed 75% of the area of the façade directly above the Premises. The top plane of the sign shall be in line with the other tenant signage.

(b)  No sign or any part thereof shall be located on the roof of the Premises.

(c)  Tenant's sign shall be individually lettered, channel-lighted, and mounted on a raceway, with the raceway painted the same color as the façade.

(d)  All signs shall be professionally fabricated and installed in compliance with all applicable codes, laws and regulations.

**SECTION VI.**
The fabrication, installation and operation of all signs shall be subject to the following restrictions:

(a)  All storefront signs must be internally illuminated and regulated by a timer or photocell.

(b)  No flashing, moving, flickering or blinking illumination or lights, animation or floodlight illumination nor any moving signs, rooftop signs, parapet signs, exposed neon or pylon signs shall be permitted.

(c)  No painted or printed signs, except one (1) non-illuminated, small scale "Signature Sign" or "store hours" sign, which is lettered on the glass portion of Tenant's store or required credit card signs, provided such sign does not exceed three inches (3") in height.

(d)  No outrigger signs shall be permitted, except one (1) pre-approved identification sign located beneath the canopy if permitted at the Shopping Center

(e)  No sign will be installed without the written approval of Landlord.

**SECTION VII.**
At such time as Landlord prepares new sign criteria for the Shopping Center, Tenant will install a new sign to comply with such new criteria at Tenant's sole expense. If Landlord temporarily requires removal of Tenant's signs, Tenant shall be responsible for removal and reinstallation of signs.

**SECTION VIII.**
Tenant will have sole responsibility for compliance with all applicable codes, ordinances, building classifications, documents of record, rules and regulations. The plan review and approval conducted by Landlord is limited to adherence to Landlord's criteria and is not for code compliance. Tenant shall not be permitted to display any neon signage, or any other any signage with marijuana or hemp leaves, or any signage bearing drug paraphernalia images or symbols.

## FOR A COMPLETE UNDERSTANDING OF THE CODE REQUIREMENTS, TENANT SHOULD CONTACT LOCAL BUILDING OFFICIALS

165106.4



## EXHIBIT D – SHOPPING CENTER PRIVATE COVENANTS AND RESTRICTIONS

The covenants and restrictions set forth in this Exhibit are excerpted from leases and agreements which are executed or in the process of being negotiated, which exclusive uses and/or prohibited uses encumber (or shall encumber) the Premises. Although set forth in terms of restrictions against Landlord, Tenant (including any assignee, subtenant, franchisee or other transferee of Tenant under the Lease) shall not use the Premises in any way which will violate (or cause Landlord to violate) any of the terms and/or conditions or other provisions of such exclusive or restrictive use provisions. Except as otherwise indicated below, defined terms used below shall have the meanings ascribed to the same in the subject agreement or document from which such provision is derived In no event shall Tenant have the right to enforce any of the following provisions against Landlord or any other tenant or occupant of the Shopping Center

**Abbot's Frozen Custard**
Landlord agrees to not lease, consent to sublease, or consent to the assignment of any lease, for any space owned by the Landlord within a five (5) mile radius of this property to any company that generates revenue through sales of frozen custard, ice cream, frozen yogurt, and gelato.

**Burtons Grill & Bar**
Landlord shall not contract with, or permit to operate in the Shopping Center, any tenant that is a full service, American cuisine style restaurant (similar in style, appearance or menu offerings to those actually offered Tenant as of the date of this Lease, including by way of example, J Alexanders, Del Frisco Grille, Stoney River, Firebirds, Clyde's, etc ) occupying an area in the Shopping Center greater than 3,500 square feet without the written consent of Tenant Landlord agrees that it shall limit the number of full service restaurants with a Gross Rentable Area of more than 3,500 square feet in the Shopping Center to four (4), including the Tenant.

**Cava Grill**
Landlord shall not permit any other fast casual restaurant in the center to engage in the sale of Greek or Mediterranean cuisine as its primary use. Primary use is described as fifteen percent (15%) or more of items or fifteen percent (15%) or more of sales  This exclusive shall not pertain to restaurants over four thousand five hundred (4,500) square feet.

**Choolaah Indian BBQ**
Tenant shall have the exclusive right to operate a restaurant serving primarily Indian food items or food items typical of the cuisine on the Indian subcontinent including India, Pakistan, Nepal Bangladesh, or Bhutan (the "Exclusive Use") at the Shopping Center and neither Landlord nor its affiliates or successors or assigns shall permit or suffer any other tenant in the Shopping Center to engage in a business which is primarily the Exclusive Use (15% or more of sales)

Landlord shall not lease space to a check cashing operation, or an adult entertainment establishment, an adult bookstore, or any other establishment engaged in the sale, distribution or exhibition of pornographic materials within the Shopping Center, without Tenant's prior written consent, which consent can be withheld in its sole discretion.

**Chuy's**
Landlord, on behalf of Landlord and Landlord's successors and assigns, officers, directors, persons owning at least ten percent of its ownership interests, parents, affiliated and subsidiary entities and any partner or other party affiliated with Landlord (a "Landlord Party"), agrees that no Landlord Party shall use, suffer, permit or consent to the use or occupancy of any portion of the Center (except the Premises) as a Tex-Mex or Mexican Restaurant, or a restaurant with a Tex-Mex or Mexican theme, including without limitation, fast food restaurants ("Tenant's Exclusive Use"). A restaurant or bar will be considered to operate as a Tex-Mex or Mexican restaurant, or to have a Tex-Mex or Mexican theme, if that enterprise derives more than 25% of its gross sales from Mexican and Tex-Mex food items

Landlord agrees that no Landlord Party shall suffer, permit or consent to the use or occupancy of any portion of the area designated as the "Restricted Use Area" on Exhibit B-1 [as referenced below] by (a) any business selling food for either on-premises or off-premises consumption, including without limitation, any fast food, fast casual, or sit-down restaurants, or (b) a gym or fitness facility or learning facility (such as Kumon or Sylvan). The foregoing shall not prohibit the operation of a business primarily serving coffee, donuts and bagels (e.g. Krispy Kreme, Starbucks, Einstein Bros, Bagel), so long as, (x) the such business shall be less than 2,000 square feet (measured from the outside of each exterior wall and the centerline of each demising wall), and (y) only one such user shall be permitted within the Restricted Use Area

Buildings in the Center shall be used for only commercial purposes of the type normally found in a retail shopping center including, without limitation, financial institutions, service shops, and retail stores. Neither Landlord nor any Landlord Party shall permit any of the following uses within the Center without Tenant's prior written consent, which may be withheld in Tenant's sole discretion: cafeteria, theatre, bowling alley, billiard parlor, funeral parlor, night club, or other place of recreation or amusement (such as laser tag or paint ball facilities; miniature or putt-putt golf facilities; go-cart tracks; rock climbing facilities; party, dance, cheer, tumbling, or gymnastics facilities; or any other facility providing a place for patrons to engage in and/or receive instruction in any leisure, hobby, past-time, exercise, play, fun, pleasure, celebration, or sport event or activity), any business deriving more than seventy percent (70%) of its gross revenues from the sale of alcoholic beverages (provided the area designated as the "Eastern Side" on Exhibit B-2 [as referenced below] shall not be subject to the foregoing restriction on alcohol sales); flea market, industrial manufacturing facility, automobile dealership, skating rink, bar (except as incidental to the operation of a restaurant on the Premises), exercise facility (except the Eastern Side shall not be subject to the foregoing restriction on exercise facilities); massage parlor (but therapeutic massage is permitted), modeling studio, adult bookstore or other establishment primarily engaged in the business of selling, exhibiting or distributing pornographic or obscene materials or live models or dancers, an amusement arcade or facility providing coin-operated amusement devices, rides, pinball machines, mechanical or electronic games, and/or similar types of equipment or devices, car repair facility, betting parlor, central laundry or dry cleaning plant (other than a dry cleaning drop-off facility which does not use dry cleaning fluids or similar chemicals or substances on site in connection with the dry cleaning of clothes) or any business which creates unreasonably or unusually strong or offensive odors, fumes, emissions or sounds

**Deka Lash**
Landlord will not do business, or lease to another business, whose primary business is providing eyelash extensions, microblading, or related services

165106 4



**DRNK Coffee & Tea/ QWENCH Juice Bar**
Landlord will not sell or permit any party, other than Tenant, to sell at the Center: the sale of: (a) whole or ground coffee beans, (b) espresso, espresso-based drinks or coffee-based drinks, (c) gourmet tea or gourmet tea-based drinks, (d) gourmet, brand-identified brewed coffee or (e) blended beverages that contain coffee, espresso as a Primary Use. And, (a) smoothies, (b) freshly squeezed raw vegetable and fruit juices, (c) acai bowls, (d) Greek yogurt bowls with fresh fruit and assorted toppings as a Primary Use. Primary Use shall be defined as ten (10%) of a Tenant's sales. All tenants may sell non-gourmet tea without restriction and iced tea from bottles, cans or soda fountain dispensers without restriction (collectively, "Tenant's Exclusive Items"). No other co-tenant shall be permitted to sell any frozen treat health focused freshly blended smoothies (collectively, "Tenant's Exclusive Items") and acai bowls, freshly squeezed raw vegetable and fruit juices, and Greek yogurt bowls with fresh fruit and assorted toppings.

**Fire Works Pizza**
Tenant shall have the exclusive right to sell pizza in the Shopping Center and no other restaurant shall sell more than fifteen percent (15%) of its food sales in pizza

**Great Clips**
No other store of the shopping center shall be used for the purpose of operating a haircutting salon with a price point less than thirty dollars ($30.00) per cut including Barber Shops (including but not limited to Fantastic Sams, Hair Cuttery, Cost Cutters, Sports Clips etc) and Beauty or Cosmetology Schools. Notwithstanding the foregoing, Tenant acknowledges and agrees that Landlord shall be permitted to enter a lease with Salon Lofts Group, LLC, on terms acceptable to the Landlord in its sole discretion, for use of premises in the Shopping Center, even though Salon Lofts Group, LLC, may be operated for the purpose of a hair salon offering haircuts at a price point of less than Thirty Dollars ($30.00).

**Harris Teeter**
"Landlord's Adjacent Land" means any property (i) located within one-half mile from any boundary of the Shopping Center and (ii) now owned or later acquired or controlled by Landlord, any affiliate of Landlord, or any partner or principal of Landlord who is also a partner or principal in the ownership of the Shopping Center. Landlord grants to Tenant the exclusive right in the Shopping Center and on Landlord's Adjacent Land to:

(a) Operate any one or more of a food supermarket or department, grocery store or department or dairy store or department,

(b) Sell seafood, meat, cheese and other delicatessen items by weight or quantity (except that Landlord may allow a delicatessen restaurant to operate elsewhere in the Shopping Center or on Landlord's Adjacent Land if the only items the delicatessen restaurant sells for off-premises consumption are sandwiches and other menu items served to on-premises customers), provided further that a restaurant (such as, by way of example, Panera Bread) which sells both sandwiches and breakfast baked-good items such as muffins and bagels shall be permitted,

(c) Sell bakery items, except one (1) specialty bakery store (including a store selling cupcakes as a principal part of its business) shall be permitted as long as such store does not exceed 2,000 square feet;

(d) Sell flowers or operate as a florist or flower shop,

(e) Operate a pharmacy, which at Tenant's election may have a walk-up window, except that one nationally recognized chain pharmacy (such as CVS or Rite Aid) with no less than 10,000 square feet of Floor Area may be located within the Shopping Center so long as that pharmacy (i) is not located in the Required Adjacent Space, (ii) does not devote more than 2,500 square feet of Floor Area in the aggregate (including the adjacent aisle space) to the sale of Grocery Items, (iii) does not have any window or outdoor signage indicating that food or groceries are sold inside the pharmacy and (iv) does not open for business to the public earlier than a date that is one (1) year after the date Tenant opens for business in the Premises. "Grocery Items" means foods typically sold in grocery stores for off-premises consumption such as canned or packaged food items (whether prepared within the premises or elsewhere), produce, meats, cheeses, seafood, bakery products, beverages or dairy products,

(f) Sell food or beverages (including alcoholic beverages, beer and wine) for off-premises consumption; provided, however, Landlord may allow elsewhere in the Shopping Center or on Landlord's Adjacent Land the sale of food and beverage items that:
    (i) Are intended for consumption in the Shopping Center or on Landlord's Adjacent Land,

    (ii) Constitute only an incidental part (five percent or less of gross sales from the applicable space) of the seller's primary business.

    (iii) Are prepared take-out items sold in the normal operation of a restaurant, delivery, or catering business (including pizza, Chinese or Mexican restaurants selling take-out food),

    (iv) Landlord may lease space in the Shopping Center to a state operated "ABC" liquor store, provided that (i) not more than the lesser of ten percent (10%) of the floor area or ten percent (10%) of the retail display and sales area of such store is devoted to beer and wine and (ii) the sale of beer and wine account for not more than ten percent (10%) of such store's gross sales.

Landlord and Tenant shall not permit any of the following uses in the respective areas under their control (Premises for Tenant, and the Shopping Center and Landlord's Adjacent Land for Landlord): an onsite dry cleaning service whereby the dry-cleaning and any other cleaning processes are performed within the Shopping Center (pick-up and drop-off only facilities shall be permitted); adult entertainment; adult video or bookstore; nightclub; tavern; lounge; dance hall; massage parlor; funeral home or morgue; pool hall; game parlor; health spa or gym with 200' of Tenant's Building (provided further such restriction shall only apply to that portion of the Shopping Center located to the west of the Main Driveway); skating rink; bingo games; betting agency; bowling alley or other entertainment or recreational use within 200' of Tenant's Building (provided further that such restriction shall only apply to that portion of the Shopping Center located to the west of the Main Driveway); health or recreational facility; flea market; auto dealership; car rentals or sales; child care center; or hazardous or illegal uses.

Except as permitted under Section 8.2 or Section 8.3(c), Landlord shall not allow any of the following uses in the Shopping Center or on Landlord's Adjacent Land: (i) a restaurant or other establishment where the sale of "home replacement meals" constitutes a significant portion of the business of such establishment

165106.4



(it being acknowledged that Boston Market, Chicken Out, Dean & Deluca, Sheetz, or Wawa are examples of establishments where the sale of "home replacement meals" constitutes a significant portion of the user's business) (ii) businesses where customers prepare their own means for off-premises consumption such as Dream Dinners, Super Suppers or similar operations; (iii) theater (motion-picture or acting) (iv) kiosk; (v) establishment selling alcoholic beverages for on-premises consumption other than restaurants permitted under clauses (c) and (d) below, (vi) sale of beer and wine, including stores such as Total Wine or similar operations, (vii) carnivals, fairs or shows that are not associated with marketing/promotion of the Shopping Center; or (viii) sales by merchants utilizing vehicles or booths.

The provisions of Section 8.3(b) to the contrary notwithstanding. Landlord may (i) allow restaurants in any free-standing buildings (other than within the No Restaurant Area, as hereinafter defined) and (ii) lease, in the remainder of the Shopping Center (excluding any free-standing buildings) up to 2,400 square feet of Floor Area per store to:

(a) an ice cream or yogurt store (similar to a Ben & Jerry's or a TCBY).

(b) a pizza restaurant or other restaurant that sells prepared food or precooked food for "take-out" that is not prohibited under Section 8 3(b) and that does not sell alcoholic beverages for any type (provided, however, if the restaurant or store is located more than 200 feet from the front entrance of the Building, then such restaurant or store may sell alcoholic beverages if the alcoholic beverage sales are ancillary to food sales and do not exceed 35 % of the total sales from that restaurant or store); and

(c) a restaurant other than as described in Section 8 3(c)(ii)(B) if such restaurants is located more than 200 feet from the front entrance of the Building and the restaurant's alcohol sales do not exceed the 35% limit stated in Section 8 3(c)(ii)(B) Anything contained herein to the contrary notwithstanding, no restaurant shall be permitted within the 6,770 square foot retail building closest to Tenant's Store depicted as the "No Restaurant Area" on the Site Plan [as referenced below], except that Landlord may permit the northernmost bay of such building, not to exceed 2,000 square feet of Floor Area, to be used as a coffee bar, bagel store or donut shop with limited food service, such as an Einstein Bagels or Caribou Coffee store, as such stores are operated as of the date hereof, but in no event shall any full service restaurant, fast-food restaurant or casual dining restaurant be permitted within such limited portion of the No Restaurant Area

## Insight Eye Optique
Landlord agrees not to enter into a lease with another tenant for space in the Shopping Center for the primary or incidental business of providing optical or eye wear products including eye examination and related accessories, except for tenants who incidentally sell such products or services not to exceed 20% of their gross sales and not to exceed 20% of their store display area (the "Exclusive Use Covenant"), or allow other tenants in the Shopping Center to offer the products or services referenced in the Exclusive Use Covenant except as provided in said Covenant.

## Metropolitan Nail Bar
The Premises shall be used solely for (1) retail operation of a high-end nail salon ("Primary Use"). Landlord shall not rent to another tenant in the Shopping Center having the same Primary Use as the tenant, primary use defined as thirty percent (30%) of a Tenant's sales.

## Pacific Dental Services
Tenant shall have the exclusive right to provide general dentistry and/or specialty dentistry (including, without limitation Orthodontics, Pediatric Dentistry, Oral Surgery, Periodontics, Endodontics, Cosmetic Dentistry) services and operations and related dental business uses within the Shopping Center (the "Exclusive Use") Accordingly, Landlord agrees that it shall not lease, sell or otherwise convey to or otherwise permit (subject to the terms and conditions relating to a Rogue Tenant Breach) the operation of, any other tenant or occupant to operate for the Exclusive Use within the Shopping Center Tenant shall not have any other exclusives right to sell merchandise or dispense services of any type and character, it being understood that Landlord reserves the absolute right to lease other space in the Shopping Center to Tenants selling merchandise or dispensing services similar to that which is being sold or dispensed by Tenant unless it violates this section 7 01.

Aside from 'General Dentistry, the Exclusive Use shall not apply to any specialty dentistry tenants in the medical and office building, as labeled on the site plan in Exhibit A [as referenced below].

## Pet Depot
Landlord agrees not to lease, let use or permit to be used, any other property owned or controlled by it within the center now or at any time during the period of this lease or any extension, any entity who competes with PET DEPOT sales or services or a similar type of user. The Grocer Anchor is excluded from this agreement and currently does compete and will provide these same types of products, services and sales Grocery Anchor is the grocery store anchor tenant

## Pivot Physical Therapy of Metro DC
Landlord shall not lease space to a retail tenant or operate a business in the Building whose Primary Use is physical therapy Primary Use shall be defined as twenty-five percent (25%) of Tenant's sales. The Exclusive Use shall not apply to a massage group (including the following brands: Massage Envy La Vida Massage, Massage Green, etc.).

## Pure Barre
No part of such land shall be leased or used or another fitness concept that utilizes a ballet barre (collectively, "Tenant's Exclusive") Tenant's Exclusive shall not apply to any tenant within the Radius with a lease in existence prior to the Commencement Date provided that in the event that Landlord has contractual discretion to deny any request for a change in permitted use by a current tenant or their proposed sublessee or assignee which would otherwise violate Tenant's Exclusive, then Landlord agrees to exercise its discretion to deny such request.

## Radiant Waxing
Landlord shall not permit any tenants in the shopping center to offer hair removal services below the neck, unless such tenants are currently offering such services in accordance with their lease, nor may Landlord permit the sale of supporting products of the Tenant, by any other Tenant where such sales exceed twenty percent (20%) of such Tenant's retail offering.

165106.4



### Salon Lofts

Tenant shall have the exclusive right in the Shopping Center and on any adjacent property owned by Landlord (or Landlord's affiliate) to operate a hair salon or a business that provides the following services as its primary source of business: hair cutting and styling (collectively "Tenant's Exclusive Services") Accordingly, Landlord agrees not to lease or sell any space in the Shopping Center (other than the Premises) or any adjacent property owned by Landlord (or its affiliate) to or otherwise permit to be operated therein another hair salon or a business which provides any of the Tenant's Exclusive Services as its primary source of business. "Primary Source of Business" shall mean more than 250 square feet devoted thereto or more than 10% of revenue derived therefrom. This covenant and Tenant's exclusive rights set forth herein shall run with the land on which the Shopping Center is located and on any property contiguous or adjacent to the Shopping Center owned or leased by Landlord (or any affiliate of Landlord), or in which Landlord (or any affiliate of Landlord) has an interest, directly or indirectly, during the Term of this Lease.

Notwithstanding the foregoing, Section 6.2 shall not prohibit any tenant under a lease existing on the date of this Lease from using premises leased to it for any use permitted under such tenant's then existing lease for the term of such lease and any renewals thereof. Notwithstanding the foregoing, Tenant acknowledges and agrees that Landlord shall be permitted to enter a lease with Great Clips, on terms acceptable to the Landlord in its sole discretion, and Landlord shall be permitted to lease premises in the Shopping Center for use as a typical Great Clips store or other, similar "budget cut" type business charging less than $30 per haircut, even though such use of Shopping Center premises by Great Clips or such other similar business may conflict with Tenant's Exclusive Services

Landlord will (a) not lease or permit the use of any storeroom located within thirty feet (30') of any boundary of the Premises for the operation of any business which emits offensive odors or which causes vibrations or noise discernible within the Premises and (b) maintain the Shopping Center so that is of retail character.

The Shopping Center will remain retail in character and, that no part of the Shopping Center shall be leased and tenanted for long-term use for any of the following: (i) exercise facility greater than 5,000 sq. ft. GLA or racquet club, gymnasium, bowling alley, skating rink, miniature golf or other sports or recreational facility; (ii) school, library, reading room, or house of worship; (iii) movie theatre, auditorium, meeting hall, hotel or motor inn, or any residential use or day-care facility; (iv) massage parlor, tattoo parlor, adult bookstore, adult entertainment facility, a so-called "head" shop, off-track betting, gambling, gaming or check cashing facility; (v) car wash, automobile repair work or automotive service or gas station, tire store, automobile body shop, automobile, motorcycle, boat, trailer or truck leasing, rental or sales, or laundromat; (vi) tavern or bar (unless operated incidental to, in conjunction with, and under the same name as, a restaurant permitted hereunder), amusement park, carnival, banquet facility, dance hall, disco, nightclub, video game, virtual reality or laser tag room or facility, pool hall, arcade, indoor children's recreational facility or other amusement or entertainment facility; (vii) any manufacturing, warehouse or office use (except incidental to a retail operation); (viii) funeral parlor, animal raising or storage (except incidental to a full-line retail pet supply operation), pawn shop. flea market or swap meet, junk yard; (ix) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; (x) any facility related to the occult sciences, such as palm readers, astrologers, fortune tellers, tea leaf readers or prophets, frozen food locker or sales facility, milk distribution center, nursing home, old age center, or governmental facility (other than a post office). recruiting center or employment center; or (xi) any use which constitutes a public or private nuisance or produces objectionable noise or vibration

### Shred415

Excluding existing tenants, Landlord shall not lease, rent, occupy, or permit to be occupied or used, any space in the Shopping Center to any fitness studio that operates boot camp style training as its primary business

### The Event Center

Exclusive use of renting space for conduction of events.

### Urbano Modern Italian

Landlord will not lease any space in the Shopping Center which may be used for the sale of fast casual Italian food, except for tenants who are leasing space as of the Date of Lease Execution. Landlord shall not lease additional space to any primary coffee use This excludes the existing tenant spaces; by reference are currently doing business as Starbucks and DRNK [Coffee & Tea / QWENCH Juice Bar].

### Wells Fargo

During the Lease Term, except only for Tenant and its parent, subsidiary, and affiliate entities, Landlord shall not, and covenants that it will not, lease to license, permit, or otherwise allow any Financial Services Entity [defined herein] to lease, sublease, occupy, license, be located in, conduct, or do business in or from any part or portion of the Center or to erect, construct, or place any signage in, on, or about the Center that identifies, advertises, or otherwise promotes the existence, presence, opening, operation, or availability of any such Financial Services Entity or of its services. Tenant shall at all times during the Lease Term be the sole and exclusive Financial Services Entity located in and operating from the Center

"Financial Services Entity" means any person or entity that is or operates as a state or national bank; savings bank, credit union; savings and loan institution finance company; industrial bank; mortgage company; securities broker or dealer; trust company; insurance company, agency, or brokerage; and any other business in the financial services industry (as most broadly defined) including the operation of automated teller machines, night depositories, merchant exchange machines, or any similar equipment

Notwithstanding anything set forth in this Section 8.2 to the contrary, Harris Teeter may install interior ATMs only within its premises (i.e., the ATM cannot be accessible from the exterior of Harris Teeter's premises)

Landlord covenants that it will operate and maintain the Center in a first-class condition and will not allow any use within the Center that (i) causes or creates a nuisance, (ii) is obnoxious, or (iii) generally detracts from the general first-class retail nature of the Center including, but not limited to, the following: funeral establishment; automobile, boat or other motor vehicle sale, leasing, repair or display establishment or used car lot, including body repair facilities and/or service stations; auction or bankruptcy sale; pawn shop; outdoor circus, carnival or amusement park, or other recreation or entertainment facility; outdoor meetings; bowling alley; shooting gallery; off-track betting (provided that state sponsored lottery tickets shall not be prohibited); any bookstore, theater amusement facility and/or facility selling or displaying books, magazines, literature, or videotapes containing Adult Material ("Adult Material" is defined as any printed and/or pictorial work that appeals to a prurient interest in sex, is patently offensive according to contemporary community standards, and has no serious

Page 24 of 31

165106.4



literary artistic, political, or scientific value, and any printed and/or pictorial work rated X, XX, XXX (or of a rating assigned to works containing material more sexually explicit than XXX), and, notwithstanding anything to the contrary contained in this Lease, no material shall be considered Adult Material if: (1) it is available, or of the type to be available to the community, through a broadcast network (i e., NBC, ABC or CBS); or (2) it is such a material that is, or has been in a cinema or theater for public viewing in the community where the Premises is located; provided, however, that any material rated X, XX, XXX, or rated for more sexually explicit content than XXX, shall be considered Adult Material and restricted regardless of its availability to the general public); auditorium, meeting hall, ballroom, school or other place of public assembly, unemployment agency, service or commission, gymnasium, health club, dance hall, cocktail lounge, bar, disco, after-hours club, or night club, bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business, video game or amusement arcade, except as an incidental part of another primary business; skating or roller rink, car wash, car repair or car rental agency, second hand store, auction house, or flea market, dry cleaning plant, storage facility (except as incidental to and in support of retail use), truck rental, outdoor amusement facility, wholesale and/or distribution operation, sporting event or other sports facility, or massage parlor.

**Zoup!**
Landlord shall not lease, rent, occupy or permit to be occupied or used, any space in the Shopping Center (including any expansion thereof) for the operation of a restaurant serving soup, etoufee, gumbo, chili, jambalaya, stew, or soup as a Primary Use "Primary Use" is defined as generating more than 20% sales from the sale of the foregoing item or items

<u>Referenced Exhibits</u>

**Chuys's Exhibit B-1 & B-2**



165106.4





165106.4



**Harris Teeter Site Plan**



165106.4



**Pacific Dental Services Exhibit A**



165106.4



## GUARANTY

THIS GUARANTY ("Guaranty") to Landlord, made by the undersigned guarantor(s) (each individually a "Guarantor," and collectively the "Guarantors"), under the following circumstances:

**PARTIES:**

Landlord: Cascades Station LLC
a Delaware limited liability company

Tenant:    Epicerie Cigar Retail Shop LLC,
a Virginia limited liability company

d/b/a:    Epicerie Cigar Retail Shop

**PREMISES:**

Shopping Center: Cascades Overlook

Shopping Center Address: 21399 Epicerie Plaza  Sterling VA 20164

Unit Number: B135 Square Feet: approximately 1,680

Landlord is about to enter into a lease agreement ("Lease"), contemporaneously executed with this Guaranty, to Tenant for the Premises and in order to induce Landlord to enter into the Lease with Tenant, Landlord requires that the performance of Tenant's (and its successors' and assigns') obligations be guaranteed as provided below.

Guarantors are willing to guarantee the performance of the obligations of Tenant (and its successors and assigns)  For purpose of this Guaranty, any reference to Tenant herein, shall include Tenant's successors and assigns

NOW, THEREFORE, in consideration of the lease of the Premises to Tenant  and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantors agree as follows

b.    **Guaranty.** The Guarantors jointly and severally guarantee:  (a) that Tenant will pay when due all of the rentals and all other sums payable by Tenant as specified in the Lease during the life of the Lease; and (b) that Tenant will perform and comply with all the agreements and obligations provided for in the Lease at the time and in the manner set forth in the Lease during the life of the Lease.

c.    **Subsequent Dealings with Tenant or Guarantors.** Any extension of time for payments due or renewals granted by Landlord, or any extensions of time for the performance of any agreements or any other indulgence that may be granted to Tenant by Landlord shall not release the Guarantors from liability on this Guaranty  All settlements, compromises, and agreed balances made in good faith between Landlord and Tenant shall be binding on the Guarantors.  The Guarantors authorize Landlord at any time to enter into agreements with Tenant to modify or amend any of the terms of the Lease; to release Tenant from liability for all or any part of its obligations under the Lease; to release, substitute, or add any one or more Guarantors; to enter into agreements with any other Guarantor modifying or amending that Guarantors' obligations under this Guaranty  and to assign this Guaranty in whole or in part.  Landlord may take any of these actions upon any terms and conditions as Landlord may elect  without giving notice to any Guarantor or obtaining the consent of any Guarantor, and without affecting the liability of any Guarantor to Landlord

d    **Independent Obligations.** This is an absolute, unconditional, and continuing guarantee  The Guarantors' obligations under this Guaranty are independent of those of Tenant.  Landlord may bring a separate action against any one or more Guarantors without first proceeding against Tenant or any other person and without pursuing any other remedy

e    **Waivers.** Notice of acceptance of this Guaranty by Landlord is waived.  The Guarantors further waive:  (a) any defense based on any legal disability of Tenant or any discharge or limitation of the liability of Tenant to Landlord  whether consensual or arising by operation of law or any bankruptcy, insolvency, or debtor-relief proceeding, or from any other cause  except payment and performance in fact; (b) presentment, demand, protest, and notice of any kind; and (c) all rights of subrogation, all rights to enforce any remedy that Landlord may have against Tenant, and all rights to participate in any security held by Landlord for the performance of Tenant's obligations, until such obligations have been paid and performed in full.

f.    **No Separate Notices.** Any notice given to Tenant shall be effective as though also given to the Guarantors  The Guarantors agree that Landlord will have no duty to report to any Guarantor any information about Tenant's financial condition or its ability to perform  Notwithstanding the above, at Landlord's sole option, Landlord may provide the Guarantors with any notice to the below listed address

g.    **Default & Remedies.** Upon a default by Tenant, Landlord may exercise any remedy in the Lease  Landlord shall have no duty to mitigate, except to the extent, if any, that Landlord has an express duty to mitigate pursuant to the terms of the Lease. No such action by Landlord will release or limit the liability of any Guarantor to Landlord, even if the effect of that action is to deprive the Guarantors of the right to collect reimbursement from Tenant for any sums paid to Landlord. Landlord may declare the Guarantors in default under this Guaranty if any one or more Guarantors fail to perform any of its obligations under this Guaranty or becomes the subject of any bankruptcy, insolvency arrangement, reorganization, or other debtor-relief proceeding under any Governing Law (as such term is defined in the Lease), whether now existing or subsequently enacted.

h.    **Miscellaneous Provisions.** The Guarantors agree to pay Landlord's reasonable out-of-pocket costs and expenses, including, but not limited to, legal fees and disbursements, incurred in any effort to collect or enforce this Guaranty, whether or not any lawsuit is filed  No delay or failure by Landlord to exercise any right or remedy against Tenant or any Guarantor will be construed as a waiver of that right or remedy  The invalidity or unenforceability of any one or more provisions of this Guaranty will not affect any other provision. This Guaranty may be amended only by a written instrument executed by the affected Guarantor and Landlord. The obligations of each Guarantor under this Guaranty will bind the heirs, legal representatives, successors, and assigns of each Guarantor and shall inure to the benefit of Landlord, its successors and assigns. Each

Page 29 of 31

165106.4



Guarantor represents and warrants to Landlord that the individual(s) signing this Guaranty, or the individual(s) signing on behalf of the Guarantor entity to this Guaranty, as applicable. has/have full authority to execute this Guaranty and bind Guarantor.

(SIGNATURE PAGES TO FOLLOW)

165106.4

DocuSign Envelope ID: 93012FF0-F3C5-45D2-9FD4    40EB0983DD

GUARANTOR #1:

Hafdalla Alahdal,
an individual,

By: _____
Print Name:  Hafdalla Alahdal
Date:  10/18/2022

Guarantor #1 Notice Address:

430 Conner Grant RD
New Bern, NC 28560

Email Address: khlimited_service@outlook.com
Phone: 247-608-2241

165106.4

# EXHIBIT B



# EXHIBIT C

PHILLIPS EDISON & COMPANY

October 21, 2024

**SENT VIA UPS OVERNIGHT MAIL**
Epicerie Cigar Retail Shop LLC
Hafdalla Alahdal
430 Conner Grant Rd
New Bern, NC 28560

**RE: NOTICE OF TENANT DEFAULT**
Lease Agreement dated October 25, 2022 ("Lease") by and between Cascades Station LLC, a Delaware limited liability company ("Landlord"), and Epicerie Cigar Retail Shop LLC d/b/a Epicerie Cigar Retail Shop("Tenant") for the premises known as Unit B135 for 1,680 sq. ft. ("Premises") at the Cascades Overlook shopping center ("Shopping Center") in Sterling, Virginia

Dear Tenant,

This letter serves as Landlord's notice of Tenant's default under the Lease as Tenant is in violation of the Permitted Use ("Notice"). Pursuant to the Lease, the Permitted Use of the Premises is limited to, "the operation of a high-end retail cigar shop selling cigars and tobacco, and related cigar and tobacco accessories, all in compliance with Governing Law, **and for no other use**." In addition, Tenant shall not:

> (i) operate as a business or facility used in growing, delivery, transferring, supplying, dispensing, distributing or selling marijuana or hemp, whether by prescription, medical recommendation, or otherwise; (ii) sell any products classified as kratom, kava, or Delta-8, or any products in any way derived from or containing marijuana; (iii) sell any illegal or illicit drugs or drug paraphernalia; (iv) sell any glassware, such as but not limited to, bongs, bowls, pipes, or any other glassware that may be used in the consumption of marijuana, hemp or tobacco; (v) operate as a headshop; (vi) grow, process, or manufacture hemp or marijuana; (vii) sell any marijuana or marijuana-related products and paraphernalia, whether or not such products are deemed legal and/or approved by the FDA or DEA; (vii) operate for any unlawful purpose or in any way which would constitute a nuisance to tenants or occupants of the Shopping Center.

11501 NORTHLAKE DRIVE | CINCINNATI OH 45249
T 513 554 1110  F 513 554 1820  PHILLIPSEDISON.COM

CINCINNATI  PARK CITY  ATLANTA

 **PHILLIPS EDISON & COMPANY** '

Tenant's present use of the Premises is in violation of the Permitted Use provision of the Lease. Pursuant to Section 25, Tenant shall cure such defaults within ten (10) days after receipt of this Notice. Failure to cure the above defaults will result in termination of the Lease. Landlord reserves any and all rights and remedies available to it under the Lease, at law, and in equity.

Sincerely,

Phillips Edison & Company, Ltd.
As Management Agent for Cascades Station LLC

# EXHIBIT D



DashComm

- Invoices
- Documents
- Requests
- Sales
- Communications
- Business
- Directory
- FAQs
- Administration

← All Businesses > Epicerie Cigar Retail Shop

# Epicerie Cigar Retail Shop

Details   Users   Compliance   Insurance

**Signage**

Status                                              Pending

UPLOAD DOCUMENT(S)

Notes 2                                              ADD NOTE

Why are we still in violation? We took everything from the shelves on October 11 2024 after we got a phone call from you guys. Our sales has even declined since we took the products you ask us to remove from the store. uploaded the product pictures taken on October 11 2024 . Thank you. Please give us a call 252-276-5858. Ms Km Chrisman   11/11/24  01 04 PM

Karma Elouandih                                              11/11/24  12 58 noon

Status changed to Pending

**Plans**

# EXHIBIT E

Ms Kim Chrisman

**From:** Amanda Riggs <ariggs@phillipsedison.com>
**Sent:** Monday, November 11, 2024 10:59 AM
**To:** khlimited_service@outlook.com <khlimited_service@outlook.com>
**Subject:** Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA

Hafdalla,

My name is Amanda Riggs. I am in the legal department at Phillips Edison, the Landlord of Cascades Station in Sterling, VA.

On October 21, 2024, Tenant was delivered a Notice of Default for violating Tenant's Permitted Use provision. Pursuant to the Lease, Tenant's Permitted Use of the Premises is strictly limited to, "the operation of a high-end retail cigar shop selling cigars and tobacco, and related cigar and tobacco accessories, all in compliance with Governing Law, and for no other use."

Despite being notified of such default, Tenant's present use of the Premises continues to be in violation of the Permitted Use provision of the Lease. Tenant was to cure said default within 10-day of receipt.

Under such continued default, Landlord is hereby exercising its right to terminate the Lease. As part of such termination, Tenant will pay to Landlord a termination fee of $39,000.00. This $39,000.00 represents 6 months of base rent ($39,128.60) rounded down to an even dollar amount.

Tenant has 14-days to sign the Lease Termination Agreement and remit payment and vacate the Premises accordingly. Otherwise, Landlord is prepared to purse legal action.

Thanks,

Amanda

**Amanda Riggs**
Tenant Default Manager
D +15133382763
ariggs@phillipsedison.com | www.phillipsedison.com

 **PHILLIPS EDISON & COMPANY**

DISCLAIMER: Statements contained in this message may not be relied upon, and will not constitute an agreement of any form nor an official representation of the sender or Phillips Edison & Company or its affiliates, unless and until memorialized in writing and signed by the appropriate parties. This message and any attachment(s) hereto are for the sole use of the intended recipient(s) This message may contain information that is privileged or otherwise protected from disclosure Any review, dissemination, use, or copying of this message or its contents by persons other than the intended recipient(s) is strictly prohibited. If you have received this message in error, please reply to the sender and delete the message from your system

   

# EXHIBIT F

 Outlook

**RE: Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA**

From Amanda Riggs <ariggs@phillipsedison.com>

Date Fri 11/15/2024 3:37 PM

To    karima elouahidy <khlimited_service@outlook.com>

Unfortunately, no. Senior Management has made their decision and instructed me to move forward with lease termination. Landlord requests that you vacate the premises.

Thanks,
Amanda

**Amanda Riggs**
Tenant Default Manager
D +15133382763
ariggs@phillipsedison com | www phillipsedison com

 PHILLIPS EDISON & COMPANY

DISCLAIMER: Statements contained in this message may not be relied upon, and will not constitute an agreement of any form, nor an official representation of the sender or Phillips Edison & Company or its affiliates, unless and until memorialized in writing and signed by the appropriate parties. This message and any attachment(s) hereto are for the sole use of the intended recipient(s). This message may contain information that is privileged or otherwise protected from disclosure. Any review, dissemination, use, or copying of this message or its contents by persons other than the intended recipient(s) is strictly prohibited. If you have received this message in error, please reply to the sender and delete the message from your system.



**From:** karima elouahidy <khlimited_service@outlook.com>
**Sent:** Thursday, November 14, 2024 3:18 PM
**To:** Amanda Riggs <ariggs@phillipsedison.com>
**Subject:** Re: Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA

Thank you for getting back to me. Is there anything we can do to keep the lease? like if we fill the store with good products to replace the missing items make it high-end Cigar shop appearance. is there anyway we can negotiate and us keeping the lease? Please let us know.

Thank you,
Ms Kim

**From:** Amanda Riggs <ariggs@phillipsedison.com>
**Sent:** Thursday, November 14, 2024 2:59 PM
**To:** karima elouahidy <khlimited_service@outlook.com>
**Subject:** RE: Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA

Good afternoon, Ms. Chrisman,

 Outlook

**RE: Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA**

From Amanda Riggs <ariggs@phillipsedison.com>

Date Thu 11/14/2024 3:00 PM

To      karima elouahidy <khlimited_service@outlook.com>

📎 1 attachment (90 KB)

October 11, 2024 pics - Epicerie.pdf;

Good afternoon, Ms. Chrisman,

My apologies for the delay in getting back to you as I have been out of the office.

With regards to the termination, the Lease was executed with the notation and understanding that Tenant would operate as a "high-end retail cigar shop".

I understand you may have removed the non-permitted items; however, the space does not give off the appearance of a high-end retail cigar shop. This has led to a series of complaints. Therefore, Landlord is exercising its right to terminate.

Thanks,
Amanda

Amanda Riggs
Tenant Default Manager
D +15133382763
ariggs@phillipsedison.com | www.phillipsedison.com

 **PHILLIPS EDISON & COMPANY**

DISCLAIMER: Statements contained in this message may not be relied upon and will not constitute an agreement of any form, nor an official representation of the sender or Phillips Edison & Company or its affiliates, unless and until memorialized in writing and signed by the appropriate parties. This message and any attachment(s) hereto are for the sole use of the intended recipient(s). This message may contain information that is privileged or otherwise protected from disclosure. Any review, dissemination, use, or copying of this message or its contents by persons other than the intended recipient(s) is strictly prohibited. If you have received this message in error, please reply to the sender and delete the message from your system.

From: karima elouahidy <khlimited_service@outlook.com>
Sent: Thursday, November 14, 2024 2:20 PM
To: Amanda Riggs <ariggs@phillipsedison.com>
Subject: Re: Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA

Good afternoon Amanda,
I left you few voicemail messages, Hafdalla Alahdal wanted to know why our lease is terminated early. We complied with the landlord's request to take kratom products and other products we were not supposed to sell. We took everything off the shelves on October 11, 2024. I sent you the pictures in my

# EXHIBIT G



*EXHIBIT 2*

State Corporation Commission
Clerk's Information System

A-    A    A+

## Entity Information

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | BeMobile, Inc. | Entity ID: | 11702455 |
| Entity Type: | Stock Corporation | Entity Status: | **Active** |
| Series LLC: | N/A | Reason for Status: | Active and In Good Standing |
| Formation Date: | 06/22/2000 | Status Date: | 05/28/2024 |
| VA Qualification Date: | 05/28/2024 | Period of Duration: | Perpetual |
| Industry Code: | 0 - General | Annual Report Due Date: | 05/31/2026 |
| Jurisdiction: | ND | Charter Fee: | $200.00 |
| Registration Fee Due Date: | 05/31/2026 | | |

### Registered Agent Information

| | | | |
|---|---|---|---|
| RA Type: | Entity | Locality: | HENRICO COUNTY |
| RA Qualification: | BUSINESS ENTITY THAT IS AUTHORIZED TO | | |

Privacy Policy    Contact Us

VIRGINIA - SCC

TRANSACT BUSINESS
IN VIRGINIA

| Name: | C T CORPORATION SYSTEM | Registered Office Address: | 4701 Cox Rd Ste 285, Glen Allen, VA, 23060 - 6808, USA |

## Principal Office Address

Address:  2100 S Columbia RD Ste 214, Grand Forks, ND, 58201, USA

## Principal Information

| Title | Director | Name | Address | Last Updated |
|---|---|---|---|---|
| President, Secretary, Treasurer | Yes | Brady J. Hansen | 2100 S Columbia RD Ste 214, Grand Forks, ND, 58201, USA | 05/28/2024 |
| Vice President | No | Jake Miller | 2100 S Columbia RD Ste 214, Grand Forks, ND, 58201, USA | 05/28/2024 |
| | Yes | James R. Hansen | 2100 S Columbia RD Ste 214, Grand Forks, ND, 58201, USA | 05/28/2024 |

## Current Shares

Total Shares:  100000

Privacy Policy          Contact Us

VIRGINIA - SCC

Filing History        RA History        Name History        Previous Registrations

Garnishment Designees        Image Request

Back    Return to Search    Return to Results

Back to Login

Privacy Policy        Contact Us

# *EXHIBIT 3*

# COMMONWEALTH OF VIRGINIA



### LOUDOUN CIRCUIT COURT
Civil Division
18 E MARKET ST/PO BOX 550
LEESBURG VA 20178-0550
(703) 777-0270

Virginia:

In the LOUDOUN CIRCUIT COURT

Proof of Service

Case number: 107CL26002555-00
Service number: 002
Service filed: April 10, 2026
Judge:

Served by: HENRICO COUNTY
Style of case: EPICERIE CIGAR RETAIL SHOP LLC vs CASCADES STATION LLC
Service on: BEMOBILE INC
    REGISTERED AGENT
    CT CORPORATION SYSTEM
    4701 COX RD., SUITE 285
    GLEN ALLEN VA 23060

Attorney: MUGHAL, FAISAL SHAWN
703-352-1300
11350 RANDOM HILLS RD STE 700
FAIRFAX VA 22030

Instructions:

Returns shall be made hereon, showing service of Summons issued Friday, April 10, 2026 with a copy of the Complaint filed Friday, April 10, 2026 attached.

Hearing date :

Service issued: Friday, April 10, 2026

For Sheriff Use Only

NAME: BEMOBILE INC

4701 COX RD APT 285, GLEN ALLEN , VA. 23060

☐ PERSONAL SERVICE

☐ Being unable to make personal service, a copy was delivered in the following manner

☐ Delivered to person found in charge of usual place of business or employment during normal business hours and giving information to its purport

☐ Delivered to family member (not temporary sojourner or guest) age 16 or older at usual place of abode of party named above giving information of its purport. List name, age of recipient and relation of recipient to party named above

☐ Posted on front door or such other door as appears to be the main entrance of usual place of abode, address listed above. (Other authorized recipient not found.)

☐ Copy mailed to judgement debtor on date below after serving the garnishee unless a different date is shown below

☐ No envelope provided

☐ Evicted          ☐ Not Evicted
☒ Served on registered agent   LAUREN EVERETT
☐ Not Found

☐ No Levy Required

☐ Not in this jurisdiction

☐ NO EFFECTS FOUND

DEPUTY SHERIFF

*W Cone*

04/20/2026
Date

Cone, W. - Badge #7522

FOR: Sheriff Alisa A. Gregory
Henrico County, Virginia

Paper Number: 4027174
Court Case Number: 107CL26002555-00
Notes: SEE ATTACHED SERVICE AUTHORIZATION LETTER THAT IS ATTACHED.

## Service Authorization
## CT Corporation System

CT Corporation System ("CT") is registered agent for service of process for numerous corporations and similar entities. CT receives the process only in its capacity as a commercial registered agent. The individuals designated below are employees of CT Corporation System and in receiving the process, do so only on CT's behalf and in CTs capacity as registered agent.

**PLEASE NOTE:** The Code of Virginia §§ 13.1-634 provides in part:
"Registered office and registered agent.
A....
B. The sole duty of the registered agent is to forward to the corporation at its last known address any process, notice or demand that is served on the registered agent."

*As such, neither CT Corporation System., nor its individual employees designated below, have the duty or the ability to respond to any legal process, notice or demand that is served on CT's clients.*

The following natural persons are designated in the office of the registered agent upon whom any process, notice or demand may be served:

Lauren Everett          Nikolas Williams          Rockayla Marable          Jessica Fitzgerald

This authorization does not certify the receipt or acceptance of any specific process

Lauren Everett
Fulfillment Associate
CT Corporation System

State of Virginia
County of Henrico

This day personally appeared before me, Lauren Everett, who name is signed above and who, being first duly sworn, upon her oath, state that the foregoing Affidavit is true to the best of her knowledge and belief.

Subscribed and sworn before me this 26 day of March, 2025.

Notary Public

# EXHIBIT 4

**AFFIDAVIT – DEFAULT JUDGMENT**
**SERVICEMEMBERS CIVIL RELIEF ACT**
Commonwealth of Virginia     VA. CODE § 8.01-15.2

Case No. CL26-2555 ....................................................

.................................................................................................
RETURN DATE AND TIME

Loudon County
.................................................................................................
CITY OR COUNTY

[X] Circuit Court     [ ] General District Court
[ ] Juvenile and Domestic Relations District Court

EPICERIE CIGAR RETAIL SHOP, LLC     v./*In re:*     BEMOBILE, INC.
.......................................................................              .................................................................................................

I, Faisal Shawn Mogha ................................., the undersigned, state the following:
        PRINT NAME

[X] The defendant/respondent     [ ] is in military service.     [X] is not in military service.
[ ] The affiant is unable to determine whether or not the defendant/respondent is in military service.

The following facts support the statement above:

The Defendant is a corporation.

Pursuant to 50 U.S.C. § 3931, if the court is unable to determine whether the defendant/respondent is in military service based upon the affiant's statement, the court, before entering judgment, may require the plaintiff/petitioner to file a bond in an amount approved by the court.

Pursuant to Va. Code § 8.01-4.3, I declare, under penalty of perjury, that the above information is true and correct.

5/15/2026 ............................................
        DATE

.................................................................................................
SIGNATURE

**NOTICE REGARDING APPOINTMENT OF COUNSEL TO REPRESENT ABSENT SERVICEMEMBER:**
Where appointment of counsel is required pursuant to 50 U.S.C. § 3931 or § 3932 or another section of the Servicemembers Civil Relief Act, the court may assess reasonable attorney fees and costs against any party as the court deems appropriate, including a party aggrieved by a violation of the Act, and shall direct in its order which of the parties to the case shall pay such fees and costs, except the Commonwealth unless it is the party that obtains the judgment. Further, counsel appointed pursuant to the Servicemembers Civil Relief Act shall not be selected by the plaintiff or have any affiliation with the plaintiff.

FOR COURT USE ONLY:

[ ] **ORDER OF APPOINTMENT OF COUNSEL**
   I find that appointment of counsel is required pursuant to 50 U.S.C. § 3931 or § 3932 or another section of the Servicemembers Civil Relief Act and therefore, I appoint the lawyer indicated below to represent the absent servicemember named as defendant/respondent above.

   [ ] The lawyer shall be paid a fee of $ ................................. for serving as counsel for the absent servicemember.

NAME,
ADDRESS OF
COURT
APPOINTED
LAWYER

.................................................................
.................................................................

.................................................................
NEXT HEARING DATE AND TIME

.................................................................
DATE

.................................................................
JUDGE

[ ] **STAY OF PROCEEDINGS**
   I find that a stay of proceedings is required pursuant to 50 U.S.C. § 3931 and, therefore, such a stay, for a minimum period of 90 days, is ordered until ...............................................................................
                                        NEXT HEARING DATE AND TIME

.................................................................
DATE

.................................................................
JUDGE

FORM DC-418 REVISED 07/25

VIRGINIA:

### IN THE CIRCUIT COURT OF LOUDOUN COUNTY

---

**EPICERIE CIGAR RETAIL SHOP LLC.:**

    Plaintiff,

    v.

**CASCADES STATION LLC**

    And

**BEMOBILE, INC.**

    Defendants.

Case No.: CL26-2555

---

### ORDER

THIS MATTER came to be heard on the Fourth day of June 2026, on Plaintiff Epicerie Cigar Retail Shop, LLC's Motion for Default Judgement against Defendant BeMobile, Inc.

IT APPEARING to the Court that Plaintiff Epicerie Cigar Retail Shop, LLC's Motion for Default Judgement is well-taken and should be granted; it is hereby

ORDERED that Plaintiff Epicerie Cigar Retail Shop, LLC's Motion for Default Judgement is GRANTED against BeMobile Inc.; and it is further

ORDERED that the judgement shall be as follows:

a.      Compensatory damages in the amount of $2,504,000.00;

b.      Additional treble damages in the amount of $5,008,000.00 pursuant to Virginia Code § 18.2-500;

c.      Attorney's Fees in the amount of $7,424.00;

d.      Punitive damages in the amount of $350,000

1

e.      Pre-judgment and post-judgment interest at six percent from April 10, 2026 until

paid, and

f.      Court costs in the amount of $384.00;


ENTERED THIS _____ DAY OF June 2026.


_____
Honorable Judge
Loudon County Circuit Court

2

I ASK FOR THIS:

MAHDAVI, BACON, HALFHILL & YOUNG, PLLC

_____
Faisal Shawn Mughal VSB# 84251
11350 Random Hills Road, Suite 700
Fairfax, VA 22030
(703) 352-1300 Telephone
(703) 352-1301 Facsimile
fsm@mbhylaw.com
*Counsel for Plaintiff*



SEEN AND _____


_____
BeMobile, Inc.
C T Corporation System
4701 Cox Rd. Suite 285.
Glen Allen, VA 23060



SEEN AND _____


_____
Cascades Station, LLC
C T Corporation System
4701 Cox Rd. Suite 285.
Glen Allen, VA 23060

3

# COMMONWEALTH OF VIRGINIA



## LOUDOUN CIRCUIT COURT
Civil Division
18 E MARKET ST/PO BOX 550
LEESBURG  VA  20178-0550
(703) 777-0270

Proof of Service

Virginia:
In the LOUDOUN CIRCUIT COURT

Case number: 107CL26002555-00
Service number: 002
Service filed: April 10, 2026
Judge:

Served by: HENRICO COUNTY
Style of case: EPICERIE CIGAR RETAIL SHOP LLC vs CASCADES STATION LLC
Service on: BEMOBILE INC
  REGISTERED AGENT
  CT CORPORATION SYSTEM
  4701 COX RD., SUITE 285
  GLEN ALLEN VA 23060

Attorney: MUGHAL, FAISAL SHAWN
703-352-1300
11350 RANDOM HILLS RD STE 700
FAIRFAX VA 22030

4027174

Instructions:

Returns shall be made hereon, showing service of Summons issued Friday, April 10, 2026 with a copy of the Complaint filed Friday, April 10, 2026 attached.

Hearing date  :
Service issued: Friday, April 10, 2026

For Sheriff Use Only



NAME: BEMOBILE INC

4701 COX RD APT 285, GLEN ALLEN , VA. 23060

☐ PERSONAL SERVICE

☐ Being unable to make personal service, a copy was delivered in the following manner
☐ Delivered to person found in charge of usual place of business or employment during normal business hours and giving information to its purport

---------------------------------------------------------------------------------

☐ Delivered to family member (not temporary sojourner or guest) age 16 or older at usual place of abode of party named above giving information of its purport. List name, age of recipient and relation of recipient to party named above

---------------------------------------------------------------------------------

☐ Posted on front door or such other door as appears to be the main entrance of usual place of abode, address listed above.
(Other authorized recipient not found.)
☐ Copy mailed to judgement debtor on date below after serving the garnishee unless a different date is shown below
☐ No envelope provided

---------------------------------------------------------------------------------

☐ Evicted          ☐ Not Evicted
☒ Served on registered agent   LAUREN EVERETT
☐ Not Found

☐ No Levy Required

☐ Not in this jurisdiction

| ☐ NO EFFECTS FOUND | DEPUTY SHERIFF |
|---|---|
| | *W Cone* |
| 04/20/2026<br>Date | Cone, W. - Badge #7522<br><br>FOR: Sheriff Alisa A. Gregory<br>Henrico County, Virginia |

**Paper Number: 4027174**
**Court Case Number: 107CL26002555-00**
Notes: SEE ATTACHED SERVICE AUTHORIZATION LETTER THAT IS ATTACHED.

## Service Authorization
## CT Corporation System

CT Corporation System ("CT") is registered agent for service of process for numerous corporations and similar entities. CT receives the process only in its capacity as a commercial registered agent. The individuals designated below are employees of CT Corporation System and in receiving the process, do so only on CT's behalf and in CTs capacity as registered agent.

**PLEASE NOTE:** The Code of Virginia §§ 13.1-634 provides in part:
"Registered office and registered agent.
A....
B. The sole duty of the registered agent is to forward to the corporation at its last known address any process, notice or demand that is served on the registered agent."

_As such, neither CT Corporation System., nor its individual employees designated below, have the duty or the ability to respond to any legal process, notice or demand that is served on CT's clients._

The following natural persons are designated in the office of the registered agent upon whom any process, notice or demand may be served:

Lauren Everett        Nikolas Williams        Rockayla Marable        Jessica Fitzgerald

This authorization does not certify the receipt or acceptance of any specific process

_signature_

Lauren Everett
Fulfillment Associate
CT Corporation System

State of Virginia
County of Henrico

This day personally appeared before me, Lauren Everett, who name is signed above and who, being first duly sworn, upon her oath, state that the foregoing Affidavit is true to the best of her knowledge and belief.

Subscribed and sworn before me this 26 day of March, 2026.

_signature_

Notary Public

ARMAN AHMED
NOTARY
PUBLIC
REG # 00380217
MY COMMISSION
EXPIRES
05/31/2029
COMMONWEALTH OF VIRGINIA

VIRGINIA:

## IN THE CIRCUIT COURT OF LOUDOUN COUNTY

EPICERIE CIGAR RETAIL SHOP LLC.:

    Plaintiff,

    v.

CASCADES STATION LLC

    And

BEMOBILE, INC.

    Defendants.

Case No.: CL26-2555



## NOTICE OF PENDING PROCEEDINGS

Pursuant to Va. Code § 8.01-296(2)(b), this notice is sent to inform you of a pending hearing scheduled for June 5th, 2026, at 10:00 a.m. at Loudon County Circuit Court, 18 E Market St, Leesburg, VA, 20178. This pending hearing is for a Motion for Default Judgment filed by Plaintiff. Accordingly, upon the expiration of ten (10) days after the giving of this Notice and the expiration of the statutory period within which to respond, without further notice, the entry of a judgement by default as prayed for in the pleadings (enclosed) may be requested. The following Defendant is subject to the judgement by default if granted, and final order entered by the Court:

    BeMobile Inc.
    R/A: C T Corporation System
    4701 Cox Rd. Suite 285.
    Glen Allen, VA, 23060

                               Respectfully submitted,
                               Epicerie Cigar Shop LLC
                               By counsel

MAHDAVI, BACON, HALFHILL, & YOUNG, PLLC

By: _____
Faisal Shawn Mughal VSB# 84251
11350 Random Hills Road
Suite 700
Fairfax, VA 22030
703-352-1300
703-352-1301 (Fax)
fsm@mbhylaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I Faisal Shawn Mughal, hereby certify that on the 15th day of May 2026, a copy of the

foregoing was sent by USPS Priority Mail, to:

BeMobile Inc.
R/A: C T Corporation System
4701 Cox Rd. Suite 285
Glen Allen, VA, 23060

I Faisal Shawn Mughal, hereby certify that on the 15th day of May2026, a copy of the

foregoing was sent by USPS First Class Mail, to:

Cascades Station, LLC
R/A: C T Corporation System
4701 Cox Rd. Suite 285
Glen Allen, VA 23060

_____
Faisal Shawn Mughal

2

**V I R G I N I A:**

## IN THE CIRCUIT COURT OF LOUDOUN COUNTY

---

EPICERIE CIGAR RETAIL SHOP LLC.:

    Plaintiff,

    v.                        Case No.: CL26-2555

CASCADES STATION LLC

    And

BEMOBILE, INC.

    Defendants.

---

## CERTIFICATE OF MAILING

In accordance with Va. Code § 8.01-296(2)(b), the undersigned certifies that a copies of the pleadings, including the Motion for Default Judgement, with notices that the proceedings are pending in Loudon County Circuit Court and that upon the expiration of 10 days after the giving of the notice and the expiration for the statutory period within which to respond, without further notice, the entry of a judgement by default as prayed for in the pleadings will be requested, were sent on this 15th day of May 2026, sent by FedEx to:

    BeMobile, Inc.
    R/A: C T Corporation System
    4701 Cox Rd. Suite 285.
    Glen Allen, VA 23060

                              Respectfully submitted,
                              Epicerie Cigar Retail Shop, LLC.
                              By Counsel

MAHDAVI, BACON, HALFHILL, & YOUNG, PLLC

1

By:    _Faisal Mughal_

Faisal Shawn Mughal (VSB#84251)
11350 Random Hills Road, Suite 700
Fairfax, VA 22030
703-352-1300(tel)
703-352-1301 (fax)
fsm@mbhylaw.com

## CERTIFICATE OF SERVICE

I, Faisal Shawn Mughal, hereby certify that on the 15th day of May 2026, a copy of the

foregoing was sent by USPS Priority Mail to:

BeMobile Inc.
R/A: C T Corporation System
4701 Cox Rd. Suite 285.
Glen Allen, VA 23060


I Faisal Shawn Mughal, hereby certify that on the 15th day of May2026, a copy of the

foregoing was sent by USPS First Class Mail, to:

Cascades Station, LLC
R/A: C T Corporation System
4701 Cox Rd. Suite 285
Glen Allen, VA 23060


_Faisal Mughal_

Faisal Shawn Mughal

2

**VIRGINIA:**

## IN THE CIRCUIT COURT OF LOUDOUN COUNTY

EPICERIE CIGAR RETAIL SHOP, LLC )
v. )
     )   ■ Civil
     )   ❑ Juvenile
CASCADES STATION LLC )   ❑ Adoption   No. CL26-2555
     )   ❑ Chancery
     )   ❑ Misc. - _____
BEMOBILE, INC. )

## PRAECIPE - CIVIL MOTION

(14 DAY NOTICE FOR CONTESTED; 7 DAY NOTICE FOR UNCONTESTED; or SEE LOCAL RULES)

The Clerk is requested to place this matter on the Court's **Civil Motions Docket** for:

Friday*, the **5th** day of **June**_____, 20**26**  at    *1ST, 3RD & 4TH FRIDAYS ONLY

    ❑ 9:00 a.m.   (UNCONTESTED MATTERS / AGREED ORDERS / RETURNS ON RULES TO SHOW CAUSE)

    ☒ 10:00 a.m.  (CONTESTED CIVIL MOTIONS (NON-DOMESTIC))

    ❑ 2:00 p.m.   (CONTESTED DOMESTIC RELATIONS MOTIONS / ORE TENUS / PENDENTE LITE MOTIONS)

to hear the following: **Motion for Default Judgement** _____
                              PURPOSE / TITLE AND ( DATE FILED )

_____.

**Note:** Civil docketing, motion and briefing requirements are set forth in the 20th Judicial Circuit: Loudoun County Local Rules and Procedures.

    ☑   I UNDERSTAND THAT ALL MOTIONS ARE PERMITTED A TOTAL OF **20 MINUTES** FOR ARGUMENT (*PENDENTE LITE* PERMITTED **30 MINUTES**). I FURTHER UNDERSTAND THAT IF I BELIEVE ADDITIONAL TIME WILL BE NEEDED THEN A GOOD FAITH TIME ESTIMATE MUST BE PROVIDED BELOW, AND THE MOTION MAY BE HEARD OR SPECIALLY RESCHEDULED IN THE DISCRETION OF THE PRESIDING JUDGE.    **TIME ESTIMATE:** **10**

Dated this: **15th** day of **May**_____, 20**26**__ .

**Submitted by: Faisal Shawn Mughal**_____   VSB# **84251**_____
    (PRINT NAME)
        ■ Counsel for: ■ Plaintiff   ❑ Defendant   ❑ Other:_____
        ❑ Self-Represented: ❑ Plaintiff   ❑ Defendant   ❑ Other:_____

My current address and contact information† is:

| | | | |
|---|---|---|---|
| 11350 Random Hills Road, Suite 700 | Fairfax | VA | 22030 |
| Street Address | City | State | Zip |
| FSM@MBHYlaw.com | 703-352-1300 | | |
| E-Mail | Phone | | |

Page 1 of 2

†Complete contact information of filing party REQUIRED
by Rule 1:4 of the Virginia Supreme Court

The name and role, e-mail and phone for all <u>other</u> counsel of record or self-represented litigant(s):
(Required if known; attach supplemental sheet if needed.)

1._____
    NAME & (ROLE)                          E-MAIL                          PHONE

2._____
    NAME & (ROLE)                          E-MAIL                          PHONE

3._____
    NAME & (ROLE)                          E-MAIL                          PHONE

4._____
    NAME & (ROLE)                          E-MAIL                          PHONE

## <u>CERTIFICATE</u>

By signing below, **I HEREBY CERTIFY** that I have served a true **copy** of this filing on all parties / counsel of record herein pursuant the Rules of the Supreme Court of Virginia by:

❑ HAND DELIVERY   ■ U.S. MAIL   ❑ FACSIMILE   ❑ E-MAIL   ❑ OTHER:_____

on this __15th__ day of _May_____, 20_26_ .

**I FURTHER CERTIFY** that I have made a good faith effort to obtain and provide the correct contact information requested above for all parties / counsel of record.

Signature: _____   **VSB#:** _84251_____

_____

COURT USE ONLY

APPROVED  4/2024

†Complete contact Information of filing party REQUIRED
by Rule 1:4 of the Virginia Supreme Court

VIRGINIA:

## IN THE CIRCUIT COURT OF LOUDOUN COUNTY

| | | |
|---|---|---|
| **EPICERIE CIGAR RETAIL SHOP LLC.** | : | |
| Plaintiff, | : | |
| v. | : | Case No.: CL26-2555 |
| **CASCADES STATION LLC** | : | |
| And | : | |
| **BEMOBILE, INC.** | : | |
| Defendants. | : | |

## MOTION FOR DEFAULT JUDGEMENT

COMES NOW, Plaintiff, Epicerie Cigar Retail Shop, ("Plaintiff"), by counsel, and for its Motion for Default Judgement against Defendant, BeMobile, Inc., ("BeMobile") states the following:

1. Plaintiff filed its Complaint in the above-captioned matter on April 10, 2026, asserting claims for conversion, statutory and common law conspiracy, tortious interference with business expectancy, and detinue against BeMobile. A copy of the complaint is attached as Exhibit 1.

2. BeMobile is a North Dakota corporation authorized to transact business in Virginia with a Virginia registered agent address of 4701 Cox Rd Ste 285, Glen Allen, VA, 23060, USA. See Exhibit 2.

3. Plaintiff's Summons and Complaint were served on BeMobile's Registered Agent on April 20, 2026 pursuant to VA code § 13.1-637. See Exhibit 3.

4. As of the date of this Motion, twenty-five (25) days have passed since service of the Complaint on BeMobile's registered agent.

5. As of the date of this Motion, BeMobile has not filed any responsive pleading, resulting in Plaintiff's claims present in its Complaint remaining uncontested.

6. A Default Judgement is proper herein pursuant to Va. R. Sup. Ct. 3:19.

7. A Default Judgement is proper herein as "the trial court has territorial jurisdiction, subject matter jurisdiction, and adequate notice has been given to the defaulting party." Landcraft Company, Inc. vs. Kincaid, 220 Va. 865 (1980).

8. Plaintiff relies on the allegations in its Complaint and the Exhibits attached thereto, to support its Motion for Default Judgment.

9. Plaintiff has sent copies of this Motion for Default Judgment, the Complaint, and a Praecipe/Notice to BeMobile for the hearing on this Motion for Default Judgment pursuant to Va. Code§ 8.0l-296(2)(b).

10. A Servicemembers Civil Relief Act affidavit is attached hereto as Exhibit 4 evidencing that BeMobile, is currently not serving in the US Military.

11. Plaintiff respectfully requests that this court:

    a.    Enter a default judgment against BeMobile Inc., for Counts II-VI of the complaint;

    b.    Award compensatory damages in the amount of $2,504,000.00 on Counts II–VI combined;

    c.    Award Plaintiff $5,008,000.00 in additional treble damages pursuant to Virginia Code § 18.2-500 for Count III (Statutory Business Conspiracy) of the complaint;

    d.    Award Plaintiff $7,424.00 in reasonable attorney's fees pursuant to Virginia Code § 18.2-500 for Count III (Statutory Business Conspiracy) of the complaint;

    e.    Award Plaintiff punitive damages in the amount of $350,000 for Count II

(Conversion), Count IV (Tortious Interference), and Count V (Common-Law

Conspiracy) of the complaint;

f.      Award Plaintiff court costs in the amount of $384.00;

g.      Award Plaintiff pre-judgment and post-judgment interest and

h.      Such other relief the court deems appropriate.


WHEREFORE Plaintiff Epicerie Cigar Retail Shop moves for judgment against Defendant

BeMobile Inc., as aforesaid.

Respectfully submitted,<br>
Epicerie Cigar Retail Shop<br>
By counsel

MAHDAVI, BACON, HALFHILL & YOUNG, PLLC


By:      _____
Faisal Shawn Mughal (VSB#84251 )
11350 Random Hills Rd., Suite 700
Fairfax, VA  22030
703-352-1300
703-352-1301
fsm@mbhylaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I Faisal Shawn Mughal, hereby certify that on the 15th day of May2026, a copy of the

foregoing was sent by USPS Priority Mail, to:

BeMobile, Inc.
R/A: C T Corporation System
4701 Cox Rd. Suite 285
Glen Allen, VA 23060

I Faisal Shawn Mughal, hereby certify that on the 15th day of May2026, a copy of the

foregoing was sent by USPS First Class Mail, to:

Cascades Station, LLC
R/A: C T Corporation System
4701 Cox Rd. Suite 285
Glen Allen, VA 23060

Faisal Shawn Mughal

# *EXHIBIT 1*

**VIRGINIA:**

## IN THE CIRCUIT COURT OF LOUDOUN COUNTY

EPICERIE CIGAR RETAIL SHOP LLC.    :

      Plaintiff,    :

      v.    :        Case No.: CL26-2555

CASCADES STATION LLC    :
Serve:  Registered Agent    :
        C T Corporation System    :
        4701 Cox Rd. Suite 285.    :
        Glen Allen, VA 23060    :
               :
BEMOBILE, INC.    :
Serve:  Registered Agent    :
        C T Corporation System    :
        4701 Cox Rd. Suite 285.    :
        Glen Allen, VA 23060    :
               :
      Defendants.    :

## COMPLAINT

**COMES NOW**, Plaintiff, Epicerie Cigar Retail Shop, LLC ("Plaintiff" or "Epiceri"or "Tenant"), by counsel, and brings this Complaint against Defendants Cascades Station LLC., ("Cascades" or "Landlord") and BeMobile, Inc., ("Bemobile" or "Verizon"), for breach of contract, conversion, statutory business conspiracy, tortious interference with business expectancy, common-law civil conspiracy, and detinue, arising from events pertaining to the unjust termination of Plaintiff's commercial business lease located at 21399 Epicerie Plaza, Sterling VA 20164 #B135 (the "Property" or "Unit") and reletting to BeMobile, Inc.. This complaint states as follows:

## PARTIES

1.    Plaintiff Epicerie Cigar Retail Shop, LLC is a Virginia limited liability company with its principal place of business at 430 Conner Grant Rd, New Bern, NC, 28562.

2.    Defendant Cascades Station LLC is a Delaware limited liability company authorized to conduct business in Virginia, with its principal place of business at 11501 Northlake Dr, Cincinnati, OH, 45249 and with a registered office at 4701 Cox Rd Ste 285, Glen Allen, VA, 23060.

3.    Defendant BeMobile, Inc., is a North Dakota corporation authorized to do business in Virginia, with its principal place of business at 2100 S Columbia RD Ste 214, Grand Forks, ND, 58201 with a registered office at 4701 Cox Rd Ste 285, Glen Allen, VA, 23060.

## JURISDICTION AND VENUE

4.    Jurisdiction is proper under Va. Code § 17.1-513 as the amount in controversy exceeds $4,500.

5.    Venue is proper under Va. Code § 8.01-262 because the property subject to the lease and the events giving rise to this claim occurred in Loudoun County, Virginia.

## FACTS

6.    On October 25, 2022, Plaintiff and Cascades entered into a written ten-year commercial lease (the "Lease") for Unit B135 at the Cascades Overlook shopping center, approximately 1,680 square feet, located at 21399 Epicerie Plaza, Sterling, Virginia 20164 (the "Property"). A true and accurate copy of the Lease is attached hereto as **Exhibit A.**

7.    The Lease set out a fixed minimum rent schedule (monthly installments escalating from $6,300 to $8,219.40 over the 120-month term) and initial estimated monthly CAM/taxes/insurance charges.

8. Plaintiff paid a $7,616.00 security deposit and first month's rent upon execution of the Lease.

9. The Lease granted two five-year renewal options, subject to conditions, evidencing Plaintiff's long-term leasehold and business expectancy at the Property.

10. The permitted use is "the operation of a high-end retail cigar shop selling cigars and tobacco, and related cigar and tobacco accessories" (a term the Lease does not define). The clause expressly permits "ancillary and incidental" related products, including nicotine vapor accessories and CBD products derived only from hemp in compliance with law; it also lists categories of prohibited products and "head shop" items.

11. Section 25 of the Lease (Default and Remedies) provides the Plaintiff with a 10-day cure period after notice written notice of default.

12. Plaintiff took possession of the property and invested significant sums to design and build a high-end cigar shop.

13. Plaintiff installed marble floors, ceilings, custom walls, electrical systems, cashier counter, displays and showcases, point of sale system, security cameras, ADT security system, TV displays, and 20 feet by 20 feet climate-controlled cigar room by expending $90,000.00.

14. The Landlord and its management inspected the Unit and approved for the Unit for opening.

15. Plaintiff opened for business and continuously operated under the tradename "Smoky Shop & More."

16. Plaintiff stocked its cigar shop with luxury and major cigar brands, displaying the cigars from floor to ceiling stacked on 24 shelves 8 feet high in its cigar room. Plaintiff sold luxury cigars ranging from $100-$200 a cigar.

17.     Plaintiff stocked, displayed, and sold hundreds of vape and tobacco products monthly on a revolving inventory.

18.     Plaintiff's business started to grow day-by-day, and the Landlord's management regularly visited, greeted, looked around the Unit, and complimented the Plaintiff on its cigar shop.

19.     The growth of Plaintiff's business attracted some bad actors, and the Unit experienced five attempted break-ins, where the thieves attempted to smash through the Unit's front facing glass.

20.     Plaintiff installed an automated, remote-controlled steel security gate at a cost of approximately $23,000 to protect its inventory, staff, and customers. This investment was made in good faith to safeguard the business and preserve the leased premises.

21.     Plaintiff's sales and revenue doubled year-by-year, and Plaintiff made all its rent payments to Cascades on time without any problems or complaints from Cascades.

22.     Plaintiff's customers consistently complimented the luxury displays, quality of selection and left 5-star reviews for the cigar shop.

23.     The Landlord continued to regularly stop by, chit chatted, looked around the Unit, and complimented the Plaintiff on its cigar shop.

24.     In or about Summer of 2024, over a few different occasions, individuals wearing Verizon shirts visited the store and browsed around without buying anything and asked the Plaintiff's staff peculiar questions such how much revenue the business was generating, how long the cigar shop had been there, whether the Plaintiff was experiencing any financial difficulties and had any plans to relocate or shut its business down.

25.     The visits from Verizon wearing shirt individuals continued for some time until October 2024. In one visit the individual stated that they were scouting for a location in the plaza for a new Verizon store.

26.     On October 11, 2024 at about 10:00AM, the Landlord contacted Plaintiff's manager Karima Elouahidy by phone and demanded that certain products (kratom and glass pipes) on display be removed from business, and in the same phone call the Landlord stated that if the business was struggling, the Landlord "had someone who would by the business."

27.     The Plaintiff rejected the Landlord's suggestion to sell the business and by 10:44AM removed the kratom and glass pipes and sent the Landlord a text message with pictures of the display evidencing the removal of the products that Landlord had objections with. A true and accurate copy of the text message with pictures is attached hereto as **Exhibit B**. The Landlord replied confirming that the text message was related to the Epicerie store.

28.     Shockingly, on October 21, 2024, Defendant's management agent (Phillips Edison & Company) issued a written Notice of Tenant Default, asserting that "Tenant shall not:... sell any products classified as kratom, kava,..." and that Plaintiff's "present use" violated the Permitted Use clause and stating "pursuant to Section 25, Tenant shall cure such defaults within ten (10) days after receipt of this Notice. Failure to cure... will result in termination."

29.     Plaintiff was confused as the Plaintiff had promptly removed the products in question on October 11, 2024 by 10:44AM, whereas the written notice was dated 10 days after the fact on October 21, 2024.

30.     Plaintiff had promptly removed products identified by management and uploaded texted photographs on October 11, 2024 to document compliance. Plaintiff attempted to contact the Landlord without success. Plaintiff messaged management using the DashComm tenant

portal and re-uploaded the October 11, 2024 10:44AM photos to the portal and inquired, "Why are we still in violation? We took everything from the shelves… I uploaded the proof (pictures taken on October 11, 2024)." After the message, the "Compliance" tab status change to "Pending." A true and accurate copy of the DashComm tenant portal is attached hereto as **Exhibit D.**

31.    Notwithstanding Plaintiff's cure, 44 minutes after receiving a phone call from the Landlord on October 11, 2024 related to the removal of the products, on November 11, 2024, the Tenant received an email on November 11, 2024 at around 10:59 AM stating:

"My name is Amanda Riggs. I am in the legal department at Phillips Edison, the Landlord of Cascades Station in Sterling, VA.

On October 21, 2024, Tenant was delivered a Notice of Default for violating Tenant's Permitted Use provision. Pursuant to the Lease, Tenant's Permitted Use of the Premises is strictly limited to, "the operation of a high-end retail cigar shop selling cigars and tobacco, and related cigar and tobacco accessories, all in compliance with Governing Law, and for no other use."

Despite being notified of such default, Tenant's present use of the Premises continues to be in violation of the Permitted Use provision of the Lease. Tenant was to cure said default within 10-day of receipt.

Under such continued default, Landlord is hereby exercising its right to terminate the Lease. As part of such termination, Tenant will pay to Landlord a termination fee of $39,000.00. This $39,000.00 represents 6 months of base rent ($39,128.60) rounded down to an even dollar amount.

Tenant has 14-days to sign the Lease Termination Agreement and remit payment and vacate the Premises accordingly. Otherwise, Landlord is prepared to purse legal action."

A true and accurate copy of the Termination Email is attached hereto as **Exhibit E.**

32.     The Plaintiff continued to plead and reason with the Landlord as to what additional objections or specific items or appearance the Landlord had issues with and the Landlord's representative respond with vague assertion that the Plaintiff was not operating a "high-end retail cigar shop[.]" that "the space does not give off the appearance of a high-end retail cigar shop." A true and accurate copy of this email communication is attached hereto as **Exhibit F.**

33.     On December 3, 2024, the Landlord deducted Plaintiff's rent payment for December 2024.

34.     On December 5, 2024, when the Plaintiff arrived to open its cigar shop, the Plaintiff discovered a handwritten taped note on the outer glass door stating:

"12/5/2024

Your locks have been changed.

For further information:

Contact: Amand Riggs 513-338-2763

or

Cheri Bloss 807-252-1786

--Property Management—"

A true and accurate copy of December 5, 2024 handwritten taped notice is attached hereto as **Exhibit G.**

35.     The Landlord unable to get through steel security gate behind the glass door told the Plaintiff that everything is fine and that the Landlord needs to conduct some "maintenance,"

that will take a few hours and whether the Plaintiff can let the Landlord into the Unit and the Plaintiff complied and observed the Unit via the security cameras.

36.    Shockingly, the Plaintiff observed unknow large men ransacking and confiscating all the property and inventory at the Unit including cash, papers, invoices, receipts, vendor bills, financial records, point of sale system, TVs cigars, vapes, and tobacco products.

37.    The Plaintiff promptly called police and arrived at the store and spoke with the police. The Police stated that the individuals were clearing the Unit because they had a lease with the Landlord for the unit and that the Plaintiff cannot enter or take anything from the Unit.

38.    The last thing observed by the Plaintiff was that the individuals disconnected one camera after another. eventually the security feed went blank.

39.    Within weeks of the lockout, a Verizon store began operating in the Unit.

40.    It was later discovered that the store was a Verizon retail store operated by BeMobile Inc.

41.    Upon information and belief, Cascades and BeMobile coordinated and conspired together to unjustly terminate and remove the Plaintiff so BeMobile could take over the place and operate a Verizon retail store.

42.    As a result of Defendants' conduct. Plaintiff suffered severe economic harm in the form of cash, cigars, hookahs, e-liquids. cigarettes, papers, glass piers, cleaners, posters, point of sale system, vape and tobacco products valued at $393,000.00.

43.    As a result of Defendants' conduct. Plaintiff suffered severe economic harm in the form of loss of showcases, displays. cigar room. marble floors, wall displays, special lighting and steel security gate value at $111,000.000.

44.    As a result of Defendants' conduct, Plaintiff suffered severe economic harm in the form of loss of receipts, invoices, financial records, daily business sales and profits of approximately $2,500.00 for an aggregate of $912,500.00.

45.    As a result of Defendants' conduct, Plaintiff suffered severe economic harm in the form of loss of rent December 2024 in the amount of $7,616.00 and security deposit in the amount of $7,616.00 for an aggregate amount of $15,352.00.

46.    As a result of Defendants' conduct, Plaintiff suffered severe economic harm in the form of loss of leasehold interest (with over eight years remaining), and harm to goodwill.

47.    As a result of Defendants' conduct, Plaintiff suffered severe economic harm in the form of loss complete and total destruction of Plaintiff's business at the Unit.

## COUNT I: BREACH OF LEASE AGREEMENT
### (Against Cascades Station LLC.)

48.    All previous paragraphs are incorporated herein.

49.    Plaintiff and Defendant entered into a valid and enforceable lease agreement on October 25, 2022, allowing for the operation of Plaintiff's cigar shop at Cascades Overlook (Exhibit 1).

50.    Section 25 of the Lease requires Defendant to provide Plaintiff written notice for any alleged lease violations and to grant Plaintiff a 10-day period to cure.

51.    Pursuant to Section 25 of the Lease, Defendant had a duty to not terminate the lease without first providing notice for any alleged lease violation and allowing Plaintiff an opportunity to cure such violation.

52.    Defendant wrongfully terminated the Lease without providing the required notice and opportunity to cure.

53.    Defendant's termination and lockout breached the Lease by failing to credit Plaintiff's cure, by weaponizing an undefined "high-end" requirement, and by acting arbitrarily to re-tenant the space.

54.    As a result of Defendant's breach, Plaintiff has suffered damages including loss of business, leasehold rights, and consequential lost profits totaling $2,000,000.00.

## COUNT II: CONVERSION
### (Against All Defendants)

55.    All previous paragraphs are incorporated herein.

56.    At all times relevant, Plaintiff owned and had the right to immediate possession of its specific personal property located at the leased Premises, including but not limited to: (i) cigar and tobacco inventory (ii) furniture, fixtures, and equipment; (iii) exterior and interior signage and (iv) cash on hand and merchant processing receipts. The property was of substantial monetary value, totaling at least $504,000.00, and was readily identifiable by invoices, photographs, and inventory records that were all confiscated by the Defendants in concert.

57.    On December 5, 2024, without Plaintiff's consent and without lawful justification, Defendants and its agents took possession of that property.

58.    Defendants' acts were willful, wanton, and malicious, reflecting a conscious disregard for Plaintiff's property rights. Defendants knew that Plaintiff owned the seized property and had not abandoned it, yet intentionally appropriated the property to its own use and for the benefit of BeMobile or other third parties.

59.    As a direct and proximate result of Defendant's willful and malicious conversion, Plaintiff has suffered damages including but not limited to the fair market value of the property wrongfully taken, loss of business continuity and goodwill, and consequential damages in the amount of $504,000.00.

## COUNT III: STATUTORY BUSINESS CONSPIRACY (Va. Code §§ 18.2-499, -500)
### (Against All Defendants)

60.    All previous paragraphs are incorporated herein.

61.    Defendants, acting in concert, combined, associated, agreed, mutually undertook, or otherwise conspired to willfully and maliciously injure Plaintiff in its trade, business, and profession by: (i) unlawfully terminating the Lease without the contractually required cure period; (ii) locking Plaintiff out of the premises and seizing its inventory and cash; and (iii) replacing Plaintiff with a Verizon retail store for BeMobile Inc.

62.    The actions of Defendants were not mere parallel conduct, but involved concerted, coordinated, and premeditated steps to pressure Plaintiff to vacate, followed by eviction under false pretenses, all with the intent to cause harm to Plaintiff's business.

63.    Defendant's conduct was intentional, without lawful justification, and undertaken for the purpose of removing Plaintiff from the premises and transferring the leasehold to BeMobile Inc., a Verizon retail store.

64.    As a direct and proximate result of Defendants' unlawful and malicious conspiracy, Plaintiff suffered significant business injuries, including lost profits, loss of leasehold interest, and inventory damages totaling approximately $2,504,000.00.

65.    Overt acts include Defendant Cascades' acceptance of Plaintiff's December 2024 rent on December 3, 2024, followed by the December 5 lockout, and both Defendants' prior statements as to the financial condition of the business, whether the Plaintiff was struggling and wanted to move out or shutdown and statement that the Landlord "had someone who would buy the business."

66.     Plaintiff is entitled to recover treble damages and reasonable attorney's fees under Va. Code § 18.2-500.

## COUNT IV: TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (Against All Defendants)

67.     All previous paragraphs are incorporated herein.

68.     At all relevant times, Plaintiff had valid business expectancies including: (i) continued operation for the remainder of its 10-year term with two five-year options; and (ii) potential assignment/sublease opportunities (subject to Lease consent procedures), about which unsolicited inquirers were made by Defendant Cascades and Defendant BeMobile.

69.     Defendants knew of these expectancies and intentionally interfered by wrongfully terminating the Lease without contractual notice or cure, changing the locks, seizing Plaintiff's property, and transferring the space to BeMobile to operate a Verizon retail store, thereby preventing Plaintiff from continuing operations or negotiating an assignment or sublease.

70.     In performing such unlawful conspiracy, Defendant performed the aforesaid acts willfully, intentionally, purposefully, and without justification against Plaintiff, using criminal and/or unlawful means.

71.     Defendant's interference was without lawful justification and directly caused Plaintiff to lose the benefit of its business expectancies and suffer substantial damages including lost profits, lost goodwill, and loss of its leasehold interest damages totaling approximately $2,504,000.00.

## COUNT V: COMMON-LAW CIVIL CONSPIRACY
### (Against All Defendants)

72.     All previous paragraphs are incorporated herein.

73. Defendants and one or more third parties, including Verizon and/or its agents, entered into an agreement or mutual understanding to use wrongful means to oust Plaintiff from its leased premises and appropriate Plaintiff's leasehold and business assets for the benefit of Verizon.

74. This agreement is evidenced by: (i) repeated unsolicited inquiries by persons connected to Verizon (BeMobile Inc.) about Plaintiff's willingness to vacate or transfer its lease; (ii) Defendant's abrupt and pretextual termination of the Lease on November 11, 2024 despite Plaintiff's documented cure efforts; and (iii) the immediate re-tenanting of the premises by BeMobile as a Verizon retail store.

75. The combination was for the unlawful purpose of (i) unlawfully terminating Plaintiff's Lease and (ii) evicting Plaintiff by self-help lockout, or for the lawful purpose of re-tenanting the space but by unlawful means (breach of lease, wrongful lockout, and conversion of Plaintiff's inventory, furniture, and cash).

76. In furtherance of this common scheme, Defendants and its co-conspirator(s) committed overt acts including, but not limited to: (i) serving a premature and invalid Termination Notice; (ii) directing Plaintiff's representatives to leave under the pretense of maintenance and then changing the locks; (iii) damaging and converting Plaintiff's inventory, furniture, signage, and cash; and (iv) transferring possession of the unit to BeMobile as a Verizon retail store.

77. These overt acts constitute breach of lease, conversion, tortious interference with business expectancy, and wrongful self-help eviction. Virginia law requires such a predicate unlawful act to support a common-law civil conspiracy.

78. As a direct and proximate result of the common-law civil conspiracy, Plaintiff has sustained business-related injuries recognized under Virginia law, including loss of its leasehold

estate (with more than eight years remaining), loss of substantial inventory and business assets, lost profits from the retail cigar business, and loss of goodwill with suppliers and customers. These damages are directly tied to Plaintiff's trade and business and therefore fall squarely within the type of business injury protected by Virginia conspiracy law.

## COUNT VI: DETINUE
### (Against All Defendants)

79.     All previous paragraphs are incorporated herein.

80.     Plaintiff is and was at all relevant times the owner of or lawfully entitled to immediate possession of specific personal property located at the leased premises, including but not limited to: (i) cigar and tobacco inventory]; (ii) furniture, fixtures, and equipment [; (iii) exterior and interior signage]; and (iv) cash on hand and merchant processing receipts. Each category of property was readily identifiable (by invoices, purchase records, and inventory valuation) and of substantial monetary value all of which the Defendants confiscated.

81.     Defendants, without lawful process and through the actions of its agents, entered and took control of the premises on or about November 2024, changed the locks, and took possession of Plaintiff's aforesaid property. Defendants have retained possession and/or disposed of it despite Plaintiff's demand for return, thereby unlawfully detaining property belonging to Plaintiff.

82.     At the time of Defendants lockout, Plaintiff had an immediate right to possess the above-described property because it owned the inventory outright and remained current under its merchant accounts.

**WHEREFORE**, Plaintiff prays and respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against Defendant Cascades Station LLC., for Breach of Lease Agreement (Count I);

B. Enter judgment in favor of Plaintiff and against Defendants Cascades Station LLC and BeMobile Inc., for Conversion (Count II);

C. Enter judgment in favor of Plaintiff and against Defendants Cascades Station LLC and BeMobile Inc., for Statutory Business Conspiracy under Virginia Code §§ 18.2-499 and 18.2-500 (Count III);

D. Enter judgment in favor of Plaintiff and against Defendants Cascades Station LLC and BeMobile Inc., for Tortious Interference with Business Expectancy (Count IV);

E. Enter judgment in favor of Plaintiff and against Defendants Cascades Station LLC and BeMobile Inc., for Common-Law Civil Conspiracy (Count V);

F. Enter judgment in favor of Plaintiff and against Defendants Cascades Station LLC and BeMobile Inc., for Detinue (Count VI), ordering the immediate return of Plaintiff's specific personal property as described herein or, if return is not possible, judgment for its fair-market value at the time of the December 5, 2024 taking, plus damages for its wrongful detention;

G. Award Plaintiff compensatory damages of not less than $2,504,000.00 on Counts I–VI combined, including but not limited to inventory losses, lost leasehold interest, lost profits, and injury to goodwill;

H. Award Plaintiff treble damages and reasonable attorney's fees pursuant to Virginia Code § 18.2-500 for Count III (Statutory Business Conspiracy);

I. Award Plaintiff punitive damages in the amount of $350,000 for Conversion, Common-Law Conspiracy, and Tortious Interference;

J. Award Plaintiff pre-judgment and post-judgment interest and the costs of this action; and

K. Grant such other and further relief, at law or in equity, as the Court deems just and

proper.

>Respectfully Submitted
>Epicerie Cigar Retail Shop, LLC
>By Counsel

MAHDAVI, BACON, HALFHILL, & YOUNG, PLLC

By:

Faisal Shawn Mughal (VSB# 84251)
11350 Random Hills Rd., Ste 700
Fairfax, VA 22030
T: 703-352-1300
F: 703-352-1301
E: fsm@mbhylaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

On this 10TH day April, 2026, I, Faisal Shawn Mughal, served a copy of this Complaint and exhibits by U.S. First Class Mail to:

**CASCADES STATION LLC**
    R/A: C T Corporation System
    4701 Cox Rd. Suite 285,
    Glen Allen, VA 23060

**BEMOBILE, INC.**
    R/A: C T Corporation System
    4701 Cox Rd. Suite 285,
    Glen Allen, VA 23060

Faisal Shawn Mughal, Esq.

# EXHIBIT A



## LEASE

THIS LEASE ("Lease") is made by and between Landlord and Tenant (as each is hereafter defined)  The following terms shall be defined as provided below:

**PARTIES:**

Landlord: Cascades Station LLC
a Delaware limited liability company

Tenant:   Epicerie Cigar Retail Shop LLC,
a Virginia limited liability company

d/b/a:   Epicerie Cigar Retail Shop

**PREMISES:**

Shopping Center:  Cascades Overlook

Shopping Center Address: 21399 Epicerie Plaza, Sterling VA 20164

Unit Number: B135 **Square Feet:** approximately 1,680

**Effective Date:** shall mean the date this Lease is fully executed by both Tenant and Landlord

**Commencement Date:** shall mean the date on which possession of the Premises is delivered by Landlord to Tenant

**Fixed Minimum Rent Commencement Date:** shall mean 180 days after the Commencement Date

**Additional Rent Commencement Date:** shall mean the Fixed Minimum Rent Commencement Date

**Expiration Date:** shall mean the last day of the 120th full calendar month after the Fixed Minimum Rent Commencement Date, unless sooner terminated, or extended, as provided for in this Lease

**FIXED MINIMUM RENT:**

| MONTH(S) | ANNUAL | MONTHLY INSTALLMENT |
|---|---|---|
| 1 - 12 | $75,600.00 | $6,300.00 |
| 13 - 24 | $77,868.00 | $6,489.00 |
| 25 - 36 | $80,203.20 | $6,683.60 |
| 37 - 48 | $82,605.60 | $6,883.80 |
| 49 - 60 | $85,092.00 | $7,091.00 |
| 61 - 72 | $87,645.60 | $7,303.80 |
| 73 - 84 | $90,266.40 | $7,522.20 |
| 85 - 96 | $92,971.20 | $7,747.60 |
| 97 - 108 | $95,760.00 | $7,980.00 |
| 109 - 120 | $98,632.80 | $8,219.40 |

**INITIAL ESTIMATED PAYMENTS OF ADDITIONAL RENT:**

| | | |
|---|---|---|
| CAM. | $747.60 | Per Month |
| Real Estate Taxes | $310.80 | Per Month |
| Insurance: | $127.40 | Per Month |

**Renewal Option:**   2 options to renew this Lease for an additional term of 5 years each ("Renewal Term"). A Renewal Term shall commence upon the first day after the last day of the then-existing term of this Lease so long as the following conditions have been satisfied:  (1) Landlord shall have received written notice of Tenant's election to exercise the applicable Renewal Option at least 180 days prior to the expiration of the then-existing Term of this Lease; (2) no event of default by Tenant shall exist at the time of commencement of any Renewal Term beyond the applicable cure period; and (3) all terms, covenants, and conditions of this Lease as set forth for the Initial Term of this Lease shall apply in the applicable Renewal Term except that (i) the Term of this Lease shall be extended for the applicable Renewal Term and (ii) Fixed Minimum Rent during the applicable Renewal Term shall be as set forth herein. The foregoing option(s) are personal to Tenant and are not exercisable by or transferable to an assignee, subtenant or successor of Tenant.

**FIRST RENEWAL TERM FIXED MINIMUM RENT:**

| MONTH(S) | ANNUAL | MONTHLY INSTALLMENT |
|---|---|---|
| 1 – 12 | $101,589 60 | $8,465 80 |
| 13 – 24 | $104,630.40 | $8,719 20 |
| 25 – 36 | $107,772 00 | $8,981 00 |
| 37 – 48 | $111,014 40 | $9,251 20 |
| 49 – 60 | $114,340 80 | $9,528 40 |

**SECOND RENEWAL TERM FIXED MINIMUM RENT:**

| MONTH(S) | ANNUAL | MONTHLY INSTALLMENT |
|---|---|---|
| 1 – 12 | $117,768.00 | $9,814.00 |
| 13 – 24 | $121,296.00 | $10,108.00 |
| 25 - 36 | $124,941.60 | $10,411.80 |
| 37 – 48 | $128,688.00 | $10,724.00 |
| 49 – 60 | $132,552.00 | $11,046.00 |

**Security Deposit:** $7,485.50 to be paid upon execution of this Lease by Tenant to payee Cascades Station LLC

**First Month's Rent Amount:** $7,485 80 to be paid upon execution of this Lease by Tenant to payee Cascades Station LLC

165106.4



Permitted Use: shall mean for the operation of a high-end retail cigar shop selling cigars and tobacco, and related cigar and tobacco accessories, all in compliance with Governing Law and for no other use. On an ancillary and incidental basis only, Tenant shall be permitted to sell nicotine vapor products, related nicotine vapor accessories, and cannabidiol (CBD) products derived only from hemp and in compliance with Governing Law. Notwithstanding anything in this Lease to the contrary, Tenant shall not: (i) operate as a business or facility used in growing, delivery, transferring, supplying, dispensing, distributing or selling marijuana or hemp, whether by prescription, medical recommendation, or otherwise, (ii) sell any products classified as kratom, kava, or Delta-8 or any products in any way derived from or containing marijuana; (iii) sell any illegal or illicit drugs or drug paraphernalia; (iv) sell any glassware, such as but not limited to, bongs, bowls, pipes, or any other glassware that may be used in the consumption of marijuana, hemp or tobacco, (v) operate as a headshop, (vi) grow, process, or manufacture hemp or marijuana, (vii) sell any marijuana or marijuana-related products and paraphernalia, whether or not such products are deemed legal and/or approved by the FDA or DEA; (vii) operate for any unlawful purpose or in any way which would constitute a nuisance to tenants or occupants of the Shopping Center. No smoking or vaping is permitted within the Premises or other areas of the Shopping Center, including product testing and/or sampling. If Landlord receives any complaints from other tenants in the Shopping Center because of odors or fumes emanating from the Premises, then Tenant shall take whatever measure necessary, at Tenant's sole cost and expense, to prevent the emanation of such odor or fumes, including but not limited to, installing a commercial air purifier or filter in the Premises. Notwithstanding anything herein to the contrary, Tenant shall not violate the Shopping Center's private covenants and restrictions set forth in Exhibit D. The interpretation of the Permitted Use shall be narrowly and strictly construed.

Rent Payment Address: Cascades Station LLC, NW 601202 P.O. Box 1450 Minneapolis, MN 55485-1202

Notice Address:

FOR LANDLORD:
Cascades Station LLC
Robert F. Myers, COO
11501 Northlake Drive
Cincinnati, Ohio 45249

WITH A COPY TO:
Legal Services
Phillips Edison & Company
11501 Northlake Drive
Cincinnati, Ohio 45249

FOR TENANT:
Epicerie Cigar Retail Shop LLC
430 Conner Grant Rd
New Bern, NC 28560
Attn: Hafdaila Alahdal
E-mail address. khlimited_service@outlook.com
Phone  247-608-2241
(cannot be a P O Box or the Shopping Center address)

The following are incorporated as part of this Lease as if fully set forth herein

A.    General Lease Terms
B.    Exhibit A - Site Plan
C.    Exhibit B - Tenant Improvement Allowance (TIA Request Form, Unconditional Final Waiver of Liens, and Estoppel)
D.    Exhibit C - Sign Criteria
E.    Exhibit D - Shopping Center Private Covenants and Restrictions
F.    Guaranty

## GENERAL LEASE TERMS

1    LEASE OF PREMISES. In consideration of Rent to be paid by Tenant and of the covenants and agreements herein contained, and other good and valuable consideration, Tenant does hereby lease from Landlord the Premises. "Initial Term" shall mean the time period from the date on which possession of the Premises is delivered by Landlord to Tenant through the Expiration Date. "Term" shall mean the Initial Term plus any renewal or extension thereof. The approximate location of the Premises is shown on the site plan attached to this Lease as Exhibit A.

2    LANDLORD TERMINATION RIGHT. Notwithstanding anything herein or in this Lease to the contrary, in the event that Landlord or a potential buyer of the Shopping Center is unable to: (i) obtain financing for the Shopping Center at market interest rates or on market loan or offering terms (market interest rates, market loan, or offering terms shall be determined based on the market at the time Landlord applies for such financing or offering) and such inability to obtain financing at market interest rates and on market loan terms is related to Tenant's tenancy and operation in the Premises; (ii) Landlord or any buyer or transferee is unable to obtain title insurance satisfactory to Landlord or any buyer or transferee; or (iii) any existing Landlord lender deems such Tenant use and operation as a violation of the loan covenants, then Landlord shall have the right to terminate this Lease at any time upon 30 days' prior written notice to Tenant.

3    LEASE CONTINGENCY - APPROVALS. This Lease shall be contingent upon Landlord obtaining all approvals required by Landlord's existing covenants and obligations with respect to the Shopping Center. In the event that Landlord is unable to obtain any such approvals, Landlord shall have the right to terminate this Lease immediately upon written notice to Tenant and this Lease shall be null and void without any further liability to either party

4    RENT PAYABLE. Throughout the Term of this Lease, Tenant agrees to pay the following (collectively referred to as "Rent") (a) Fixed Minimum Rent and (b) all additional sums, charges, or amounts of whatever nature ("Additional Rent") to be paid by Tenant to Landlord in accordance with Governing Law, court order or this Lease and all shall be deemed as rents from real property. Commencing on the dates set forth in this Lease, Tenant shall pay Rent, payable on or before the first day of each month in advance, via Electronic Funds Transfer (EFT) through www.dashcomm.com, or provided Landlord provides notice to Tenant, via such other payment method and/or at such other location as may be acceptable to Landlord in its sole discretion, without deduction or set-off. Landlord and Tenant agree that Fixed Minimum Rent, Percentage Rent, Additional Rent, and all other charges paid to Landlord under this Lease shall qualify as "rents from real property" as defined in Section 856(d) of the Internal Revenue code of 1986, as amended from time to time (the "Code") and as further defined in Treasury Regulation ("Regulation") Section 1.856-4. Should the requirements of the Code and/or Regulation be amended so that any amount payable to Landlord under this Lease no longer qualifies as "rents from real property" for the purposes of the Code and associated Regulations, such amount payable to Landlord under this Lease shall, at Landlord's option, be adjusted so that it will qualify as "rents from real property" for the purposes of the

165106.4



Code and Regulation, as amended; provided, however, that any adjustments required pursuant to this provision shall be made so as to produce the equivalent (in economic terms) consideration as was payable prior to such adjustment. Tenant and Landlord shall enter into such amendment or amendments as may be necessary to effect the foregoing and negotiate in good faith with respect thereto. Except for casualty or condemnation, if Tenant is paying any form of Rent abatement, or is entitled to pay a future Rent abatement, and Tenant extends the Term of this Lease via the exercise of an option, renewal, holdover, or otherwise, then upon the commencement of such extended Term, Tenant shall resume the full payment of Rent as provided under this Lease. For purposes of clarity, Tenant shall have no right to revive the direct cause of such Rent abatement during the remaining Term of this Lease. All payments received by Landlord under the terms of this Lease shall be applied by Landlord to Tenant's account in Landlord's sole discretion. Notwithstanding anything in this Lease to the contrary, Tenant's obligation to pay Rent, including any holdover premium, shall under no circumstances be subject to force majeure.

5.    REPORTING GROSS SALES  Tenant shall report its gross sales to Landlord for each calendar month, on a quarterly basis, electronically via Landlord's website at www.dashcomm.com or in such other form as shall be acceptable to Landlord in its sole discretion, certifying that the information is complete and correct. If any report of gross sales is not received by Landlord within 30 days following the applicable reporting period set forth above, then Tenant shall be subject to a late fee of $100.00 and an additional $100.00 for each month the report of gross sales is not yet received.

6.    ADDITIONAL RENT. Commencing upon the Additional Rent Commencement Date, Tenant shall pay, as Additional Rent Tenant's Proportionate Share of the Shopping Center's (i) common area maintenance charges ("CAM") (which charges include but are not limited to all of the following: all utility charges, utility management services, painting, repaving, resurfacing, re-striping, landscaping, traffic control, repairs and improvements, lighting, internet, holiday decorations, sanitary and drainage control, public address system, online services, cleaning, removal of snow, trash, and rubbish; management fees; operation of and maintenance of any sign(s); personnel to direct parking and to provide security for the common areas and facilities, management and supervision, personal property taxes, supplies, licenses, impact and permit fees, equipment used for such maintenance; all Landlord costs and expenses related to reducing and/or managing the Shopping Center's carbon footprint, environmental impact, and/or greenhouse gas emissions, including, but not limited to, implementing and maintaining any: energy efficiency, environmental management plan(s); sustainability; alternative/renewable energy system(s) including, without limitation, solar, wind, or other technology; LED lighting, recycling program(s); water management system(s); and related actions and/or improvements and the technological evolutions thereof; capital improvements made to the Shopping Center (provided that with respect to capital improvements Tenant shall pay, annually, its Proportionate Share of the approximate average amount of 15% of the total cost of all capital improvements made to the Shopping Center), (ii) real estate taxes for the Shopping Center (including assessments, ad valorem taxes, water and sewer rents, public utilities, excises, levies, business license or permit fees, gross receipts taxes, rent taxes, parcel tax, margin tax, franchise tax, net worth tax, and other governmental charges related to the Shopping Center or any part thereof, including the buildings and improvements, or on the sidewalks or streets in front of the same and costs and expenses incurred in contesting or negotiating an adjustment thereof) and (iii) insurance carried by the Landlord for the Shopping Center, plus an administrative fee not to exceed 15% of such CAM, real estate taxes and insurance for each full or partial calendar year during the Term of this Lease. Tenant's Proportionate Share is the square footage of the Premises divided by the total square footage of the leasable floor area within the Shopping Center, not including those tenants designated from time to time by Landlord. Following the end of each calendar year, Landlord shall send Tenant a reconciliation statement showing actual expenses for the prior calendar year. In the event of a deficit, Tenant shall pay the difference upon demand, in the event of an overage. Landlord shall credit same toward Tenant's account.

7.    PAYMENT OF RENT AND CHARGES  All Rent to be paid by Tenant shall be paid as provided in this Lease. If Tenant shall fail to pay any Rent on or before the fifth (5th) day after the due date, then Tenant shall be assessed a late fee of 5% of the amount due each month until paid in full. Any unpaid amounts shall also bear interest in the amount of 1½% per month, or the maximum allowed by Governing Law, whichever is less. Tenant shall also pay to Landlord all expenses incurred in the collection of any such past due amounts. Should any governmental authority acting under any Governing Law, ordinance, or regulation, levy, assess, or impose a sales tax, excise and/or assessment upon or against this Lease, the execution hereof and/or the payment of rent including without limitation, any sales and use taxes or surtax, tax on business activity, product use or consumption, whether by way of substitution for or in addition to any existing tax or otherwise, and whether evidenced by documentary stamps or the like, Tenant shall be responsible for and shall pay such tax excise and/or assessment, or shall reimburse Landlord for Landlord's payment thereof as Rent.

8.    SECURITY DEPOSIT. Tenant acknowledges and agrees that the Security Deposit shall at all times during the Term of this Lease remain on deposit with Landlord as security for the payment of Rent and the performance by Tenant of the terms of this Lease. Tenant shall pay and deliver the Security Deposit as required under this Lease. In the event of any default or damage to the Premises, the Security Deposit shall be retained by Landlord and may be applied toward damages arising from such default and/or damage and shall not be construed as liquidated damages. The cost of any repairs to the Premises will be estimated and will also include administrative costs incurred by Landlord in repairing such damage. If applied toward damages, Tenant shall replenish the Security Deposit upon request by Landlord. Upon yielding the Premises to Landlord at the expiration of this Lease in the condition required under this Lease, and provided no default has occurred, the remaining balance of the Security Deposit shall be returned to Tenant in accordance with Governing Law.

9.    TENANT WORK. In the event Tenant desires to perform any construction, improvements, or Permanent Improvements (as hereafter defined) in the Premises ("Tenant Work"), Tenant shall prior to starting construction, submit to Landlord for Landlord's approval all plans, drawings, and/or specifications required to be submitted to any city, county, zoning or other governmental authority in order to obtain the required permits for the Tenant Work ("Tenant's Plans"). Any Tenant Work shall be performed and completed by licensed contractors in a first-class manner and in compliance with all applicable Governing Law. "Permanent Improvements" shall mean physical improvements, additions and modifications to the Premises that (i) will become a permanent part of the Premises or are permanently affixed to the Premises such that removal may be likely to cause damage to the Premises, and (ii) increase the value, utility or appearance of the Premises, and (iii) are not specific to Tenant's trade use of the Premises. Tenant shall open for business to the public and be fully stocked, staffed, and operational within the entire Premises no later than 180 days after the Commencement Date and thereafter shall continuously and actively so operate for a minimum of 40 hours each week throughout the Term. In the event Tenant's business hours exceed the standard operating hours for the Shopping Center, Tenant shall be responsible for all costs associated with such excess hours (including but not limited to common area lighting, electricity, and

165106.4



security) If permits are required by Governing Law for Tenant to complete the Tenant Work, then within 30 days following the Effective Date, Tenant shall first submit Tenant's Plans to Landlord for Landlord's review and approval Landlord shall then have 7 days following receipt of Tenant's Plans to review and approve or comment. If Landlord does not timely approve Tenant's Plans in any instance, then Tenant's Plans shall be deemed not approved and Tenant shall re-submit to Landlord If Landlord approves Tenant's Plans, then Tenant shall have 7 days following Landlord's approval to submit Tenant's Plans to the applicable governmental authority to diligently pursue and obtain Tenant's permits If Landlord comments on Tenant's Plans, then Tenant shall revise Tenant's Plans accordingly and re-submit to Landlord, and the review approval and submission time frames set forth within this Section shall again apply Tenant's failure to comply with these terms and conditions shall constitute a default under this Lease.

10. ABANDONMENT OF FF&E Subject to the priority lien of Tenant's lender Tenant grants to Landlord a lien and continuing security interest for all Rent and other obligations of Tenant under this Lease upon all abandoned goods wares, equipment, fixtures, furniture, inventory, and other personal property of Tenant that remains in the Premises following the expiration of the 30th day after the expiration or earlier termination of this Lease, or other repossession of the Premises by Landlord, and such property shall not be removed from the Premises without the consent of Landlord, except in the ordinary course of business.

11. SIGNS. Tenant shall place no signs, advertisements, lettering, curtains, shades, exterior lighting or similar items, on the glass, windows or doors, nor shall Tenant paint or affix anything to the exterior of the Premises except the façade signage. Further, Tenant shall not be permitted to display any neon signage, or any other signage with marijuana or hemp leaves, or any signage bearing drug paraphernalia images or symbols. Tenant shall be specifically prohibited from placing any signage in the Common Areas, including but not limited to, sandwich boards, banners or flags. Any façade signage must directly correspond to the Premises and such signage shall not encroach upon any other tenant's façade Notwithstanding anything to the contrary in the preceding sentence Tenant shall be permitted to place professionally made signage on the interior of the storefront window surface of the Premises, provided such signage is professionally made and it does not cover more than 25% of the storefront window surface. Subject to applicable sign regulations of any governmental authority, Tenant shall obtain all required sign permits and install, no later than the date upon which Tenant opens for business in the Premises, façade signage in accordance with Landlord's sign criteria. Tenant shall be responsible for repairing any damage to the building attributable to the installation, maintenance, and/or removal of signs. Signs which remain in place on the Premises 10 days after the end of the Term or after Tenant abandons the Premises shall automatically become the property of Landlord and may be removed by Landlord at Tenant's expense (including the cost of repairs to the interior and exterior of the Premises). Landlord shall have no obligation to deliver the Premises to Tenant unless and until Tenant provides Landlord with its façade sign drawing.

12. TENANT'S USE. The Premises shall be used by Tenant solely for the Permitted Use Tenant agrees that it will not suffer or permit the Premises to be used for (i) any unlawful or immoral purpose, (ii) any purpose prohibited by Governing Law or covenants, conditions, or restrictions of record, or in violation of other leases at the Shopping Center Tenant shall completely comply with all Governing Law and all governmental authorities having jurisdiction of the Shopping Center or the Premises (including, without limitation, cleanliness health, safety occupational, and use laws and regulations), now existing or hereafter adopted Tenant shall not interrupt, hinder or disrupt the use or enjoyment of any owner, occupant, tenant, customer, contractor, or Landlord in the Shopping Center or adjoining property Tenant shall not use any portion of the Premises for the operation of an ATM Tenant shall not disturb or penetrate the floor slab within the Premises without first obtaining Landlord's written consent. Tenant shall not solicit Shopping Center invitees in the common areas of the Shopping Center

Pursuant to Governing Law, as may be amended or replaced from time to time, the Landlord's interest as herein described shall not be subject to liens for improvements made by Tenant or any subtenant, and upon request of Landlord, Tenant shall join in a notice of non-responsibility attesting to such fact.

13. UTILITIES & WASTE MANAGEMENT Tenant agrees to pay for all electric gas, sewer, heat, water, and other utilities and taxes or charges on such utility services which are used in or attributable to the Premises, including but not limited to all meter connection charges and impact fees. Notwithstanding anything in this Lease to the contrary, the rights granted to Tenant under this Lease expressly exclude any right to use the air space outside the Premises (including the right to operate any aerial vehicle or drone), or the façade or other common areas of the Shopping Center for any virtual or augmented reality or similar technology; it being acknowledged that all such rights belong exclusively to Landlord In the event that Tenant's Permitted Use or operations requires any modification(s) to the Shopping Center common areas as a result of Governing Law or governmental approval, then any costs related to such modification(s) shall be the sole responsibility of Tenant, regardless as to the party that performs the work, and the performance of such modification shall be determined by Landlord in its sole discretion

Landlord reserves the right to (i) designate from time to time a garbage and/or recycling service to be utilized by Tenant, or (ii) provide and sell water, sewer, and electricity to Tenant at rates competitive to the rates charged by governmental authorities having jurisdiction, if any. Tenant will not permit or suffer any actual or threatened lien or other encumbrance, to attach to the Premises, any buildings, improvements, or any part of or interest in the Shopping Center, or the interest of Landlord, and nothing contained herein shall be deemed to imply any agreement of Landlord to subject Landlord's interest or estate to any lien or any encumbrance, and hereby appoints Landlord as attorney-in-fact to resolve any lien or encumbrance, and to the fullest extent permitted by Governing Law. Tenant shall indemnify and hold Landlord harmless for all costs and expenses, including attorney fees, related thereto. Tenant shall not cause any noise, vibration, odor, or other nuisance to emanate outside of the Premises. In addition to Landlord's rights and remedies under this Lease, Landlord shall also have the right to require Tenant to promptly install any necessary mitigation materials within the Premises at Tenant's sole cost and expense, in the event Tenant violates such emanation prohibition. Upon request from Landlord, Tenant shall report all of its energy and utility consumption to Landlord

14 RADIUS CLAUSE. During the Term of this Lease, Tenant shall not directly or indirectly operate, manage, or have any interest in any similar or competing business within a radius of 5 miles from the exterior boundary of the Shopping Center.

15 ACCEPTANCE OF PREMISES Even though Landlord may have notified Tenant that possession of the Premises is available for Tenant's occupancy and the Commencement Date has occurred pursuant to the terms of this Lease, Tenant agrees and acknowledges that Landlord, in its sole discretion, may elect to prohibit Tenant and its agents, employees and contractors from accessing the Premises unless and until Landlord

165106 4



has received: (i) copies of Tenant's certificates of insurance and endorsements required herein; and (ii) written evidence that all individually metered public utilities servicing the Premises are in Tenant's name. Tenant acknowledges and agrees that (a) Landlord is delivering the Premises and its systems in its "AS-IS", "WHERE-IS" condition WITH ALL FAULTS, (b) Tenant has examined the Premises prior to its execution of this Lease and is accepting the Premises (and taking possession thereof) in its "AS-IS", "WHERE-IS" condition WITH ALL FAULTS, (c) Landlord (including any party on behalf of Landlord) makes no warranty or representation whatsoever, whether written or oral, express or implied, as to the condition or repair of the Premises, including, without limitation, any representations or warranties relating to the condition of the subsurface of the Premises and systems, its habitability, merchantability, or fitness for a particular purpose, compliance with Governing Law or the presence of Hazardous Materials (as defined below) at, under, from, to, or in the vicinity of the Premises, and (d) Landlord makes no warranty or representation as to whether or not the Shopping Center or the Premises complies with ADA or any similar legislation. In the event that Tenant's use of the Premises requires modifications or additions to the Premises or Shopping Center in order to be in compliance with Governing Law, Tenant agrees to make any such necessary modifications and/or additions at Tenant's sole cost and expense. Tenant acknowledges that Landlord does not own or claim any ownership interest in any equipment, personal property or other related items left in the Premises by the previous tenant. Tenant acknowledges that any such equipment, personal property and other related items are owned only by the previous tenant, and neither Tenant nor Landlord has any ownership interest in such previously stated items. All damage done to any such aforementioned property shall be repaired at Tenant's sole cost and expense. Tenant acknowledges that if the previous tenant, lien holders or creditors of the previous tenant, or any other party which may hold a secured or unsecured interest in such equipment, personal property and other related items, reclaim(s) such property, Tenant is still bound by all terms and conditions of this Lease. Except as specifically provided in this Lease, Tenant hereby releases and fully discharges Landlord and each of Landlord's affiliates, members, employees, agents, attorneys, successors and assigns from any and all claims, demands, causes of action (or settlement thereof), losses, damages, liabilities, fines, penalties, costs and expenses (including attorney's fees and expenses), whether asserted or unasserted, known or unknown, liquidated or contingent, or in existence or arising hereafter, and whether based on negligence, intentional acts, statutes, or any other theory arising from or relating to the Premises, including, without limitation, (i) any conditions, including environmental and other physical conditions, affecting the Premises whether the same are a result of negligence or otherwise, or (ii) the past, present, future, actual or threatened presence or release of any Hazardous Materials at, under, from, to, or in the vicinity of the Premises.

16  LANDLORD'S MAINTENANCE. At all times, Landlord shall have full control over all exterior portions of the Premises and common areas of the Shopping Center. Landlord will keep the roof and the exterior walls of the Premises (excluding the store front, interior nonstructural portions of the exterior walls, and any plate glass, windows, window frames, doors, and door frames) in proper repair, provided that in each case Tenant shall have given Landlord prior written notice of the necessity of such repair. Notwithstanding any other provision of this Lease, in no event shall Landlord be responsible for repairing, maintaining, or replacing the Premises or any part of the Premises or its systems when any such damage and/or maintenance is caused or necessitated by (1) any act or omission of Tenant or any of Tenant's employees, agents, customers, invitees, or licensees; (2) any fixtures, equipment, or other items installed in or placed in the Premises by Tenant; or (3) any use of the Premises not permitted under the terms of this Lease. Landlord shall not be charged with default in the performance of any of its obligations hereunder unless Landlord fails to perform such obligations within 30 days (or within such additional time as is reasonably required to correct any such default) after written notice to Landlord. Tenant shall have an affirmative duty to notify Landlord of needed maintenance or repairs to the Shopping Center or the common area.

17  TENANT'S MAINTENANCE. Except for the repairs Landlord is obligated to make pursuant to this Lease, Tenant shall, at its own cost and expense, make all necessary repairs, replacement, improvements, and decorations and perform all maintenance on, in, and to the Premises that are necessary or appropriate to keep the Premises including the doors and windows, clean, orderly and in good condition and repair, and in a safe and tenantable condition. Any work performed by or on behalf of Tenant shall be performed by a licensed contractor in the applicable field. Said obligation shall include, but is not limited to, the maintenance repair and replacement of the store front including but not limited to all glass, doors and windows, Tenant's signs, all mechanical, plumbing, electrical, and heating, ventilation and air-conditioning ("HVAC") systems. All such repairs and maintenance shall be accomplished in a good and workmanlike manner using new quality materials, and shall be in compliance with all Governing Law. Tenant is responsible for installation of any grease trap required by code and shall clean and maintain any grease trap servicing the Premises. Tenant shall not permit the accumulation of garbage, trash or other waste in or around the Premises or dumpster, nor the excessive usage of such. As part of Tenant's maintenance, repair, and replacement obligations, Tenant shall, at its sole cost and expense, enter into and maintain a contract with a certified third party HVAC service contractor, providing for the periodic (at least quarterly) service, maintenance and repair of the HVAC system serving the Premises, which shall provide for a scope of work and periodic services at a minimum, in accordance with manufacturer's specifications. Upon request by Landlord, Tenant shall furnish Landlord with a copy of the current service contract, which contract shall be in form and substance reasonably satisfactory to Landlord and a current certificate of insurance of the Tenant's service contractor naming Landlord as an additional insured and such certificate shall be in form and substance and contain such coverages satisfactory to Landlord. In the event Landlord obtains an assignable warranty for any HVAC system servicing the Premises, to the extent assignable, Landlord shall assign to Tenant any such assignable warranty on parts and labor for the HVAC system. Tenant shall keep the Premises free of mold and mildew, and any conditions that could reasonably be expected to give rise to mold and mildew within the Premises. If Tenant fails to perform any obligation and such failure continues for 15 days after written notice from Landlord (except in the case of an emergency when no prior notice shall be necessary), Landlord may, but shall not be obligated to, perform such obligation, and Tenant shall pay to Landlord, upon demand, as Additional Rent, the cost of such performance plus 15% of such cost for supervision and overhead.

18  CONDITION OF PREMISES AT TERMINATION OR EXPIRATION. At the expiration or earlier termination of this Lease, Tenant will quit and surrender the Premises in good condition and repair, reasonable wear and tear thereof excepted. All electric, plumbing and HVAC systems and equipment ("Systems") shall be surrendered to Landlord in good working order, with written documentation of services performed thereon and the dates performed. Tenant shall deliver all keys and security codes for the Premises to Landlord. Any furniture or trade fixtures left in the Premises after the Term, shall be deemed abandoned and become the property of Landlord or Landlord may have them disposed of and removed. Any work undertaken by Landlord that is associated with Tenant's failure to return the Premises to Landlord as required under this Lease, including, but not limited to repair and/or replacement of such damage, receipt of Tenant deliverables as required under this Lease, removal of Tenant's personal property, and/or cleaning, will be billed back to Tenant at Tenant's sole cost and expense. The costs of such repairs, including administrative costs incurred by Landlord in the pursuit and performance such work, will be in Landlord's discretion. Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease.

165106.4

19. HAZARDOUS MATERIALS. (a) Tenant shall not use, generate, manufacture, produce, store, treat, dispose, or permit the escape on, under, about, or from the Premises, or any part thereof, any flammable, explosive, radioactive, hazardous, toxic, contaminating, or polluting matter, waste, oil or substance, or related injurious materials or waste, or any petroleum or petroleum-derived products, emerging contaminants including but not limited to per and polyfluoroalkyl substances, asbestos in any form, urea formaldehyde foam insulation and polychlorinated biphenyls (collectively "Hazardous Materials"). Tenant shall not install or operate any underground storage tanks on the Premises. (b) To the fullest extent permitted by Governing Law Tenant shall defend, indemnify, protect, and hold Landlord and each of Landlord's members, employees, agents, attorneys, successors, and assigns, free and harmless from and against any and all claims, liabilities, penalties, forfeitures, losses, or expenses (including reasonable attorney fees) for death of or injury to any person or damage to any property whatsoever, alleged or claimed to be arising from or caused in whole or in part, directly or indirectly, by: (1) the presence in, on, under, or about the Premises, or discharge in or from the Premises, of any Hazardous Materials; or (2) Tenant's failure to comply with any federal, state, county, municipal, local, or other law (including common law), rule, ordinance, code, regulation, directive, order, permit, license, or authorization now or hereafter in effect relating to the industrial hygiene, worker health and safety, environmental protection, use, analysis, generation, manufacture, purchase, transportation, storage, removal, or disposal of Hazardous Materials (collectively, "Environmental Laws"). (c) Tenant shall provide immediate notice to Landlord of any violations of Environmental Laws, releases of Hazardous Materials, or upon receipt of any notices of violation, claims, suits, notices of liability, or oral or written investigations, inspections, requests for information, or meetings, or other inquiries from any governmental authorities and shall provide copies of any documents from or correspondence with any governmental authorities. (d) If asbestos or asbestos-containing material is damaged or disturbed by actions of Tenant or its agents, employees, or contractors, Tenant shall, at its sole cost, take all actions necessary to remove all such asbestos or asbestos-containing materials, or repair or encapsulate all such asbestos or asbestos-containing materials in full compliance with Environmental Laws. (e) Tenant shall promptly commence and diligently pursue to completion any investigation, corrective action or remediation (collectively, "Corrective Action") of any kind or nature that is necessary under any applicable Environmental Law or this Lease because of, or in connection with, Tenant's violation of any Environmental Law or the release of Hazardous Materials by Tenant. All Corrective Actions shall be performed by one or more contractors approved in advance in writing by Landlord and shall be completed in compliance with all applicable Environmental Laws. All costs and expenses related to such Corrective Actions shall be paid by Tenant, including, without limitation, reasonable costs and expenses incurred by Landlord in connection with monitoring or review of such Corrective Actions. In the event that Tenant shall fail to promptly commence or fail to diligently pursue to completion all such Corrective Actions, Landlord may, but shall not be required to, cause such Corrective Actions to be performed and all costs and expenses so incurred shall become immediately due and payable from Tenant to Landlord together with interest from the date of advancement until paid by Tenant. (f) Upon termination of this Lease or upon Tenant's abandonment of the Premises, Tenant shall, at its sole expense, remove all Hazardous Materials from the Premises, and shall clean up any contamination that occurred during the Term to the satisfaction of Landlord in its sole discretion and in compliance with all Environmental Laws and this Lease. (g) Tenant's duty to defend shall arise when Tenant receives notice of any death of or injury to any person or damage to any property that may trigger Tenant's duty to indemnify, protect, and hold Landlord and each of Landlord's members, employees, agents, attorneys, successors, and assigns, free and harmless, under this section. (h) Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease. The duty to defend shall continue until a court of competent jurisdiction determines that there is no possibility that Tenant's duty to indemnify, protect, and hold Landlord and each of Landlord's members, employees, agents, attorneys, successors, and assigns, free and harmless, under this section. Tenant's duty to defend shall extend to include any and all claims where Landlord's or third-party negligence is alleged. It is the intent of the parties that Tenant shall defend Landlord from the outset of any claims that Tenant could be found liable. Tenant agrees to defend such claims through counsel selected by Landlord. Any acts or omissions by employees, agents, assignees, contractors, or subcontractors of Tenant or others acting for or on behalf of Tenant (whether or not they are negligent, intentional, willful, or unlawful), will be strictly attributable to Tenant.

20. TENANT'S INSURANCE. At all times during the Term, Tenant shall keep in force at its own expense, with insurance carrier(s) having an A.M. Best rating or its equivalent of A-VIII or better, the following:

- Special Form Cause of Loss Policy insuring an amount equal to at least the 100% full replacement cost of Tenant's betterments, improvements, fixtures, furniture, inventory, equipment (including HVAC systems servicing the Premises) and all other items of personal property of Tenant whether or not located on or within the Premises. The deductible shall not exceed $1,000.00.

- Commercial general liability insurance form insuring the Premises, and any other portions of the Shopping Center used by Tenant, with limits no less than $1,000,000.00 per occurrence and $2,000,000.00 general aggregate with respect to bodily injury and property damage, including contractual liability, and $200,000.00 with respect to damage to property (fire legal liability). If Tenant sells alcoholic beverages for on-premises consumption, Tenant must have no less than $1,000,000.00 of liquor liability insurance. The aggregate limit may be satisfied through a combination of primary and umbrella/excess liability insurance. If Tenant has multiple locations, such insurance shall also provide that the general aggregate limits apply separately to each insured location. Tenant will name Landlord as "Additional Insured" and include (a) an endorsement to the effect that the insurer agrees to notify Landlord not less than thirty (30) days in advance of any modification or cancellation thereof; (b) an endorsement providing that such insurance affords Landlord primary insurance coverage and that any other insurance maintained by Landlord is excess and noncontributory with the insurance required herein; and (c) a waiver of subrogation endorsement. Claims-made coverage and insurance policies containing self-insured retention(s) are NOT ACCEPTABLE. Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by the standard form of property insurance. Tenant agrees to pay, on ten (10) days written demand, and as Additional Rent, any increase in Landlord's premiums for property and liability insurance, boiler and loss of rents that may be charged during the term of this Lease as a result of such actions.

- Tenant shall require any contractor performing work on the Premises to carry and maintain, at no expense to the Landlord comprehensive general liability insurance, including contractor's liability coverage, contractual liability coverage, broad form property damage endorsement and contractor's protective liability coverage, providing protection with limits not less than $2,000,000.00 per occurrence; and workers compensation or similar insurance in amounts required by Governing Law. Tenant shall provide evidence of contractor's coverage prior to any Tenant Work being performed in the Premises to alaswell@phillipsedison.com

165106.4



- Tenant will furnish to Landlord copies of evidence of property coverage (Acord 28) and Certificate of Liability Insurance (Acord 25) evidencing coverages required by this Lease, and evidence of payment of the premiums therefore    as Landlord may request. Evidence of coverage must be sent to: pecocerts@phillipsedison.com or to: Phillips Edison Risk Management, 11501 Northlake Drive, Cincinnati, OH 45249. Landlord shall have no obligation to deliver the Premises to Tenant until it has received evidence of the coverage required herein.

- Tenant shall at all times during the Term carry business interruption insurance, that also covers loss events due to communicable and infectious diseases, in an amount equal to all Rent payable under this Lease for a period of 12 months, and naming Landlord as a loss payee

- In the event Tenant fails to obtain, and provide the certificate(s) of insurance as required in this Lease, on or before the Commencement Date, or if Tenant fails to maintain such insurance at any time during the Term, Landlord shall have the right, without notice to Tenant to take such action as Landlord deems necessary to protect its interest in the Premises, including, without limitation, the obtaining of such insurance coverage required in this Lease, and all expenses incurred by Landlord in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Tenant to Landlord upon demand as Additional Rent, plus a 15% administrative fee.

- If Tenant uses any Hazardous Materials as part of its Permitted Use or operations, including, but not limited to a dry cleaner, vehicle service station, fuel pad, car wash, laundromat, or the like, Tenant shall obtain an environmental insurance policy with limits no less than $1,000,000.00 per occurrence and deliver proof of such policy to Landlord as required under this Lease.

- Tenant shall provide proof of such required insurance annually to Landlord and/or within 10 days following Landlord's request

21. INDEMNIFICATION. To the fullest extent permitted by Governing Law, Tenant covenants and agrees that it will defend, indemnify, protect and save and keep Landlord forever harmless against and from (i) any penalty or damage or charges imposed for any violation of Governing Law, whether occasioned by Tenant or those holding under Tenant; (ii) against and from all claims, loss, cost, damage or expense arising out of or from any act, omission or negligence of Tenant, or Tenant's contractors, licensees, agents, servants, invitees, concessionaires or employees, or arising from any accident or other occurrence on or about the Premises, or any sidewalk or common area used by Tenant, causing injury to any person or property; (iii) against and from any and all claims, loss, cost, damage or expense arising out of any failure of Tenant in any respect to comply with and perform all the requirements and provisions of this Lease. Tenant's duty to defend shall arise when Tenant receives notice of any claims, loss, cost, damage or expense that may trigger Tenant's duty to indemnify, protect, and hold Landlord free and harmless, under this section. The duty to defend shall continue until a court of competent jurisdiction determines that there is no possibility that Tenant's duty to indemnify, protect, and hold Landlord free and harmless, under this section. Tenant's duty to defend shall extend to include any and all claims where Landlord's or third-party negligence is alleged. It is the intent of the parties that Tenant shall defend Landlord from the outset of any claims that Tenant could be found liable. Tenant agrees to defend such claims through counsel selected by Landlord. Tenant hereby waives any and every claim for recovery from Landlord and its successors and assigns for any and all loss of or damage to the Shopping Center or Premises or to the contents thereof, which loss or damage is covered by valid and collectible physical damage or general liability insurance policies, it being understood and agreed that the foregoing waiver shall also apply to the deductible under any such policy. Tenant waives any and every claim against Landlord for any and all loss of or damage to the Shopping Center or the Premises or the content thereof, and any general liability, which would have been covered had the insurance policies required to be maintained by Tenant by this Lease been in force, to the extent that such loss, damage, or liability would have been recoverable under such insurance policies. In that this Tenant waiver will preclude the assignment of any such claim by subrogation (or otherwise) to an insurance company (or any other person), Tenant agrees to give to its insurance company which has issued, or in the future may issue, to it policies of physical damage insurance, written notice of the terms of this Tenant waiver, and to have said insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverage by reason of said Tenant waiver. Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease

22 LANDLORD'S LIABILITY. Landlord shall not be liable for any damage to the Premises or its contents, regardless of the cause of such damage, for any acts or omissions of other tenants of the Shopping Center, nor for any condition of the Premises whatsoever unless Landlord is responsible for the repair thereof, pursuant to the terms of this Lease, and has failed to make such repair after written notice from Tenant of the need therefor, and expiration of a reasonable time for the making of such repair. Further Landlord shall not be liable for any damage, loss or cause of action, wherein the cause of such loss is attributable to the maintenance of Landlord, where Tenant knew or should have known of the need for such maintenance and failed to notify Landlord thereof. All personal property, fixtures, goods, wares, and merchandise in or about the Premises or the Shopping Center shall be and remain at Tenant's sole risk. Tenant shall timely pay all taxes directly or indirectly assessed on any furniture, fixtures and equipment existing in the Premises or otherwise owned by Tenant, whether such taxes are assessed against Tenant, Landlord, or the Shopping Center. Landlord shall have the right to sell or transfer the Shopping Center in its discretion, and in the event of any sale or transfer of Landlord's interest in the Premises, Landlord is hereby completely released and forever discharged from and of all covenants, obligations, and liabilities hereunder  Tenant acknowledges and agrees that Landlord's liability under this Lease shall be limited to Landlord's interest in the Shopping Center, and any judgements rendered against Landlord shall be satisfied solely out of the proceeds of sale of Landlord's interest in the Shopping Center.

23. DAMAGE TO REAL PROPERTY. Landlord will maintain fire and extended coverage insurance on the Shopping Center  If the Shopping Center building housing the Premises shall be damaged by fire or other casualty of the kind insured against in standard policies of fire insurance with extended coverage,  or in the event that any portion of the Premises shall be physically taken or condemned for public use, or transferred in lieu of such physical taking or condemnation, Landlord shall, using reasonable discretion, either repair or restore the damage or terminate this Lease if: (a) the cost of repair or restoration exceeds the amount of insurance proceeds received by Landlord and available for the repair and restoration of the Premises or if Landlord's mortgagee or the applicable governmental authorities refuse to give their approval and consent to the repair and restoration; or (b) this Lease is in the last 12 months of the Term; or (c) any tenant leasing greater than 5,000 square feet of space in the Shopping Center terminates its lease as a result of damage (regardless of whether such damage affects the Premises); or (d) more than 25% of the Shopping Center is damaged (regardless of whether such damage affects the Premises). Any such termination shall not affect any

165106.4

rights accrued to Landlord because of prior defaults by Tenant. Tenant shall have no right or claim to the proceeds of any transfer in lieu of such physical taking or condemnation or for any portion of Landlord's condemnation award, and shall have no right or claim based on the condemnation of the Premises or the improvements thereto or of Tenant's leasehold interest therein. Tenant, upon the request of any Landlord, shall execute, within 5 days after such request, any and all instruments required in order to effectuate any such condemnation or sale in lieu of condemnation, in the form requested by Landlord or such public authority. In all instances of restoration, Landlord shall only be required to restore the building which houses the Premises and common areas adjoining the Premises, and that portion of the Premises which Landlord is required to maintain pursuant to this Lease, to the condition they were in prior to the damage. Landlord shall have no responsibility to repair or restore any portion of the Premises required to be insured by Tenant under this Lease and Tenant shall have 30 days after delivery of access to Tenant by Landlord to complete its rebuilding or repairing in accordance with plans to be approved by Landlord before the commencement of construction. In the event any portion of the Premises is not usable by Tenant due to such damage. Fixed Minimum Rent shall abate proportionate to the unusable square footage until re-delivered by Landlord.

24. TENANT ASSIGNMENT  Tenant shall not assign, transfer, encumber, or sublease this Lease without the prior written consent of Landlord which may be granted or withheld in Landlord's sole discretion. Any request for Landlord's consent to any proposed assignment or sublease shall be accompanied by an administrative fee in the amount of greater of (i) $5,000.00, or (ii) 5% of the final purchase price for the sale of Tenant's business to its transferee. Notwithstanding anything in this Lease to the contrary, if Tenant proposes to transfer this Lease, Landlord may, at its option, upon written notice to Tenant delivered within 60 days after its receipt of Tenant's notice of proposed transfer, elect to terminate this Lease upon 30 days written notice. Upon any such termination, Landlord and Tenant shall have no further obligations or liabilities to each other under this Lease, except with respect to obligations or liabilities which accrue or have accrued prior to the date of such termination.

25. DEFAULT AND REMEDIES  The following shall be an event of default by Tenant: (a) failure to perform or observe any terms, conditions, and/or obligations of this Lease, which failure is not cured within 10 days after notice of such default; (b) failure to pay Rent or any sum of money hereunder when due (including any past due Rent, or other sum of money owed to Landlord, whether or not pursuant to a separate written agreement); (c) the bankruptcy or insolvency of Tenant or the filing by or against Tenant of a petition in bankruptcy or for reorganization or arrangement or for the appointment of a receiver or trustee of all or a portion of Tenant's property, or Tenant's assignment for the benefit of creditors; and/or (d) if Tenant, or its employees, contractors, agents, business invitees, assignees, sublessees, licensees, concessionaires, shareholders, members, owners, affiliates, and/or any other permitted occupants of the Premises (collectively, "Tenant Parties" and individually a "Tenant Party") shall conduct, or permit any activity in violation of Governing Law at the Premises and/or the Shopping Center that may result in Tenant or such Tenant Party being charged for a criminal or civil offense. Upon the occurrence of a Tenant default, Landlord without notice to Tenant in any instance (Tenant hereby expressly waiving any notices or demand required by Governing Law), may do any one or more of the following: (i) perform, on behalf of and at the expense of Tenant, any terms, conditions, and/or obligations under this Lease which Tenant has failed to perform; (ii) declare the entire amount of the Rent which would become due and payable during the remainder of the Term of this Lease to be due and payable immediately, including any past due Rent, or other sum of money owed to Landlord, whether or not pursuant to a separate written agreement; (iii) re-enter the Premises, terminate Tenant's and/or any Tenant Party's right to possession of the Premises and/or remove Tenant, any Tenant Party and all other persons and property from the Premises, without terminating this Lease; (iv) relet said Premises or any part thereof upon any such terms and conditions as Landlord in its sole discretion may deem advisable, (v) terminate this Lease; (vi) remove Tenant's property from the Premises and store the same at Tenant's expense, or dispose of Tenant's property, without Landlord being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby; (vii) sell Tenant's property located within the Premises at a public or private sale, with the proceeds being applied to the costs of sale and storage, Landlord's reasonable attorney fees, amounts owed to Landlord under this Lease, and with any surplus paid to Tenant, in that order; (viii) change the locks of the Premises and lock Tenant out of the Premises; (ix) charge Tenant an administrative fee of 10% per month for all monetary amounts owed by Tenant to Landlord (including any expenditures by Landlord in performing Tenant's obligations under this Lease), until such amounts have been paid in full; and/or (x) exercise any legal or equitable rights and/or remedies available to Landlord pursuant to Governing Law. All of Landlord's rights and remedies set forth within this Lease shall be cumulative. Tenant waives any rights to re-enter the Premises and any rights of redemption; exercise any other legal or equitable right or remedy it may have, which shall specifically include but not be limited to Landlord's exercise without court proceeding of a lien on any of Tenant's property in the Premises until cure of all events of default. No re-entry or commencement of any action for re-entry by Landlord shall be construed as an election to terminate this Lease, nor to release Tenant from its obligations hereunder. Tenant hereby waives all rights to request a jury trial in any action, proceeding, or counterclaim arising out of this Lease. Tenant further waives any right to interpose any non-compulsory counterclaim, or to seek damages, other than injunctive relief, in relation to the reasonableness of Landlord's discretion. In no event may Tenant recover any special, consequential, indirect or punitive damages against or from Landlord herein, including, without limitation, any damages for or relating to any lost profit or business income. If this Lease is terminated by Landlord after default by Tenant, Tenant nevertheless shall remain liable for all Rent which may be due or damages which may be sustained prior to such termination, and all reasonable costs, fees, and expenses, including attorney fees, incurred by Landlord in pursuit of its remedies hereunder, and/or in connection with any bankruptcy proceedings of Tenant or Tenant's guarantor (if applicable), and/or in connection with renting the Premises to others from time to time, plus additional damages which shall be an amount equal to the present value of Rent, discounted at a rate of 8%, which would have become due during the remainder of the Term. Notwithstanding anything in this Lease or other document(s) to the contrary, upon the occurrence of any Tenant default, or upon the effective date of any assignment or other transfer of this Lease by Tenant to any third party, the following provisions contained within this Lease, if any, shall be automatically, immediately, and permanently removed and deemed null and void: (a) any exclusive use right granted to Tenant, (b) any use restrictions and/or prohibitions granted to Tenant; (c) any building, improvement, development, or kiosk restrictions (either permanent or temporary); and (d) any co-tenancy and pylon/monument provisions granted to Tenant. In addition to any other rights and remedies available to Landlord under this Lease and/or at law and/or in equity. Tenant shall reimburse Landlord upon demand the unamortized portion of: (i) any allowance for Tenant improvements; (ii) brokerage fees paid by Landlord in connection with this Lease; (iii) costs expended by Landlord in connection with any tenant improvements made by Landlord; and (iv) all other costs, expenses and other sums incurred by Landlord in connection with preparing and/or improving the Premises for Tenant's occupancy under this Lease. In addition to all other rights and remedies, if Tenant shall be in default hereunder, Landlord shall, to the extent permitted by law, have a right of distress for rent and a lien on all of Tenant's fixtures, merchandise, and equipment in the Premises, as security for rent and all other charges payable hereunder. No delay or omission of Landlord to exercise any right or remedy shall be construed as a waiver of any such right or remedy or of any default by Tenant hereunder. The acceptance by Landlord of any Rent hereunder shall not be a waiver of any breach or default by Tenant, other than the failure of Tenant to pay the particular Rent accepted, regardless of Landlord's knowledge of such breach or at the time of

Page 8 of 31

165106 4



acceptance of such Rent, or a waiver of Landlord's right to exercise any remedy available to Landlord by virtue of such breach or default. Acceptance of a partial payment of any amount of Rent owed shall not be a waiver of Landlord's right to recover the remaining amounts of Rent still owing.

26. LANDLORD'S INSPECTION RIGHTS Landlord shall have the right at all reasonable times to enter upon the Premises to: (i) inspect and; make repairs, additions, or improvements, comply on behalf of Tenant with Governing Law if Tenant fails to do so, at no cost to Landlord and in Landlord's sole discretion; examine the Premises to verify Tenant's compliance with its obligations under this Lease, install, maintain and repair pipes or other utility lines to provide service to or for other premises located in the Shopping Center, or otherwise perform any work or satisfy any other Landlord obligation or right as set forth within this Lease, (ii) to bring potential purchasers, tenants, or mortgagees into the Premises and/or to (iii) market the space, including installing temporary signage

27. SUBORDINATION/ ESTOPPEL The rights of Tenant under this Lease shall be subordinate to the lien and terms and conditions of the instrument or the lien resulting from any other method of financing or refinancing now or hereafter in force against the real estate and/or buildings of which the Premises are a part or against any buildings hereafter placed upon the real estate of which the Premises are a part In addition, if the interest of Landlord in the Premises shall be transferred to and owned by the holder of any deed of trust or mortgage ("Lender") by reason of foreclosure or any other manner, Tenant shall be bound to Lender under all of the terms of this Lease, with the same force and effect as if the Lender were the original Landlord under this Lease Tenant does hereby attorn to (a) the Lender as its Landlord when the Lender is in possession of the Premises, (b) a receiver appointed in any action or proceeding to foreclose the deed of trust or mortgage, (c) any party acquiring title to the Premises, and (d) any successor to Landlord, said attornment to be effective and self-operative, without the execution of any further instruments on the part of any of the parties hereto, immediately upon such successor succeeding to the interest of Landlord in the Premises. The provisions of this section shall be self-operative Tenant, however, upon the request of any Lender or Landlord shall execute within 5 days after such request, instruments in confirmation of the foregoing provisions in the form requested by any such Lender or Landlord Additionally, Tenant agrees within 5 days after written request, to execute, and deliver to Landlord and/or Landlord's designee an estoppel certificate in such form and substance as reasonably requested by Landlord, Landlord's designee and/or lender, with customary provisions Should Tenant fail to return the estoppel certificate then Tenant hereby appoints Landlord as attorney-in-fact to execute an estoppel certificate on Tenant's behalf and to the fullest extent permitted by Governing Law, Tenant shall indemnify and hold Landlord harmless for all costs and expenses, including attorney fees, related thereto.

28. RULES AND REGULATIONS. Tenant agrees to comply with and observe the rules and regulations of the Shopping Center Tenant's failure to keep and observe said rules and regulations shall constitute a breach of the terms of this Lease in the same manner as if such rules and regulations were contained herein as covenants

29. HOLDING OVER. In the event that Tenant shall hold over after the expiration of this Lease for any reason, the monthly Fixed Minimum Rent shall be 2 times the monthly average Fixed Minimum Rent that was payable during the last full 12 month period of this Lease, and thereafter, in all cases, 30 days' written notice shall be required to terminate such tenancy In the event Tenant fails to timely vacate the Premises following such 30-day period, then Tenant shall be deemed immediately and automatically in default of this Lease

30. RELOCATION OF PREMISES Landlord may, upon 60 days prior written notice to Tenant relocate Tenant to another existing location within the Shopping Center, in Landlord's sole discretion, and constructed at Landlord's expense. If in Landlord's sole discretion (i) no existing suitable space is available, (ii) Governing Law hinders such relocation, or (iii) Tenant has less than 12 months' lease term remaining, Landlord may terminate this Lease upon 30 day's written notice to Tenant in Landlord's sole discretion In the event of such relocation, all references in this Lease to the "Premises" shall thereafter refer to the space to which Tenant is relocated Tenant's Proportionate Share shall be adjusted based on the change in the square footage of the Premises

31. REDEVELOPMENT OF SHOPPING CENTER. In the event of any expansion, renovation, redevelopment or remerchandising of the Shopping Center, Landlord may require Tenant to surrender possession of all or a portion of the Premises for such period of time as required for such purposes, including for the remainder of the Term Landlord shall provide Tenant with 60 days' prior written notice of such surrender During such period of surrender Fixed Minimum Rent shall proportionally abate. If the expansion, renovation redevelopment, or remerchandising of the Shopping Center requires Tenant to surrender the Premises for the remainder of the Term as determined by Landlord in its sole discretion, then this Lease shall terminate upon 30 day's written notice by Landlord to Tenant Tenant's Proportionate Share shall be adjusted to reflect any changes in the total square footage of the Shopping Center Notwithstanding anything in this Lease to the contrary, if any grocery anchor expresses an intent to expand its premises into an area that encompasses any portion of the Premises then Landlord may terminate this Lease by delivering 90 days' written notice to Tenant and this Lease shall terminate without any liability to any party

32. NOTICE. All notices given or required to be given by Tenant must be delivered by a nationally-recognized overnight courier service or by registered or certified mail - return receipt requested postage prepaid (or equivalent), to the Notice Address Such address may be changed from time to time by written notice.

33. BROKERS Each of the parties represents and warrants that it has engaged no broker and that no claims for brokerage commissions or finder's fees will arise in connection with the execution of this Lease To the fullest extent permitted by Governing Law, each of the parties agrees to indemnify the other against and hold it harmless from all liabilities arising from any such claim arising on account of its acts or omissions (including, without limitation the cost of attorney fees in connection therewith).

34. FORCE MAJEURE. In the event that Landlord shall be delayed or hindered in or prevented from doing or performing any act required in this Lease by reason of strikes, lock-outs, casualties, acts of God, labor troubles, inability to procure materials, failure of power, Governing Law, any order or recommendation of any governmental authority, state or federal emergency declarations, communicable and infectious diseases, riots, insurrection, war, delays attributable to Tenant, delays attributable to utility provider(s), or other causes beyond the reasonable control of Landlord, then Landlord shall not be liable or responsible for any such delays, and the doing or performing of such act shall be excused for the

165106.4



period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. Monetary obligations under this Lease shall not be subject to force majeure.

35.  MISCELLANEOUS PROVISIONS:  This Lease shall be effective as of the earlier of (i) the date executed by both Landlord and Tenant or (ii) the date on which possession of the Premises is delivered by Landlord to Tenant, and all terms and conditions shall be applicable even though the Term of this Lease has not yet commenced and shall be governed and construed under the applicable governmental laws, codes, rules, authorities, approvals, orders, reviews, regulations, court orders, including, but not limited to, local zoning and building codes of the state in which the Shopping Center is located, and Environmental Laws (as defined above), as may be amended from time to time ("Governing Law"). If Tenant is not an individual, Tenant represents and warrants that throughout the Term of this Lease, Tenant is and shall be a valid legal entity, duly licensed to do business in the state in which the Shopping Center is located, and in the event Tenant is not an individual, and should Tenant fail to maintain its status as a valid legal entity or license to do business within the Shopping Center state, then the individual members, partners, or shareholders of Tenant shall be liable for all the terms and conditions set forth in this Lease. Landlord shall have the right to audit Tenant's gross sales in the event any other tenant or occupant of the Shopping Center alleges that Tenant has violated such tenant's or occupant's use restriction(s). If this Lease is signed by more than one individual as "Tenant", the liability of all signatories shall be joint and several. Tenant agrees to hold this Lease as confidential and Tenant shall not, without Landlord's prior written consent, disclose the contents of this Lease or any information related to this Lease including but not limited to CAM-related information, to any third party.  In the event Tenant violates this confidentiality clause, Tenant shall be obligated to promptly pay Landlord $10,000.00 as liquidated damages; the actual damages which would be suffered by Landlord in such event being impossible to ascertain as of the date hereof, but the agreed upon amount being a reasonable estimate thereof. Each provision of this Lease shall be construed in a manner as to give it the fullest legal force and effect possible.  To the extent any provision is held to be unenforceable or invalid, the unenforceability or invalidity of such provision shall not affect the enforceability or validity of the remaining provisions of this Lease. No waiver of any provision of this Lease shall be deemed or shall constitute a waiver of any other provision hereof or shall constitute a continuing waiver unless expressly provided in writing by the Landlord. In the event of any breach of this Lease, and/or any litigation between Landlord and Tenant arising out of this Lease, the non-prevailing party shall pay to the prevailing party all reasonable costs and expenses, including but not limited to attorney fees, paralegal fees, filing fees and court costs, incurred by the prevailing party in connection with the litigation, which shall be payable on demand, and, if payable to Landlord, as Additional Rent, subject to all of Landlord's rights and remedies provided herein. This Lease may not be amended, modified, or varied except in a writing signed by both Landlord and Tenant. Landlord shall have the right, but not the obligation, at any time during the Term, to renovate the existing Shopping Center by performing any work that Landlord deems necessary, in its sole discretion, to modify and/or improve all or any of the following storefronts, façades, canopies, lighting systems, Shopping Center identification signs, tenant identification signs, parking, roof, common areas and other similar items, including, but not limited, lease, sell, grant, or license space to occupants in the common areas. Notwithstanding anything in this Lease to the contrary, Landlord shall have the right, but is under no obligation, to install solar system(s), submeter(s), battery(ies), alternative energy sources, electrical vehicle charging station(s), and/or technological evolutions thereof in the Shopping Center. Under no circumstances shall Tenant have the right to act as Landlord's attorney-in-fact or use power of attorney to settle, litigate, or resolve any claims that could negatively impact Landlord unless agreed to in writing by both Tenant and Landlord. Tenant acknowledges and agrees that, at any time, Landlord is authorized to make all inquiries deemed necessary to verify the accuracy of Tenant's and/or guarantor(s') financial status and to determine the credit worthiness of Tenant and/or any guarantor(s). Notwithstanding anything in this Lease to the contrary, the terms and provisions of Tenant's personal financial statement that was submitted by Tenant to Landlord shall remain as part of this Lease. Tenant authorizes Landlord to make inquiries to outside parties about Tenant's and/or guarantor(s') credit experience. Tenant represents and warrants to Landlord that the individual(s) signing this Lease, or the individual(s) signing on behalf of the Tenant entity to this Lease, as applicable, has/have full authority to execute this Lease and bind Tenant. Tenant shall cooperate with Landlord as necessary for Landlord to comply with Governing Law.

36.  PREPARATION.  THIS IS A LEGAL DOCUMENT AND HAS BEEN PREPARED BY LANDLORD BUT HAS BEEN REVIEWED AND APPROVED BY TENANT. TENANT HAS HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL PRIOR TO EXECUTION, AND THUS THIS AGREEMENT SHALL NOT BE INTERPRETED IN FAVOR OF EITHER LANDLORD OR TENANT OR AGAINST EITHER LANDLORD OR TENANT MERELY BASED UPON THEIR EFFORTS IN PREPARING SUCH

37.  COUNTERPARTS & DIGITAL EXECUTION. This Lease may be executed in counterparts (each of which shall be deemed an original but all of which together shall constitute one and the same Lease) and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party. In the event that any signature is delivered by: (i) by electronic signature pursuant to Electronic Signatures In Global and National Commerce Act ("E-SIGN") or The Uniform Electronic Transactions Act ("UETA"), or similar laws, regulations, or orders of such signature (including, without limitation, through software programs such as DocuSign); (ii) by e-mail delivery of a " pdf" format data file, "JPEG" file, or similar imaging format; or (iii) through any other electronic transmission, then, in each case, each party acknowledges and agrees that such electronic signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such were an original thereof. Landlord, Tenant, and any other signatory party to this Lease waives any right to claim that such respective electronic signature does not create a valid and binding contract memorializing the parties' intents through such Lease's terms and conditions. The delivery of an executed copy hereof by Tenant shall be deemed an offer only, open for acceptance by Landlord solely upon execution and delivery of this Lease by Landlord and an agreement binding on Landlord shall not be deemed formed until such execution and delivery not withstanding any reliance by Tenant on any oral or written or other statements from Landlord or any of its agents delivered via e-mail or otherwise. Tenant hereby acknowledges that it disclaims any such reliance.

38.  OFAC. Tenant represents and warrants to Landlord that (i) neither Tenant, nor any person or entity that owns an equity interest in Tenant, nor any of Tenant's officers, directors or managing members is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under Executive Order 13224 ("Executive Order") signed on September 24, 2001, and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism," or other governmental action, (ii) Tenant's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) Tenant is currently in compliance and, throughout the Term of this Lease, Tenant shall comply with the Executive Order and with the Money Laundering Act and any other governmental requirement relating thereto. To the fullest extent permitted by Governing Law, Tenant shall defend, indemnify, and hold

165106.4



harmless Landlord from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorneys' fees and related costs) incurred by Landlord arising from or related to any breach by Tenant of the foregoing representations in this Section; and the foregoing indemnity obligations shall survive the expiration or earlier termination of this Lease

------- END OF GENERAL LEASE TERMS --------
(SIGNATURE PAGES TO FOLLOW)

165106.4



LANDLORD:
Cascades Station LLC,
 a Delaware limited liability company

BY: Phillips Edison Grocery Center Operating Partnership I, L.P., a Delaware limited partnership, its manager

BY: Phillips Edison Grocery Center OP GP I LLC, a Delaware limited liability company, its general partner

By:

Name: Robert F. Myers

Its: Executive Vice President

Date: 10/25/2022

165106.4

DocuSign Envelope ID: 93012FF0-F3C5-45D2-9FD4    40EB0983DD

TENANT:
Epicerie Cigar Retail Shop LLC,
a Virginia limited liability company

By: _Hafdalla Alahdal_

Name: Hafdalla Alahdal

Its (Title): Owner

Date: 10/18/2022


Tenant D/B/A: Epicerie Cigar Retail Shop

165106.4



## EXHIBIT A – SITE PLAN



**DISCLAIMER** - This Site Plan is for general information purposes only and is not intended to constitute representations and warranties by Landlord as to the ownership of the real property depicted herein or the identity or nature of any occupants thereof, excluding the areas specifically identified in the legend of this Site Plan and except as otherwise expressly provided for in body of this Lease to the contrary.

165106.4



## EXHIBIT B - TENANT IMPROVEMENT ALLOWANCE

Landlord shall pay to Tenant a cash allowance ("Tenant Improvement Allowance") not to exceed $25,200.00 as Landlord's contribution toward the commercially reasonable cost of Permanent Improvements (as such term is defined in this Lease) to the Premises, which have been completed in a first class manner and in compliance with all applicable codes by licensed contractors. Notwithstanding anything in this Lease to the contrary, Landlord may, in Landlord's sole discretion, apply any or all of the Tenant Improvement Allowance towards any amounts owed by Tenant to Landlord under the Lease, and the Tenant Improvement Allowance shall be reduced, on a proportionate dollar for dollar basis, by any Tenant Improvement Allowance amount that Landlord applies to Tenant's arrears. The Tenant Improvement Allowance shall be issued after the fulfillment of each of the following requirements ("Requirements").

1   Tenant opens for business in the Premises, and has paid a full month's Rent after opening for business; and

2   Landlord receives Tenant's invoice (sample Request Form attached) which must include: Shopping Center name, Tenant name, contact information, and address (no P.O. Box) for mailing of payment, for payment of the Tenant Improvement Allowance with all of the following attached thereto:

    i.   copies of receipts/invoices showing the work or materials purchased or other evidence of the cost of reimbursable Permanent Improvements, the aggregate sum of which is at least the amount of the Tenant Improvement Allowance being requested by Tenant; and

    ii   a list of all contractors, subcontractors and material suppliers (collectively "Contractors"), which must contain all of the following information for each Contractor: (a) Business Name (b) business address (c) business phone number (d) contact name (e) proof of contractor's license (f) dollar amount for services rendered at the Premises; and

    iii  notarized unconditional final lien waivers and/or notarized unconditional final lien releases (sample attached hereto) from all Contractors in excess of $2,500.00; and

    iv.  copy of building permits for Tenant Work, if required to perform Tenant Work; and

    v.   a copy of the final Certificate of Occupancy for the Premises; and

    vi.  drawings: an electronic copy (AutoCAD format) of all applicable drawings and specifications including but not limited to architectural, mechanical, electrical, plumbing, civil and shop drawings, to the extent and if required for Tenant Work and/or permitting; and

    vii  HVAC information: A list detailing the model numbers, serial numbers, and tonnage for each installed HVAC unit as well as the balance report and all warranty information related thereto, if HVAC systems were installed, or repaired as part of Tenant Work; and

    viii warranties: one (1) year workmanship warranty from all Contractors performing any Tenant Work over $2,500.00, and all warranties for any equipment installed as part of Tenant Work; and

    ix   an estoppel certificate certifying that this Lease is in full force and effect; and

    x.   Tenant's W-9; and

    xi.  Tenant's e-mail address and ACH bank account information

3.  Tenant's request (sample Request Form attached), along with all of the foregoing documentation is received by Landlord no later than sixty (60) days after the date Tenant opens for business in the Premises, at the following address

    Vice President of Construction
    ATTN: TIA PAYMENT REQUESTS
    Phillips Edison & Company
    11501 Northlake Drive
    Cincinnati, OH 45249

4.  Landlord, at Landlord's option, has conducted a lien search on the Premises which has revealed no liens filed in relationship to the work performed by or on behalf of Tenant; and

5   Tenant is in compliance with all obligations under this Lease

Landlord may, at Landlord's option, retain a portion of the Tenant Improvement Allowance as Landlord deems necessary to insure Landlord against any liability for mechanics' or materialmen's liens and to ensure completion of the Permanent Improvements, each being held by Landlord

165106.4



until such time has passed under Governing Law that a mechanics' or materialmen's lien can no longer be filed against the Shopping Center. In the event: (i) Landlord has not received and approved copies of Tenant's contractor's insurance pursuant to the terms of this Lease prior to start of Tenant Work, and/or (ii) Landlord has not received and approved copies of Tenant's Plans, if applicable, prior to the start of Tenant Work, Landlord shall reduce the Tenant Improvement Allowance by 2.5% in each event, for a total potential reduction in Tenant Improvement Allowance by 5%. In the event Tenant fails to request any portion of the Tenant Improvement Allowance within the aforementioned timeframe, or fails to satisfy the Requirements, any obligation of Landlord to pay the Tenant Improvement Allowance shall be deemed null and void. Landlord will issue payment of Tenant Improvement Allowance within 60 days of receipt of all of the Requirements for such request. If either party terminates this Lease for any reason prior to the expiration of the Initial Term or any renewal thereof, Tenant shall reimburse Landlord for the unamortized portion of the Tenant Improvement Allowance within 15 days of the termination of this Lease. Further, in addition to any remedies available to Landlord under this Lease, in the event Tenant commits an event of default, regardless of whether this Lease is terminated, Tenant shall reimburse Landlord for the unamortized portion of the cost of the Tenant Improvement Allowance within 15 days of such notice. For purposes of this Section, the Tenant Improvement Allowance shall be amortized on a straight-line basis over the life of this Lease, including any renewal terms. Landlord and Tenant agree that the monies to be paid by Landlord to Tenant pursuant to this Section are being paid to Tenant for the purpose of Tenant's constructing or improving qualified long-term real property as defined in Section 110(c)(1) of the Internal Revenue Code of 1986, as amended, for use in such Tenant's trade or business at the Premises, which Premises Landlord and Tenant acknowledge constitutes retail space. It is the intent of Landlord and Tenant that Landlord and Tenant shall consider any such payment as made in accordance with Section 110 of the Internal Revenue Code of 1986, as amended, and Landlord and Tenant shall provide the Internal Revenue Service any and all information concerning such payments as may be required by the Internal Revenue Service.

165106.4



## SAMPLE TIA REQUEST FORM

Date: _____, 20___

Shopping Center Name: _____
Tenant Name: _____
TIA Amount requested: $_____
Tenant contact name: _____
Tenant contact phone number: ___ (____) _____

Tenant ACH Information:
- Name on Account: _____
- Type of Account: _____
- Routing Number: _____
- Account Number: _____

Dear Landlord:

Please consider this Tenant's request for reimbursement of the commercially reasonable cost of Permanent Improvements to the space (Tenant Improvement Allowance) up to the limits defined in my Lease. By making such request, Tenant certifies that the Permanent Improvements for which reimbursement is sought have been completed in the Premises, according to Governing Law (as such term is defined in the Lease), in a good and workmanlike manner, and that all Contractors have been paid in full for such work.
Tenant has enclosed the following (check if enclosed):

> copies of receipts/invoices showing the work or materials purchased or other evidence of the cost of reimbursable Permanent Improvements, the aggregate sum of which is at least the amount of the Tenant Improvement Allowance being requested by Tenant;

> a list of all contractors, subcontractors and material suppliers (collectively "Contractors"), which must contain all of the following information for each Contractor: (a) Business Name, (b) business address, (c) business phone number, (d) contact name, (e) proof of contractor's license, and (f) dollar amount for services rendered at the Premises;

> notarized unconditional final lien waivers and notarized unconditional final lien releases (sample attached hereto) from all Contractors in excess of $2,500.00;

> copy of building permits for Tenant Work, if required to perform Tenant Work;

> a copy of the final Certificate of Occupancy for the Premises;

> drawings: an electronic copy (AutoCAD format) of all applicable drawings and specifications including but not limited to architectural, mechanical, electrical, plumbing, civil and shop drawings, to the extent and if required for Tenant Work and/or permitting;

> HVAC information: A list detailing the model numbers and tonnage for each installed HVAC unit as well as the balance report and all warranty information related thereto, if HVAC systems were installed, or repaired as part of Tenant Work;

> warranties: one (1) year workmanship warranty from all Contractors performing any Tenant Work over $2,500.00, and all warranties for any equipment installed as part of Tenant Work;

> an estoppel certificate certifying that the Lease is in full force and effect,

> Tenant's W-9

Tenant requests that the payment be mailed to the following address (cannot be a P.O Box):

_____
_____
_____

Signed: _____     Date: _____

Printed name: _____

165106.4



## FINAL WAIVER OF LIENS

The undersigned, being a party in connection with the construction, repair, renovation and/or demolition of the improvements being made upon real estate owned by _____, located in _____City, State of _____, and generally described as _____ Shopping Center,

Acknowledges that payment in the amount of $_____ has been paid in full by _____ for the work completed and materials supplied to the above-described property. Contractor does hereby waive, release and quit claim all right to a lien upon the land and improvements above described, as a result of work done and/or materials furnished by the undersigned, any employees, materialmen and sub-contractors through the Pay Application date for which this payment was made.

Undersigned warrants that upon completion of any work or delivery of any materials, all laborers and sub-contractors employed in the performance of the work and all material men who have furnished materials and services will have been fully paid, that no laborers, sub-contractors or materialmen will assert a claim against or a lien upon the premises hereinabove described, that no claim has been assigned or will be assigned for payment or right to perfect a lien against said land and improvements, and that the undersigned is fully authorized and empowered to execute this waiver of lien.

Undersigned understands and agrees that the Owner, any lender and the title insurance company are entitled to rely upon this waiver.

WITNESS:                                          CONTRACTOR:

_____                        _____

                                                 Printed Name: _____

                                                 Title: _____

COUNTY OF _____)
                                   )SS:
STATE OF _____)

BE IT REMEMBERED that on this _____ day of _____, 20__, before me, a Notary Public in and for the said county and state, personally appeared _____, who acknowledged that he/she did sign the foregoing instrument and that the same is his/her free and voluntary act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my notarial seal on the date and year above-mentioned

                                                 _____
                                                 NOTARY PUBLIC

165106.4



**ESTOPPEL**

_____, 20___

Cascades Station LLC
11501 Northlake Drive
Cincinnati, Ohio 45249
Attention:  Construction

Re:    Lease dated _____, 20___ ("Lease"), between Cascades Station LLC ("Landlord") and Epicerie Cigar Retail Shop LLC, a Virginia limited liability company ("Tenant").

Ladies and Gentlemen:

The undersigned, as Tenant, warrants and represents to Landlord as follows:

1.    Landlord is not in default under the terms and/or conditions of the Lease;

2    Landlord has satisfied its responsibilities in accordance with Landlord Work as set forth in the Lease;

3    The Lease is in full force and effect and has not been modified, altered, or amended;

4    The person signing this letter on behalf of Tenant, as applicable, is a duly authorized agent of the Tenant, as applicable.

TENANT:

By:

_____

Printed Name:

_____

Title.

_____

165106.4



## EXHIBIT C – SIGN CRITERIA

**SECTION I.**
The content of all signs shall be limited to letters designating the Tenant name and/or type of store or business only (any such designation of the store type shall be by general descriptive terms and shall not include any specifications of the merchandise offered for sale therein or the services rendered therein) and shall contain no advertising devices, slogans, symbols or marks (other than the store name and/or type of store). Crests and corporate shield designs are not permitted

**SECTION II.**
Landlord will provide an area on the building façade of appropriate size and location to Tenant's storefront.  After having first obtained Landlord's written approval of Tenant's sign design (which submission shall include letter style and size) prepared in accordance with these criteria, Tenant will properly install a sign on the façade.

**SECTION III.**
The character, design, color, location and layout of all signs shall be subject to Landlord's prior approval. Requests for sign approval must be submitted to Landlord for approval prior to fabrication and shall include two (2) sets drawings each showing the following: (i) the storefront drawing with signage drawn to scale, (ii) section of sign indicating sign construction and means of attachment to storefront and shall indicate sign depth dimension and lease line plane; (iii) specific colors and materials to be used. Landlord will require fifteen (15) business days to review Tenant requests for sign approval. No deviation from the approved drawings will be permitted without resubmission for Landlord's approval. All signage submissions shall be sent to:

> Phillips Edison & Company
> 11501 Northlake Drive
> Cincinnati, Ohio 45249
> Attn:  Director of Property Management
> (513) 554-1110
> (513) 554-1009 (Fax)

**SECTION IV.**
Excepting the signs specified in Section VI of this Exhibit, no occupant shall install more than one (1) sign.

**SECTION V.**
All signs shall be in accordance with the following requirements

(a)     The sign lettering or any part thereof shall be located within the physical limits of the storefront of the Premises and must remain at least eighteen (18") inches away from the lease lines, and shall not exceed 75% of the area of the façade directly above the Premises. The top plane of the sign shall be in line with the other tenant signage.

(b)     No sign or any part thereof shall be located on the roof of the Premises.

(c)     Tenant's sign shall be individually lettered, channel-lighted, and mounted on a raceway, with the raceway painted the same color as the façade.

(d)     All signs shall be professionally fabricated and installed in compliance with all applicable codes, laws and regulations.

**SECTION VI.**
The fabrication, installation and operation of all signs shall be subject to the following restrictions:

(a)     All storefront signs must be internally illuminated and regulated by a timer or photocell.

(b)     No flashing, moving, flickering or blinking illumination or lights, animation or floodlight illumination nor any moving signs, rooftop signs, parapet signs, exposed neon or pylon signs shall be permitted.

(c)     No painted or printed signs, except one (1) non-illuminated, small scale "Signature Sign" or "store hours" sign, which is lettered on the glass portion of Tenant's store or required credit card signs, provided such sign does not exceed three inches (3") in height.

(d)     No outrigger signs shall be permitted, except one (1) pre-approved identification sign located beneath the canopy if permitted at the Shopping Center

(e)     No sign will be installed without the written approval of Landlord.

**SECTION VII.**
At such time as Landlord prepares new sign criteria for the Shopping Center, Tenant will install a new sign to comply with such new criteria at Tenant's sole expense. If Landlord temporarily requires removal of Tenant's signs, Tenant shall be responsible for removal and reinstallation of signs.

**SECTION VIII.**
Tenant will have sole responsibility for compliance with all applicable codes, ordinances, building classifications, documents of record, rules and regulations. The plan review and approval conducted by Landlord is limited to adherence to Landlord's criteria and is not for code compliance. Tenant shall not be permitted to display any neon signage, or any other any signage with marijuana or hemp leaves, or any signage bearing drug paraphernalia images or symbols.

## FOR A COMPLETE UNDERSTANDING OF THE CODE REQUIREMENTS, TENANT SHOULD CONTACT LOCAL BUILDING OFFICIALS

165106.4



## EXHIBIT D – SHOPPING CENTER PRIVATE COVENANTS AND RESTRICTIONS

The covenants and restrictions set forth in this Exhibit are excerpted from leases and agreements which are executed or in the process of being negotiated, which exclusive uses and/or prohibited uses encumber (or shall encumber) the Premises. Although set forth in terms of restrictions against Landlord, Tenant (including any assignee, subtenant, franchisee or other transferee of Tenant under the Lease) shall not use the Premises in any way which will violate (or cause Landlord to violate) any of the terms and/or conditions or other provisions of such exclusive or restrictive use provisions. Except as otherwise indicated below, defined terms used below shall have the meanings ascribed to the same in the subject agreement or document from which such provision is derived In no event shall Tenant have the right to enforce any of the following provisions against Landlord or any other tenant or occupant of the Shopping Center

### Abbot's Frozen Custard
Landlord agrees to not lease, consent to sublease, or consent to the assignment of any lease, for any space owned by the Landlord within a five (5) mile radius of this property to any company that generates revenue through sales of frozen custard, ice cream, frozen yogurt, and gelato.

### Burtons Grill & Bar
Landlord shall not contract with, or permit to operate in the Shopping Center, any tenant that is a full service, American cuisine style restaurant (similar in style, appearance or menu offerings to those actually offered Tenant as of the date of this Lease, including by way of example, J Alexanders, Del Frisco Grille, Stoney River, Firebirds, Clyde's, etc ) occupying an area in the Shopping Center greater than 3,500 square feet without the written consent of Tenant Landlord agrees that it shall limit the number of full service restaurants with a Gross Rentable Area of more than 3,500 square feet in the Shopping Center to four (4), including the Tenant.

### Cava Grill
Landlord shall not permit any other fast casual restaurant in the center to engage in the sale of Greek or Mediterranean cuisine as its primary use. Primary use is described as fifteen percent (15%) or more of items or fifteen percent (15%) or more of sales  This exclusive shall not pertain to restaurants over four thousand five hundred (4,500) square feet.

### Choolaah Indian BBQ
Tenant shall have the exclusive right to operate a restaurant serving primarily Indian food items or food items typical of the cuisine on the Indian subcontinent including India, Pakistan, Nepal Bangladesh, or Bhutan (the "Exclusive Use") at the Shopping Center and neither Landlord nor its affiliates or successors or assigns shall permit or suffer any other tenant in the Shopping Center to engage in a business which is primarily the Exclusive Use (15% or more of sales)

Landlord shall not lease space to a check cashing operation, or an adult entertainment establishment, an adult bookstore, or any other establishment engaged in the sale, distribution or exhibition of pornographic materials within the Shopping Center, without Tenant's prior written consent, which consent can be withheld in its sole discretion.

### Chuy's
Landlord, on behalf of Landlord and Landlord's successors and assigns, officers, directors, persons owning at least ten percent of its ownership interests, parents, affiliated and subsidiary entities and any partner or other party affiliated with Landlord (a "Landlord Party"), agrees that no Landlord Party shall use, suffer, permit or consent to the use or occupancy of any portion of the Center (except the Premises) as a Tex-Mex or Mexican Restaurant, or a restaurant with a Tex-Mex or Mexican theme, including without limitation, fast food restaurants ("Tenant's Exclusive Use"). A restaurant or bar will be considered to operate as a Tex-Mex or Mexican restaurant. or to have a Tex-Mex or Mexican theme, if that enterprise derives more than 25% of its gross sales from Mexican and Tex-Mex food items

Landlord agrees that no Landlord Party shall suffer, permit or consent to the use or occupancy of any portion of the area designated as the "Restricted Use Area" on Exhibit B-1 [as referenced below] by (a) any business selling food for either on-premises or off-premises consumption, including without limitation, any fast food, fast casual, or sit-down restaurants. or (b) a gym or fitness facility or learning facility (such as Kumon or Sylvan). The foregoing shall not prohibit the operation of a business primarily serving coffee, donuts and bagels (e.g. Krispy Kreme, Starbucks, Einstein Bros, Bagel), so long as. (x) the such business shall be less than 2,000 square feet (measured from the outside of each exterior wall and the centerline of each demising wall), and (y) only one such user shall be permitted within the Restricted Use Area

Buildings in the Center shall be used for only commercial purposes of the type normally found in a retail shopping center including, without limitation, financial institutions, service shops, and retail stores. Neither Landlord nor any Landlord Party shall permit any of the following uses within the Center without Tenant's prior written consent, which may be withheld in Tenant's sole discretion: cafeteria, theatre, bowling alley, billiard parlor, funeral parlor, night club, or other place of recreation or amusement (such as laser tag or paint ball facilities; miniature or putt-putt golf facilities; go-cart tracks; rock climbing facilities; party, dance, cheer, tumbling, or gymnastics facilities; or any other facility providing a place for patrons to engage in and/or receive instruction in any leisure, hobby, past-time, exercise, play, fun, pleasure, celebration, or sport event or activity), any business deriving more than seventy percent (70%) of its gross revenues from the sale of alcoholic beverages (provided the area designated as the "Eastern Side" on Exhibit B-2 [as referenced below] shall not be subject to the foregoing restriction on alcohol sales): flea market, industrial manufacturing facility, automobile dealership, skating rink, bar (except as incidental to the operation of a restaurant on the Premises), exercise facility (except the Eastern Side shall not be subject to the foregoing restriction on exercise facilities); massage parlor (but therapeutic massage is permitted), modeling studio, adult bookstore or other establishment primarily engaged in the business of selling, exhibiting or distributing pornographic or obscene materials or live models or dancers, an amusement arcade or facility providing coin-operated amusement devices, rides, pinball machines, mechanical or electronic games, and/or similar types of equipment or devices. car repair facility, betting parlor, central laundry or dry cleaning plant (other than a dry cleaning drop-off facility which does not use dry cleaning fluids or similar chemicals or substances on site in connection with the dry cleaning of clothes) or any business which creates unreasonably or unusually strong or offensive odors, fumes, emissions or sounds

### Deka Lash
Landlord will not do business, or lease to another business, whose primary business is providing eyelash extensions, microblading, or related services

165106 4



**DRNK Coffee & Tea/ QWENCH Juice Bar**

Landlord will not sell or permit any party, other than Tenant, to sell at the Center: the sale of: (a) whole or ground coffee beans, (b) espresso, espresso-based drinks or coffee-based drinks, (c) gourmet tea or gourmet tea-based drinks, (d) gourmet, brand-identified brewed coffee or (e) blended beverages that contain coffee, espresso as a Primary Use. And, (a) smoothies, (b) freshly squeezed raw vegetable and fruit juices, (c) acai bowls, (d) Greek yogurt bowls with fresh fruit and assorted toppings as a Primary Use. Primary Use shall be defined as ten (10%) of a Tenant's sales. All tenants may sell non-gourmet tea without restriction and iced tea from bottles, cans or soda fountain dispensers without restriction (collectively, "Tenant's Exclusive Items"). No other co-tenant shall be permitted to sell any frozen treat health focused freshly blended smoothies (collectively, "Tenant's Exclusive Items") and acai bowls, freshly squeezed raw vegetable and fruit juices, and Greek yogurt bowls with fresh fruit and assorted toppings.

**Fire Works Pizza**

Tenant shall have the exclusive right to sell pizza in the Shopping Center and no other restaurant shall sell more than fifteen percent (15%) of its food sales in pizza.

**Great Clips**

No other store of the shopping center shall be used for the purpose of operating a haircutting salon with a price point less than thirty dollars ($30.00) per cut including Barber Shops (including but not limited to Fantastic Sams, Hair Cuttery, Cost Cutters, Sports Clips etc) and Beauty or Cosmetology Schools. Notwithstanding the foregoing, Tenant acknowledges and agrees that Landlord shall be permitted to enter a lease with Salon Lofts Group, LLC, on terms acceptable to the Landlord in its sole discretion, for use of premises in the Shopping Center, even though Salon Lofts Group, LLC, may be operated for the purpose of a hair salon offering haircuts at a price point of less than Thirty Dollars ($30.00).

**Harris Teeter**

"Landlord's Adjacent Land" means any property (i) located within one-half mile from any boundary of the Shopping Center and (ii) now owned or later acquired or controlled by Landlord, any affiliate of Landlord, or any partner or principal of Landlord who is also a partner or principal in the ownership of the Shopping Center. Landlord grants to Tenant the exclusive right in the Shopping Center and on Landlord's Adjacent Land to:

(a) Operate any one or more of a food supermarket or department, grocery store or department or dairy store or department,

(b) Sell seafood, meat, cheese and other delicatessen items by weight or quantity (except that Landlord may allow a delicatessen restaurant to operate elsewhere in the Shopping Center or on Landlord's Adjacent Land if the only items the delicatessen restaurant sells for off-premises consumption are sandwiches and other menu items served to on-premises customers), provided further that a restaurant (such as, by way of example, Panera Bread) which sells both sandwiches and breakfast baked-good items such as muffins and bagels shall be permitted,

(c) Sell bakery items, except one (1) specialty bakery store (including a store selling cupcakes as a principal part of its business) shall be permitted as long as such store does not exceed 2,000 square feet;

(d) Sell flowers or operate as a florist or flower shop,

(e) Operate a pharmacy, which at Tenant's election may have a walk-up window, except that one nationally recognized chain pharmacy (such as CVS or Rite Aid) with no less than 10,000 square feet of Floor Area may be located within the Shopping Center so long as that pharmacy (i) is not located in the Required Adjacent Space, (ii) does not devote more than 2,500 square feet of Floor Area in the aggregate (including the adjacent aisle space) to the sale of Grocery Items, (iii) does not have any window or outdoor signage indicating that food or groceries are sold inside the pharmacy and (iv) does not open for business to the public earlier than a date that is one (1) year after the date Tenant opens for business in the Premises. "Grocery Items" means foods typically sold in grocery stores for off-premises consumption such as canned or packaged food items (whether prepared within the premises or elsewhere), produce, meats, cheeses, seafood, bakery products, beverages or dairy products,

(f) Sell food or beverages (including alcoholic beverages, beer and wine) for off-premises consumption; provided, however, Landlord may allow elsewhere in the Shopping Center or on Landlord's Adjacent Land the sale of food and beverage items that:

(i) Are intended for consumption in the Shopping Center or on Landlord's Adjacent Land,

(ii) Constitute only an incidental part (five percent or less of gross sales from the applicable space) of the seller's primary business,

(iii) Are prepared take-out items sold in the normal operation of a restaurant, delivery, or catering business (including pizza, Chinese or Mexican restaurants selling take-out food),

(iv) Landlord may lease space in the Shopping Center to a state operated "ABC" liquor store, provided that (i) not more than the lesser of ten percent (10%) of the floor area or ten percent (10%) of the retail display and sales area of such store is devoted to beer and wine and (ii) the sale of beer and wine account for not more than ten percent (10%) of such store's gross sales.

Landlord and Tenant shall not permit any of the following uses in the respective areas under their control (Premises for Tenant, and the Shopping Center and Landlord's Adjacent Land for Landlord): an onsite dry cleaning service whereby the dry-cleaning and any other cleaning processes are performed within the Shopping Center (pick-up and drop-off only facilities shall be permitted); adult entertainment; adult video or bookstore; nightclub; tavern; lounge; dance hall; massage parlor; funeral home or morgue; pool hall; game parlor; health spa or gym with 200' of Tenant's Building (provided further such restriction shall only apply to that portion of the Shopping Center located to the west of the Main Driveway); skating rink; bingo games; betting agency; bowling alley or other entertainment or recreational use within 200' of Tenant's Building (provided further that such restriction shall only apply to that portion of the Shopping Center located to the west of the Main Driveway); health or recreational facility; flea market; auto dealership; car rentals or sales; child care center; or hazardous or illegal uses.

Except as permitted under Section 8.2 or Section 8.3(c), Landlord shall not allow any of the following uses in the Shopping Center or on Landlord's Adjacent Land: (i) a restaurant or other establishment where the sale of "home replacement meals" constitutes a significant portion of the business of such establishment

165106.4



(it being acknowledged that Boston Market, Chicken Out, Dean & Deluca, Sheetz, or Wawa are examples of establishments where the sale of "home replacement meals" constitutes a significant portion of the user's business), (i) businesses where customers prepare their own means for off-premises consumption such as Dream Dinners, Super Suppers or similar operations; (iii) theater (motion-picture or acting), (iv) kiosk; (v) establishment selling alcoholic beverages for on-premises consumption other than restaurants permitted under clauses (c) and (d) below, (vi) sale of beer and wine, including stores such as Total Wine or similar operations, (vii) carnivals, fairs or shows that are not associated with marketing/promotion of the Shopping Center; or (viii) sales by merchants utilizing vehicles or booths.

The provisions of Section 8.3(b) to the contrary notwithstanding. Landlord may (i) allow restaurants in any free-standing buildings (other than within the No Restaurant Area, as hereinafter defined) and (ii) lease, in the remainder of the Shopping Center (excluding any free-standing buildings) up to 2,400 square feet of Floor Area per store to:

(a) an ice cream or yogurt store (similar to a Ben & Jerry's or a TCBY).

(b) a pizza restaurant or other restaurant that sells prepared food or precooked food for "take-out" that is not prohibited under Section 8 3(b) and that does not sell alcoholic beverages for any type (provided, however, if the restaurant or store is located more than 200 feet from the front entrance of the Building, then such restaurant or store may sell alcoholic beverages if the alcoholic beverage sales are ancillary to food sales and do not exceed 35 % of the total sales from that restaurant or store); and

(c) a restaurant other than as described in Section 8 3(c)(ii)(B) if such restaurants is located more than 200 feet from the front entrance of the Building and the restaurant's alcohol sales do not exceed the 35% limit stated in Section 8 3(c)(ii)(B) Anything contained herein to the contrary notwithstanding, no restaurant shall be permitted within the 6,770 square foot retail building closest to Tenant's Store depicted as the "No Restaurant Area" on the Site Plan [as referenced below], except that Landlord may permit the northernmost bay of such building, not to exceed 2,000 square feet of Floor Area, to be used as a coffee bar, bagel store or donut shop with limited food service, such as an Einstein Bagels or Caribou Coffee store, as such stores are operated as of the date hereof, but in no event shall any full service restaurant, fast-food restaurant or casual dining restaurant be permitted within such limited portion of the No Restaurant Area

### Insight Eye Optique
Landlord agrees not to enter into a lease with another tenant for space in the Shopping Center for the primary or incidental business of providing optical or eye wear products including eye examination and related accessories, except for tenants who incidentally sell such products or services not to exceed 20% of their gross sales and not to exceed 20% of their store display area (the "Exclusive Use Covenant"), or allow other tenants in the Shopping Center to offer the products or services referenced in the Exclusive Use Covenant except as provided in said Covenant.

### Metropolitan Nail Bar
The Premises shall be used solely for (1) retail operation of a high-end nail salon ("Primary Use"). Landlord shall not rent to another tenant in the Shopping Center having the same Primary Use as the tenant, primary use defined as thirty percent (30%) of a Tenant's sales.

### Pacific Dental Services
Tenant shall have the exclusive right to provide general dentistry and/or specialty dentistry (including, without limitation Orthodontics, Pediatric Dentistry, Oral Surgery, Periodontics, Endodontics, Cosmetic Dentistry) services and operations and related dental business uses within the Shopping Center (the "Exclusive Use") Accordingly, Landlord agrees that it shall not lease, sell or otherwise convey to, or otherwise permit (subject to the terms and conditions relating to a Rogue Tenant Breach) the operation of, any other tenant or occupant to operate for the Exclusive Use within the Shopping Center Tenant shall not have any other exclusives right to sell merchandise or dispense services of any type and character, it being understood that Landlord reserves the absolute right to lease other space in the Shopping Center to Tenants selling merchandise or dispensing services similar to that which is being sold or dispensed by Tenant unless it violates this section 7 01.

Aside from 'General Dentistry, the Exclusive Use shall not apply to any specialty dentistry tenants in the medical and office building, as labeled on the site plan in Exhibit A [as referenced below].

### Pet Depot
Landlord agrees not to lease, let use or permit to be used, any other property owned or controlled by it within the center now or at any time during the period of this lease or any extension, any entity who competes with PET DEPOT sales or services or a similar type of user. The Grocer Anchor is excluded from this agreement and currently does compete and will provide these same types of products, services and sales Grocery Anchor is the grocery store anchor tenant

### Pivot Physical Therapy of Metro DC
Landlord shall not lease space to a retail tenant or operate a business in the Building whose Primary Use is physical therapy Primary Use shall be defined as twenty-five percent (25%) of Tenant's sales. The Exclusive Use shall not apply to a massage group (including the following brands: Massage Envy La Vida Massage, Massage Green, etc.).

### Pure Barre
No part of such land shall be leased or used or another fitness concept that utilizes a ballet barre (collectively, "Tenant's Exclusive") Tenant's Exclusive shall not apply to any tenant within the Radius with a lease in existence prior to the Commencement Date provided that in the event that Landlord has contractual discretion to deny any request for a change in permitted use by a current tenant or their proposed sublessee or assignee which would otherwise violate Tenant's Exclusive, then Landlord agrees to exercise its discretion to deny such request.

### Radiant Waxing
Landlord shall not permit any tenants in the shopping center to offer hair removal services below the neck, unless such tenants are currently offering such services in accordance with their lease, nor may Landlord permit the sale of supporting products of the Tenant, by any other Tenant where such sales exceed twenty percent (20%) of such Tenant's retail offering.

165106.4



**Salon Lofts**

Tenant shall have the exclusive right in the Shopping Center and on any adjacent property owned by Landlord (or Landlord's affiliate) to operate a hair salon or a business that provides the following services as its primary source of business: hair cutting and styling (collectively "Tenant's Exclusive Services"). Accordingly, Landlord agrees not to lease or sell any space in the Shopping Center (other than the Premises) or any adjacent property owned by Landlord (or its affiliate) to or otherwise permit to be operated therein another hair salon or a business which provides any of the Tenant's Exclusive Services as its primary source of business. "Primary Source of Business" shall mean more than 250 square feet devoted thereto or more than 10% of revenue derived therefrom. This covenant and Tenant's exclusive rights set forth herein shall run with the land on which the Shopping Center is located and on any property contiguous or adjacent to the Shopping Center owned or leased by Landlord (or any affiliate of Landlord), or in which Landlord (or any affiliate of Landlord) has an interest, directly or indirectly, during the Term of this Lease.

Notwithstanding the foregoing, Section 6.2 shall not prohibit any tenant under a lease existing on the date of this Lease from using premises leased to it for any use permitted under such tenant's then existing lease for the term of such lease and any renewals thereof. Notwithstanding the foregoing, Tenant acknowledges and agrees that Landlord shall be permitted to enter a lease with Great Clips, on terms acceptable to the Landlord in its sole discretion, and Landlord shall be permitted to lease premises in the Shopping Center for use as a typical Great Clips store or other, similar "budget cut" type business charging less than $30 per haircut, even though such use of Shopping Center premises by Great Clips or such other similar business may conflict with Tenant's Exclusive Services.

Landlord will (a) not lease or permit the use of any storeroom located within thirty feet (30') of any boundary of the Premises for the operation of any business which emits offensive odors or which causes vibrations or noise discernible within the Premises and (b) maintain the Shopping Center so that is of retail character.

The Shopping Center will remain retail in character and, that no part of the Shopping Center shall be leased and tenanted for long-term use for any of the following: (i) exercise facility greater than 5,000 sq. ft. GLA or racquet club, gymnasium, bowling alley, skating rink, miniature golf or other sports or recreational facility; (ii) school, library, reading room, or house of worship; (iii) movie theatre, auditorium, meeting hall, hotel or motor inn, or any residential use or day-care facility; (iv) massage parlor, tattoo parlor, adult bookstore, adult entertainment facility, a so-called "head" shop, off-track betting, gambling, gaming or check cashing facility; (v) car wash, automobile repair work or automotive service or gas station, tire store, automobile body shop, automobile, motorcycle, boat, trailer or truck leasing, rental or sales, or laundromat; (vi) tavern or bar (unless operated incidental to, in conjunction with, and under the same name as, a restaurant permitted hereunder); amusement park, carnival, banquet facility, dance hall, disco, nightclub, video game, virtual reality or laser tag room or facility, pool hall, arcade, indoor children's recreational facility or other amusement or entertainment facility; (vii) any manufacturing, warehouse or office use (except incidental to a retail operation); (viii) funeral parlor, animal raising or storage (except incidental to a full-line retail pet supply operation), pawn shop, flea market or swap meet, junk yard; (ix) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; (x) any facility related to the occult sciences, such as palm readers, astrologers, fortune tellers, tea leaf readers or prophets, frozen food locker or sales facility, milk distribution center, nursing home, old age center, or governmental facility (other than a post office), recruiting center or employment center; or (xi) any use which constitutes a public or private nuisance or produces objectionable noise or vibration.

**Shred415**

Excluding existing tenants, Landlord shall not lease, rent, occupy, or permit to be occupied or used, any space in the Shopping Center to any fitness studio that operates boot camp style training as its primary business.

**The Event Center**

Exclusive use of renting space for conduction of events.

**Urbano Modern Italian**

Landlord will not lease any space in the Shopping Center which may be used for the sale of fast casual Italian food, except for tenants who are leasing space as of the Date of Lease Execution. Landlord shall not lease additional space to any primary coffee use. This excludes the existing tenant spaces; by reference are currently doing business as Starbucks and DRNK [Coffee & Tea / QWENCH Juice Bar].

**Wells Fargo**

During the Lease Term, except only for Tenant and its parent, subsidiary, and affiliate entities, Landlord shall not, and covenants that it will not, lease to license, permit, or otherwise allow any Financial Services Entity [defined herein] to lease, sublease, occupy, license, be located in, conduct, or do business in or from any part or portion of the Center or to erect, construct, or place any signage in, on, or about the Center that identifies, advertises, or otherwise promotes the existence, presence, opening, operation, or availability of any such Financial Services Entity or of its services. Tenant shall at all times during the Lease Term be the sole and exclusive Financial Services Entity located in and operating from the Center.

"Financial Services Entity" means any person or entity that is or operates as a state or national bank; savings bank, credit union; savings and loan institution finance company; industrial bank; mortgage company; securities broker or dealer; trust company; insurance company, agency, or brokerage; and any other business in the financial services industry (as most broadly defined) including the operation of automated teller machines, night depositories, merchant exchange machines, or any similar equipment.

Notwithstanding anything set forth in this Section 8.2 to the contrary, Harris Teeter may install interior ATMs only within its premises (i.e., the ATM cannot be accessible from the exterior of Harris Teeter's premises).

Landlord covenants that it will operate and maintain the Center in a first-class condition and will not allow any use within the Center that (i) causes or creates a nuisance, (ii) is obnoxious, or (iii) generally detracts from the general first-class retail nature of the Center including, but not limited to, the following: funeral establishment; automobile, boat or other motor vehicle sale, leasing, repair or display establishment or used car lot, including body repair facilities and/or service stations; auction or bankruptcy sale; pawn shop; outdoor circus, carnival or amusement park, or other recreation or entertainment facility; outdoor meetings; bowling alley; shooting gallery; off-track betting (provided that state sponsored lottery tickets shall not be prohibited); any bookstore, theater, amusement facility and/or facility selling or displaying books, magazines, literature, or videotapes containing Adult Material ("Adult Material" is defined as any printed and/or pictorial work that appeals to a prurient interest in sex, is patently offensive according to contemporary community standards, and has no serious

165106.4



literary artistic, political, or scientific value, and any printed and/or pictorial work rated X, XX, XXX (or of a rating assigned to works containing material more sexually explicit than XXX), and, notwithstanding anything to the contrary contained in this Lease, no material shall be considered Adult Material if: (1) it is available, or of the type to be available to the community, through a broadcast network (i e., NBC, ABC or CBS); or (2) it is such a material that is, or has been in a cinema or theater for public viewing in the community where the Premises is located; provided, however, that any material rated X, XX, XXX, or rated for more sexually explicit content than XXX, shall be considered Adult Material and restricted regardless of its availability to the general public); auditorium, meeting hall, ballroom, school or other place of public assembly, unemployment agency, service or commission, gymnasium, health club, dance hall, cocktail lounge, bar, disco, after-hours club, or night club, bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business, video game or amusement arcade, except as an incidental part of another primary business; skating or roller rink, car wash, car repair or car rental agency, second hand store, auction house, or flea market, dry cleaning plant, storage facility (except as incidental to and in support of retail use), truck rental, outdoor amusement facility, wholesale and/or distribution operation, sporting event or other sports facility, or massage parlor.

### Zoup!

Landlord shall not lease, rent, occupy or permit to be occupied or used, any space in the Shopping Center (including any expansion thereof) for the operation of a restaurant serving soup, etoufee, gumbo, chili, jambalaya, stew, or soup as a Primary Use  "Primary Use" is defined as generating more than 20% sales from the sale of the foregoing item or items

### Referenced Exhibits

**Chuys's Exhibit B-1 & B-2**



Page 1 of 2

165106.4





165106.4



**Harris Teeter Site Plan**



165106.4

**Pacific Dental Services Exhibit A**



165106.4



## GUARANTY

THIS GUARANTY ("Guaranty") to Landlord, made by the undersigned guarantor(s) (each individually a "Guarantor," and collectively the "Guarantors"), under the following circumstances

**PARTIES:**

Landlord: Cascades Station LLC
a Delaware limited liability company

Tenant:     Epicerie Cigar Retail Shop LLC,
a Virginia limited liability company

d/b/a:     Epicerie Cigar Retail Shop

**PREMISES:**

Shopping Center: Cascades Overlook

Shopping Center Address: 21399 Epicerie Plaza  Sterling VA 20164

Unit Number: B135 Square Feet: approximately 1,680

Landlord is about to enter into a lease agreement ("Lease"), contemporaneously executed with this Guaranty, to Tenant for the Premises and in order to induce Landlord to enter into the Lease with Tenant, Landlord requires that the performance of Tenant's (and its successors' and assigns') obligations be guaranteed as provided below.

Guarantors are willing to guarantee the performance of the obligations of Tenant (and its successors and assigns) For purpose of this Guaranty, any reference to Tenant herein, shall include Tenant's successors and assigns

NOW, THEREFORE, in consideration of the lease of the Premises to Tenant and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantors agree as follows

b.     **Guaranty.** The Guarantors jointly and severally guarantee: (a) that Tenant will pay when due all of the rentals and all other sums payable by Tenant as specified in the Lease during the life of the Lease; and (b) that Tenant will perform and comply with all the agreements and obligations provided for in the Lease at the time and in the manner set forth in the Lease during the life of the Lease.

c.     **Subsequent Dealings with Tenant or Guarantors.** Any extension of time for payments due or renewals granted by Landlord, or any extensions of time for the performance of any agreements or any other indulgence that may be granted to Tenant by Landlord shall not release the Guarantors from liability on this Guaranty  All settlements, compromises, and agreed balances made in good faith between Landlord and Tenant shall be binding on the Guarantors.  The Guarantors authorize Landlord at any time to enter into agreements with Tenant to modify or amend any of the terms of the Lease; to release Tenant from liability for all or any part of its obligations under the Lease; to release, substitute, or add any one or more Guarantors; to enter into agreements with any other Guarantor modifying or amending that Guarantors' obligations under this Guaranty  and to assign this Guaranty in whole or in part. Landlord may take any of these actions upon any terms and conditions as Landlord may elect, without giving notice to any Guarantor or obtaining the consent of any Guarantor, and without affecting the liability of any Guarantor to Landlord

d     **Independent Obligations.** This is an absolute, unconditional, and continuing guarantee  The Guarantors' obligations under this Guaranty are independent of those of Tenant.  Landlord may bring a separate action against any one or more Guarantors without first proceeding against Tenant or any other person and without pursuing any other remedy

e     **Waivers.** Notice of acceptance of this Guaranty by Landlord is waived.  The Guarantors further waive:  (a) any defense based on any legal disability of Tenant or any discharge or limitation of the liability of Tenant to Landlord, whether consensual or arising by operation of law or any bankruptcy, insolvency, or debtor-relief proceeding, or from any other cause, except payment and performance in fact; (b) presentment, demand, protest, and notice of any kind, and (c) all rights of subrogation, all rights to enforce any remedy that Landlord may have against Tenant, and all rights to participate in any security held by Landlord for the performance of Tenant's obligations, until such obligations have been paid and performed in full.

f.     **No Separate Notices.** Any notice given to Tenant shall be effective as though also given to the Guarantors  The Guarantors agree that Landlord will have no duty to report to any Guarantor any information about Tenant's financial condition or its ability to perform  Notwithstanding the above, at Landlord's sole option, Landlord may provide the Guarantors with any notice to the below listed address

g.     **Default & Remedies.** Upon a default by Tenant, Landlord may exercise any remedy in the Lease  Landlord shall have no duty to mitigate, except to the extent, if any, that Landlord has an express duty to mitigate pursuant to the terms of the Lease. No such action by Landlord will release or limit the liability of any Guarantor to Landlord, even if the effect of that action is to deprive the Guarantors of the right to collect reimbursement from Tenant for any sums paid to Landlord. Landlord may declare the Guarantors in default under this Guaranty if any one or more Guarantors fail to perform any of its obligations under this Guaranty or becomes the subject of any bankruptcy, insolvency arrangement, reorganization, or other debtor-relief proceeding under any Governing Law (as such term is defined in the Lease), whether now existing or subsequently enacted.

h.     **Miscellaneous Provisions.** The Guarantors agree to pay Landlord's reasonable out-of-pocket costs and expenses, including, but not limited to, legal fees and disbursements, incurred in any effort to collect or enforce this Guaranty, whether or not any lawsuit is filed  No delay or failure by Landlord to exercise any right or remedy against Tenant or any Guarantor will be construed as a waiver of that right or remedy  The invalidity or unenforceability of any one or more provisions of this Guaranty will not affect any other provision. This Guaranty may be amended only by a written instrument executed by the affected Guarantor and Landlord. The obligations of each Guarantor under this Guaranty will bind the heirs, legal representatives, successors, and assigns of each Guarantor and shall inure to the benefit of Landlord, its successors and assigns. Each

165106.4



Guarantor represents and warrants to Landlord that the individual(s) signing this Guaranty, or the individual(s) signing on behalf of the Guarantor entity to this Guaranty, as applicable, has/have full authority to execute this Guaranty and bind Guarantor.

(SIGNATURE PAGES TO FOLLOW)

165106.4

DocuSign Envelope ID: 93012FF0-F3C5-45D2-9FD4    40EB0983DD

GUARANTOR #1:

Hafdalla Alahdal,
an individual

By: _____
      Hafdalla Alahdal

Print Name: _____

Date: 10/18/2022


Guarantor #1 Notice Address:

430 Conner Grant RD
New Bern, NC 28560

Email Address: khlimited_service@outlook.com
Phone: 247-608-2241

Page 31 of 31

165106.4

# EXHIBIT B



# EXHIBIT C

 **PHILLIPS EDISON & COMPANY**

October 21, 2024

**SENT VIA UPS OVERNIGHT MAIL**
Epicerie Cigar Retail Shop LLC
Hafdalla Alahdal
430 Conner Grant Rd
New Bern, NC 28560

**RE: NOTICE OF TENANT DEFAULT**
Lease Agreement dated October 25, 2022 ("Lease") by and between Cascades Station LLC, a Delaware limited liability company ("Landlord"), and Epicerie Cigar Retail Shop LLC d/b/a Epicerie Cigar Retail Shop("Tenant") for the premises known as Unit B135 for 1,680 sq. ft. ("Premises") at the Cascades Overlook shopping center ("Shopping Center") in Sterling, Virginia

Dear Tenant,

This letter serves as Landlord's notice of Tenant's default under the Lease as Tenant is in violation of the Permitted Use ("Notice"). Pursuant to the Lease, the Permitted Use of the Premises is limited to, "the operation of a high-end retail cigar shop selling cigars and tobacco, and related cigar and tobacco accessories, all in compliance with Governing Law, **and for no other use.**" In addition, Tenant shall not:

> (i) operate as a business or facility used in growing, delivery, transferring, supplying, dispensing, distributing or selling marijuana or hemp, whether by prescription, medical recommendation, or otherwise; (ii) sell any products classified as kratom, kava, or Delta-8, or any products in any way derived from or containing marijuana; (iii) sell any illegal or illicit drugs or drug paraphernalia; (iv) sell any glassware, such as but not limited to, bongs, bowls, pipes, or any other glassware that may be used in the consumption of marijuana, hemp or tobacco; (v) operate as a headshop; (vi) grow, process, or manufacture hemp or marijuana; (vii) sell any marijuana or marijuana-related products and paraphernalia, whether or not such products are deemed legal and/or approved by the FDA or DEA; (vii) operate for any unlawful purpose or in any way which would constitute a nuisance to tenants or occupants of the Shopping Center.

11501 NORTHLAKE DRIVE  |  CINCINNATI OH 45249
T 513 554 1110   F 513 554 1820   PHILLIPSEDISON.COM

CINCINNATI   PARK CITY   ATLANTA

 **PHILLIPS EDISON & COMPANY** ·

Tenant's present use of the Premises is in violation of the Permitted Use provision of the Lease. Pursuant to Section 25, Tenant shall cure such defaults within ten (10) days after receipt of this Notice. Failure to cure the above defaults will result in termination of the Lease. Landlord reserves any and all rights and remedies available to it under the Lease, at law, and in equity.

Sincerely,

Phillips Edison & Company, Ltd.
As Management Agent for Cascades Station LLC

# EXHIBIT D



**DashComm**

← Ał Businesses › Epicerie Cigar Retail Shop

# Epicerie Cigar Retail Shop

Details  Users  Compliance  Insurance

- Invoices
- Documents
- Requests
- Sales
- Communications
- Business
- Directory
- FAQs
- Administration

**Signage**

Status                                                    Pending

UPLOAD DOCUMENT(S)

Notes 2                                                   ADD NOTE ⊕

Why are we still in violation? We took everything from the Shelves on October 11, 2024 after we got a phone call from you guys. Our sales has even declined since we took the products you ask    11/11/24  01:04 PM
us to remove from the store. uploaded the product pictures taken on October 11, 2024 . Thank you  Please give us a call 252-276-5858. Ms Kim Chrisman
Karima Elouaridi

                                                         Karima Elouaridi          11/11/24  12:58 noon
Status changed to Pending

**Plans**

# EXHIBIT E

Ms Kim Chrisman

**From:** Amanda Riggs <ariggs@phillipsedison.com>
**Sent:** Monday, November 11, 2024 10:59 AM
**To:** khlimited_service@outlook.com <khlimited_service@outlook.com>
**Subject:** Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA

Hafdalla,

My name is Amanda Riggs. I am in the legal department at Phillips Edison, the Landlord of Cascades Station in Sterling, VA.

On October 21, 2024, Tenant was delivered a Notice of Default for violating Tenant's Permitted Use provision. Pursuant to the Lease, Tenant's Permitted Use of the Premises is strictly limited to, "the operation of a high-end retail cigar shop selling cigars and tobacco, and related cigar and tobacco accessories, all in compliance with Governing Law, and for no other use."

Despite being notified of such default, Tenant's present use of the Premises continues to be in violation of the Permitted Use provision of the Lease. Tenant was to cure said default within 10-day of receipt.

Under such continued default, Landlord is hereby exercising its right to terminate the Lease. As part of such termination, Tenant will pay to Landlord a termination fee of $39,000.00. This $39,000.00 represents 6 months of base rent ($39,128.60) rounded down to an even dollar amount.

Tenant has 14-days to sign the Lease Termination Agreement and remit payment and vacate the Premises accordingly. Otherwise, Landlord is prepared to purse legal action.

Thanks,

Amanda

**Amanda Riggs**
Tenant Default Manager
D +15133382763
ariggs@phillipsedison.com | www.phillipsedison.com

 PHILLIPS EDISON & COMPANY

DISCLAIMER: Statements contained in this message may not be relied upon, and will not constitute an agreement of any form nor an official representation of the sender or Phillips Edison & Company or its affiliates, unless and until memorialized in writing and signed by the appropriate parties. This message and any attachment(s) hereto are for the sole use of the intended recipient(s). This message may contain information that is privileged or otherwise protected from disclosure. Any review, dissemination, use, or copying of this message or its contents by persons other than the intended recipient(s) is strictly prohibited. If you have received this message in error, please reply to the sender and delete the message from your system



EXHIBIT F

 Outlook

**RE: Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA**

From Amanda Riggs <ariggs@phillipsedison.com>

Date Fri 11/15/2024 3:37 PM

To    karima elouahidy <khlimited_service@outlook.com>

Unfortunately, no. Senior Management has made their decision and instructed me to move forward with lease termination. Landlord requests that you vacate the premises.

Thanks,
Amanda

**Amanda Riggs**
Tenant Default Manager
D +15133382763
ariggs@phillipsedison.com | www.phillipsedison.com

 **PHILLIPS EDISON & COMPANY**

DISCLAIMER: Statements contained in this message may not be relied upon, and will not constitute an agreement of any form, nor an official representation of the sender or Phillips Edison & Company or its affiliates, unless and until memorialized in writing and signed by the appropriate parties. This message and any attachment(s) hereto are for the sole use of the intended recipient(s). This message may contain information that is privileged or otherwise protected from disclosure. Any review, dissemination, use, or copying of this message or its contents by persons other than the intended recipient(s) is strictly prohibited. If you have received this message in error, please reply to the sender and delete the message from your system.



**From:** karima elouahidy <khlimited_service@outlook.com>
**Sent:** Thursday, November 14, 2024 3:18 PM
**To:** Amanda Riggs <ariggs@phillipsedison.com>
**Subject:** Re: Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA

Thank you for getting back to me. Is there anything we can do to keep the lease? like if we fill the store with good products to replace the missing items make it high-end Cigar shop appearance. is there anyway we can negotiate and us keeping the lease? Please let us know.

Thank you,
Ms Kim

**From:** Amanda Riggs <ariggs@phillipsedison.com>
**Sent:** Thursday, November 14, 2024 2:59 PM
**To:** karima elouahidy <khlimited_service@outlook.com>
**Subject:** RE: Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA

Good afternoon, Ms. Chrisman,

 Outlook

**RE: Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA**

From Amanda Riggs <ariggs@phillipsedison.com>
Date Thu 11/14/2024 3:00 PM
To      karima elouahidy <khlimited_service@outlook.com>

📎 1 attachment (90 KB)
October 11, 2024 pics - Epicerie.pdf;

Good afternoon, Ms. Chrisman,

My apologies for the delay in getting back to you as I have been out of the office.

With regards to the termination, the Lease was executed with the notation and understanding that Tenant would operate as a "**high-end retail cigar shop**".

I understand you may have removed the non-permitted items; however, the space does not give off the appearance of a high-end retail cigar shop. This has led to a series of complaints. Therefore, Landlord is exercising its right to terminate.

Thanks,
Amanda

Amanda Riggs
Tenant Default Manager
D +15133382763
ariggs@phillipsedison.com | www.phillipsedison.com

 **PHILLIPS EDISON & COMPANY**

DISCLAIMER: Statements contained in this message may not be relied upon, and will not constitute an agreement of any form, nor an official representation of the sender or Phillips Edison & Company or its affiliates, unless and until memorialized in writing and signed by the appropriate parties. This message and any attachment(s) hereto are for the sole use of the intended recipient(s). This message may contain information that is privileged or otherwise protected from disclosure. Any review, dissemination, use, or copying of this message or its contents by persons other than the intended recipient(s) is strictly prohibited. If you have received this message in error, please reply to the sender and delete the message from your system

🔗 📷 🐦 📘

From: karima elouahidy <khlimited_service@outlook.com>
Sent: Thursday, November 14, 2024 2:20 PM
To: Amanda Riggs <ariggs@phillipsedison.com>
Subject: Re: Notice of Lease Termination: Epicerie Cigar Retail Shop LLC at Cascades Station | Sterling, VA

Good afternoon Amanda,
I left you few voicemail messages, Hafdalla Alahdal wanted to know why our lease is terminated early. We complied with the landlord's request to take kratom products and other products we were not supposed to sell. We took everything off the shelves on October 11, 2024. I sent you the pictures in my

# EXHIBIT G



*EXHIBIT 2*

5/13/26, 3:21 PM                                                    VIRGINIA - SCC

State Corporation Commission
Clerk's Information System

A-    [ A ]    A+

## Entity Information

### Entity Information

| | | | |
|---|---|---|---|
| Entity Name: | BeMobile, Inc. | Entity ID: | 11702455 |
| Entity Type: | Stock Corporation | Entity Status: | **Active** |
| Series LLC: | N/A | Reason for Status: | Active and In Good Standing |
| Formation Date: | 06/22/2000 | Status Date: | 05/28/2024 |
| VA Qualification Date: | 05/28/2024 | Period of Duration: | Perpetual |
| Industry Code: | 0 - General | Annual Report Due Date: | 05/31/2026 |
| Jurisdiction: | ND | Charter Fee: | $200.00 |
| Registration Fee Due Date: | 05/31/2026 | | |

### Registered Agent Information

| | | | |
|---|---|---|---|
| RA Type: | Entity | Locality: | HENRICO COUNTY |
| RA Qualification: | BUSINESS ENTITY THAT IS AUTHORIZED TO | | |

Privacy Policy          Contact Us

5/13/26, 3:21 PM                                                    VIRGINIA - SCC

TRANSACT BUSINESS
IN VIRGINIA

Name: C T CORPORATION            Registered Office  4701 Cox Rd Ste 285,
SYSTEM                                    Address:  Glen Allen, VA, 23060 -
                                                    6808, USA

## Principal Office Address

Address: 2100 S Columbia RD
Ste 214, Grand Forks,
ND, 58201, USA

## Principal Information

| Title | Director | Name | Address | Last Updated |
|-------|----------|------|---------|--------------|
| President, Secretary, Treasurer | Yes | Brady J. Hansen | 2100 S Columbia RD Ste 214, Grand Forks, ND, 58201, USA | 05/28/2024 |
| Vice President | No | Jake Miller | 2100 S Columbia RD Ste 214, Grand Forks, ND, 58201, USA | 05/28/2024 |
| | Yes | James R. Hansen | 2100 S Columbia RD Ste 214, Grand Forks, ND, 58201, USA | 05/28/2024 |

## Current Shares

Total Shares: 100000

Privacy Policy          Contact Us

https://cis.scc.virginia.gov/EntitySearch/BusinessInformation                                    2/3

VIRGINIA - SCC

Filing History        RA History        Name History        Previous Registrations

Garnishment Designees        Image Request

Back        Return to Search        Return to Results

Back to Login

*EXHIBIT 3*

# COMMONWEALTH OF VIRGINIA



## LOUDOUN CIRCUIT COURT
Civil Division
18 E MARKET ST/PO BOX 550
LEESBURG  VA  20178-0550
(703) 777-0270

Virginia:                                                    Proof of Service

In the LOUDOUN CIRCUIT COURT

Case number: 107CL26002555-00
Service number: 002
Service filed: April 10, 2026

Served by: HENRICO COUNTY
Style of case: EPICERIE CIGAR RETAIL SHOP LLC vs CASCADES STATION LLC
Service on: BEMOBILE INC
    REGISTERED AGENT
    CT CORPORATION SYSTEM
    4701 COX RD., SUITE 285
    GLEN ALLEN VA 23060

Judge:
Attorney: MUGHAL, FAISAL SHAWN
703-352-1300
11350 RANDOM HILLS RD STE 700
FAIRFAX VA 22030

4027174

Instructions:

Returns shall be made hereon, showing service of Summons issued Friday, April 10, 2026 with a copy of the Complaint filed Friday, April 10, 2026 attached.

Hearing date  :

Service issued: Friday, April 10, 2026

## For Sheriff Use Only

NAME: BEMOBILE INC

4701 COX RD APT 285, GLEN ALLEN , VA. 23060

☐ PERSONAL SERVICE

☐ Being unable to make personal service, a copy was delivered in the following manner
☐ Delivered to person found in charge of usual place of business or employment during normal business hours and giving information to its purport

☐ Delivered to family member (not temporary sojourner or guest) age 16 or older at usual place of abode of party named above giving information of its purport. List name, age of recipient and relation of recipient to party named above

☐ Posted on front door or such other door as appears to be the main entrance of usual place of abode, address listed above. (Other authorized recipient not found.)
☐ Copy mailed to judgement debtor on date below after serving the garnishee unless a different date is shown below
☐ No envelope provided

☐ Evicted          ☐ Not Evicted
☒ Served on registered agent  LAUREN EVERETT
☐ Not Found

☐ No Levy Required
☐ Not in this jurisdiction
☐ NO EFFECTS FOUND

| | DEPUTY SHERIFF |
| --- | --- |
| | W Cone |
| 04/20/2026 Date | Cone, W. - Badge #7522 FOR: Sheriff Alisa A. Gregory Henrico County, Virginia |

Paper Number: 4027174
Court Case Number: 107CL26002555-00
Notes: SEE ATTACHED SERVICE AUTHORIZATION LETTER THAT IS ATTACHED.

# Service Authorization
## CT Corporation System

CT Corporation System ("CT") is registered agent for service of process for numerous corporations and similar entities. CT receives the process only in its capacity as a commercial registered agent. The individuals designated below are employees of CT Corporation System and in receiving the process, do so only on CT's behalf and in CTs capacity as registered agent.

**PLEASE NOTE:** The Code of Virginia §§ 13.1-634 provides in part:
"Registered office and registered agent.
A....
B. The sole duty of the registered agent is to forward to the corporation at its last known address any process, notice or demand that is served on the registered agent."

*As such, neither CT Corporation System., nor its individual employees designated below, have the duty or the ability to respond to any legal process, notice or demand that is served on CT's clients.*

The following natural persons are designated in the office of the registered agent upon whom any process, notice or demand may be served:

Lauren Everett        Nikolas Williams        Rockayla Marable        Jessica Fitzgerald

This authorization does not certify the receipt or acceptance of any specific process

Lauren Everett
Fulfillment Associate
CT Corporation System

State of Virginia
County of Henrico

This day personally appeared before me, Lauren Everett, who name is signed above and who, being first duly sworn, upon her oath, state that the foregoing Affidavit is true to the best of her knowledge and belief.

Subscribed and sworn before me this 26 day of March, 2026.

Notary Public

ARMAN AHMED
NOTARY
PUBLIC
REG # 00380217
MY COMMISSION
EXPIRES
05/31/2029
COMMONWEALTH OF VIRGINIA

# *EXHIBIT 4*

**AFFIDAVIT – DEFAULT JUDGMENT**
**SERVICEMEMBERS CIVIL RELIEF ACT**
Commonwealth of Virginia     VA. CODE § 8.01-15.2

Case No. ....CL26-2555....

........................................................................
RETURN DATE AND TIME

[X] Circuit Court     [ ] General District Court
[ ] Juvenile and Domestic Relations District Court

_____Loudon County_____
CITY OR COUNTY

EPICERIE CIGAR RETAIL SHOP, LLC                 v./In re:                    BEMOBILE, INC.

I, __Faisal Shawn Megha'__, the undersigned, state the following:
PRINT NAME

[X] The defendant/respondent     [ ] is in military service.     [X] is not in military service.
[ ] The affiant is unable to determine whether or not the defendant/respondent is in military service.

The following facts support the statement above:

The Defendant is a corporation.

Pursuant to 50 U.S.C. § 3931, if the court is unable to determine whether the defendant/respondent is in military service based upon the affiant's statement, the court, before entering judgment, may require the plaintiff/petitioner to file a bond in an amount approved by the court.

Pursuant to Va. Code § 8.01-4.3, I declare, under penalty of perjury, that the above information is true and correct.

__5/15/2026__
DATE

_____
SIGNATURE

**NOTICE REGARDING APPOINTMENT OF COUNSEL TO REPRESENT ABSENT SERVICEMEMBER:**
Where appointment of counsel is required pursuant to 50 U.S.C. § 3931 or § 3932 or another section of the Servicemembers Civil Relief Act, the court may assess reasonable attorney fees and costs against any party as the court deems appropriate, including a party aggrieved by a violation of the Act, and shall direct in its order which of the parties to the case shall pay such fees and costs, except the Commonwealth unless it is the party that obtains the judgment. Further, counsel appointed pursuant to the Servicemembers Civil Relief Act shall not be selected by the plaintiff or have any affiliation with the plaintiff.

FOR COURT USE ONLY:

[ ] **ORDER OF APPOINTMENT OF COUNSEL**
I find that appointment of counsel is required pursuant to 50 U.S.C. § 3931 or § 3932 or another section of the Servicemembers Civil Relief Act and therefore, I appoint the lawyer indicated below to represent the absent servicemember named as defendant/respondent above.

[ ] The lawyer shall be paid a fee of $ ......................... for serving as counsel for the absent servicemember.

NAME,
ADDRESS OF
COURT
APPOINTED
LAWYER

_____
NEXT HEARING DATE AND TIME

_____
DATE

_____
JUDGE

[ ] **STAY OF PROCEEDINGS**
I find that a stay of proceedings is required pursuant to 50 U.S.C. § 3931 and, therefore, such a stay, for a minimum period of 90 days, is ordered until ......................................................
NEXT HEARING DATE AND TIME

_____
DATE

_____
JUDGE

FORM DC-418 REVISED 07/25

**V I R G I N I A :**

## IN THE CIRCUIT COURT OF LOUDOUN COUNTY

---

**EPICERIE CIGAR RETAIL SHOP LLC.:**

    Plaintiff,

    v.                       Case No.: CL26-2555

**CASCADES STATION LLC**

    And

**BEMOBILE, INC.**

    Defendants.

---

## ORDER

THIS MATTER came to be heard on the Fourth day of June 2026, on Plaintiff Epicerie Cigar Retail Shop, LLC's Motion for Default Judgement against Defendant BeMobile, Inc.

IT APPEARING to the Court that Plaintiff Epicerie Cigar Retail Shop, LLC's Motion for Default Judgement is well-taken and should be granted; it is hereby

ORDERED that Plaintiff Epicerie Cigar Retail Shop, LLC's Motion for Default Judgement is GRANTED against BeMobile Inc.; and it is further

ORDERED that the judgement shall be as follows:

a.      Compensatory damages in the amount of $2,504,000.00;

b.      Additional treble damages in the amount of $5,008,000.00 pursuant to Virginia Code § 18.2-500;

c.      Attorney's Fees in the amount of $7,424.00;

d.      Punitive damages in the amount of $350,000

1

e.      Pre-judgment and post-judgment interest at six percent from April 10, 2026 until

paid, and

f.      Court costs in the amount of $384.00;


ENTERED THIS _____ DAY OF June 2026.


_____

Honorable Judge
Loudon County Circuit Court

2

I ASK FOR THIS:

MAHDAVI, BACON, HALFHILL & YOUNG, PLLC

_____

Faisal Shawn Mughal VSB# 84251
11350 Random Hills Road, Suite 700
Fairfax, VA 22030
(703) 352-1300 Telephone
(703) 352-1301 Facsimile
fsm@mbhylaw.com
*Counsel for Plaintiff*

SEEN AND _____

_____

BeMobile, Inc.
C T Corporation System
4701 Cox Rd. Suite 285.
Glen Allen, VA 23060

SEEN AND _____

_____

Cascades Station, LLC
C T Corporation System
4701 Cox Rd. Suite 285.
Glen Allen, VA 23060

3